MARILYN E. BEDNARSKI, SBN 105322
E-Mail: mbednarski@mbllegal.com
McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

ABBE DAVID LOWELL, *pro hac vice*
DAVID A. KOLANSKY, *pro hac vice*
E-Mail: alowellpublicoutreach@lowellandassociates.com
Lowell & Associates, PLLC
1250 H Street, NW, Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116

Attorneys for Defendant
DAVID HUERTA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>DAVID HUERTA,<br><br>*Defendant.* | CASE NO.: 2:25-CR-00841-SB<br><br>**DEFENDANT'S MOTION TO DISMISS FOR CONSTITUTIONAL VIOLATIONS**<br><br>Date: February 3, 2026 (PTC)<br>(Hearing Length Estimate: 1 hour)<br>Time: 8:00 a.m.<br>Ctrm: 6C (1st Street U.S. Courthouse) |

**NOTICE OF MOTION**

Defendant David Huerta, by and through undersigned counsel, brings this Motion to Dismiss for Constitutional Violations, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A), and respectfully requests this Court for an order dismissing the Information against him, as he was charged under a sentence of Title 18 U.S.C. § 1501 that is overbroad on its face, in violation of the First Amendment, unconstitutionally vague, in violation of the First and Fifth Amendments, and should be dismissed under this court's supervisory powers, for violations of Mr. Huerta's First and Fourth Amendment rights during his arrest.

On December 17, 2025, counsel for Mr. Huerta and the government conferred by telephone regarding the government's position on our request that they specify what conduct on June 6, 2025, constituted his "knowingly and willfully, obstruct[ing], resist[ing], and oppos[ing] an officer of the United States" in serving and executing a search warrant alleged in the Information, in violation of Section 1501.[1]  ECF 29.  Government counsel indicated on the phone and in follow-up correspondence dated December 19, 2025 that the government's theory of criminal liability is based on what they described as "Mr. Huerta's course of conduct" on June 6, from his arrival outside the search warrant location to begin protesting, at approximately 11:49 a.m. to approximately 12:15 p.m., when Mr. Huerta was thrown to the ground and detained by federal agents.

On January 5, 2026, defense counsel conferred by video with and advised the government of its intention to file this motion to dismiss the Information for

---

[1] Counsel for Mr. Huerta first requested that the government identify the specific conduct that constituted "obstruct, resist, and oppose an officer" alleged in the Information in a letter to government counsel, dated November 5, 2025.  Defense counsel's letter went unanswered until December 19, 2025.

1

constitutional violations, and government counsel indicated that it would oppose the motion.

Dated: January 6, 2026                    Respectfully submitted,

LOWELL & ASSOCIATES, PLLC

By:   */s/ Abbe David Lowell*
          Abbe David Lowell

MCLANE, BEDNARSKI & LITT, LLP
By:   */s/ Marilyn E. Bednarski*
          Marilyn E. Bednarski

*Attorneys for Defendant David Huerta*

2

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND......................................................................................... 2

I.      Federal Agents Serve and Execute Search Warrant and Conduct Immigration Raid—and Surveille Peaceful Protesters. ....................................................... 2

II.     Mr. Huerta Joins Peaceful Protest Outside Ambiance Apparel. ..................... 4

III.    Agent Ribner and Officer Crook Retaliate Against Mr. Huerta with Brutal Takedown and Arrest. ..................................................................................... 7

IV.     The Charge Filed Against Mr. Huerta, Downgraded to A Misdemeanor..... 11

ARGUMENT ............................................................................................................. 12

I.      Protest, Criticisms, and Challenges of Law Enforcement Actions are Protected Speech Under the First Amendment. ............................................. 13

II.     The First Sentence of Section 1501 is Facially Overbroad, in Violation of the First Amendment. ......................................................................................... 15

        A.      Prohibition of Obstructing, Resisting, or Opposing Federal Law Enforcement Activities Criminalizes a Substantial Amount of Protected Speech. ............................................................................................... 16

        B.      No Limiting Construction Remedies the First Paragraph's Overbreadth ... 23

III.    Section 1501 is Unconstitutionally Vague in Violation of the First Amendment and the Due Process Clause...................................................... 25

IV.     The Information Results From the Government's Retaliatory and Brutal Arrest of Mr. Huerta, in Violation of his First and Fourth Amendment Rights. ...30

        A.      Mr. Huerta was Arrested in Retaliation for His Protected Speech. .... 30

        B.      In Effectuating Mr. Huerta's Arrest, the Government Used Unreasonable Excessive Force, in Violation of the Fourth Amendment. ...34

        C.      Dismissal Provides the Only Remedy for These Violations. ............. 36

CONCLUSION.......................................................................................................... 37

i

# TABLE OF AUTHORITIES

**Cases**

*Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066 (N.D. Cal. 2020) ................................................................................................33

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ........................................15

*Ballentine v. Tucker*, 28 F.4th 54 (9th Cir. 2022) ....................................................31

*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)....................36

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206 (W.D. Wash. 2020) ................................................14

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ..............................36

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973).........................................................16

*Brooks v. N. Carolina Dep't of Correction*, 984 F. Supp. 940 (E.D.N.C. 1997)....19

*Brown v. Louisiana*, 383 U.S. 131 (1966)................................................................14

*Butcher v. Knudsen*, 38 F.4th 1163 (9th Cir. 2022) ................................................27

*Carr v. Cnty. of San Diego*, 2021 WL 4244596 (S.D. Cal. Sept. 17, 2021) ...........35

*Carter v. State,* 222 Ga.App. 397 (1996) ................................................................19

*Chicago Headline Club v. Noem*, 2025 WL 3240782 (N.D. Ill. Nov. 20, 2025)...11, 22

*City of Houston v. Hill*, 482 U.S. 451 (1987) ........................................13, 14, 15, 17

*Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420 (2017)................................34

*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996) .......................................13, 14, 30

*Connick v. Myers*, 461 U.S. 138 (1983) ...................................................................31

*Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990) .........................13, 16, 28

*Edwards v. South Carolina*, 372 U.S. 229 (1963)...................................................19

*Egbert v. Boule*, 596 U.S. 482 (2022) .....................................................................36

*Fortson v. City of Los Angeles*, 628 F. Supp. 3d 976 (C.D. Cal. 2022).................35

*Garrison v. Louisiana*, 379 U.S. 64 (1964).............................................................14

*Gibson v. United States*, 781 F.2d 1334 (9th Cir.1986) ....................................30, 31

ii

*Goldey v. Fields*, 606 U.S. 942 (2025) .................................................................. 36

*Graham v. Connor*, 490 U.S. 386 (1989) ............................................................. 35

*Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013) .................................. 35

*Guice v. City of Fairfield*, 2006 WL 8458911 (E.D. Cal. Nov. 16, 2006).............. 18

*Hamilton v. City of San Bernardino*, 325 F. Supp. 2d 1087 (C.D. Cal. 2004) ....... 14

*Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002)...... 35

*Hill v. City of Houston*, 764 F.2d 1156 (5th Cir. 1985)........................................... 17

*Hoyland v. McMenomy*, 869 F.3d 644 (8th Cir. 2017) ........................................... 19

*Hunt v. City of Los Angeles*, 638 F.3d 703 (9th Cir. 2011)..................................... 25

*Illinois v. Trump*, 2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) ....................... 11, 27

*Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020) ....................................................................................................................... 29

*King v. Ambs*, 519 F.3d 607 (6th Cir. 2008)........................................................... 24

*Los Angeles Press Club v. City of Los Angeles*, 2025 WL 2640421 (C.D. Cal. Sept. 10, 2025) ......................................................................................................... 11, 33

*Mackinney v. Nielsen*, 69 F.3d 1002 (9th Cir. 1995)............................................... 13

*Marinello v. United States*, 584 U.S. 1 (2018) ....................................................... 18

*Miller v. United States*, 230 F.2d 486 (5th Cir. 1956)............................................ 20

*NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F. Supp. 3d 382 (N.D. Cal. 2021) ............................................................................................................... 33

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .............................. 13, 31

*Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir. 1993) ............................................... 35

*People v. Vasquez*, 465 Mich. 83 (2001)................................................................. 23

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92 (1972) ............................ 19

*Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023) ................................................... 14

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)........................................................ 21

*Resek v. City of Huntington Beach*, 41 F. App'x 57 (9th Cir. 2002) ...................... 15

*Snyder v. Phelps*, 562 U.S. 443 (2011).................................................................. 19

iii

*Tucson v. City of Seattle*, 91 F.4th 1318 (9th Cir. 2024)..........................................23

*United States v. Barrera-Moreno*, 951 F.2d 1089 (9th Cir. 1991)..........................30

*United States v. Baugh*, 187 F.3d 1037 (9th Cir. 1999) ...........................................14

*United States v. Bonds*, 784 F.3d 582 (9th Cir. 2015)..............................................21

*United States v. Contreras*, 2025 WL 2858034 (W.D. Tex. Sept. 18, 2025) .........24

*United States v. Giampino*, 680 F.2d 898 (2d Cir. 1982)..........................................24

*United States v. Gonzalez*, 122 F.3d 1383 (11th Cir. 1997)....................................25

*United States v. Grace*, 461 U.S. 171 (1983) ...........................................................19

*United States v. Hansen*, 599 U.S. 762 (2023)..........................................................15

*United States v. McDonald*, 26 Fed.Cas. 1074 (C.C.E.D. Wis. 1879)....................20

*United States v. Moore*, 958 F.2d 646 (5th Cir. 1992) .............................................25

*United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001) ...................................13, 14

*United States v. Quintanilla-Chavez*, 2025 WL 2982191 (W.D. Tex. Oct. 20, 2025)
...................................................................................................................................37

*United States v. Reyes-Lopez*, 141 F. App'x 533 (9th Cir. 2005) ...........................24

*United States v. Rundo*, 990 F.3d 709 (9th Cir. 2021) .............................................23

*United States v. Sommerstedt*, 752 F.2d 1494 (9th Cir. 1985)................................20

*United States v. Williams*, 553 U.S. 285 (2008) .......................................................17

*Vill. of Hoffman Ests. v. Flipside*, 455 U.S. 489 (1982)...........................................25

*Wilson v. Kittoe*, 229 F. Supp. 2d 520 (W.D. Va. 2002).........................................19

*Young v. Cnty. of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011)...............................35

**Statutes**

18 U.S.C. § 111...........................................................................................................24

18 U.S.C. § 1501.................................................................................................*passim*

**Other Authorities**

Obstruct, Black's Law Dictionary (12th ed. 2024) ...................................................18

Oppose, Oxford English Dictionary (revised ed. 2004)...........................................17

Resist, Oxford English Dictionary (revised ed. 2010) ............................................18

# INTRODUCTION

On June 6, 2025, the president of the Service Employees International Union of California (SEIU), David Huerta, did what he has done all of his career as a labor leader and organizer, protesting what he saw as injustice.   For his constitutionally protected speech at a lawful protest, 59-year-old Mr. Huerta was shoved to the ground, tackled, dog-piled, pepper sprayed, arrested, and charged with violating 18 U.S.C. § 1501.

From the time he arrived at the scene of an ongoing protest to the time he was taken to the ground, Mr. Huerta exercised his First Amendment rights to challenge and criticize law enforcement.  Standing on the other side of a closed gate from federal agents, he yelled at them, gave them the finger, questioned their morality, ethics, and lawfulness of their methods of immigration enforcement.  He briefly sat in protest in front of the closed gate, joined others in a picket line, filmed federal agents, and protested on a public sidewalk while an unmarked white van approached and then drove through the gate.  He engaged only in classic forms of protected speech.

Notwithstanding the facts of this case, because a search warrant happened to be served and executed in the building on the other side of the gate, the government charged him with a crime that prohibits the knowing and willful obstruction, resistance, or opposition to law enforcement officers conducting a specific act— here, the service and execution of that search warrant.  This charge reveals that the statutory basis for this case, the first sentence of Section 1501, is so overbroad that it encompasses substantial protected speech and is therefore unconstitutional.  In addition, because the words of the statute's first sentence are so broad and so vague—for example here covering alleged conduct that at most was auxiliary to any search warrant—the charge brought under the statute also violates Mr. Huerta's rights to free speech and due process as applied to him.  And as the facts of his arrest

demonstrate that federal agents targeted him specifically for his protected speech with unreasonable brutality, this Court should use its supervisory powers to provide him with the only redress still available for the violation of his First and Fourth Amendment rights.  With a menu of three separate reasons for the unconstitutionality of the charge against Mr. Huerta, this Court should dismiss the Information with prejudice.

**FACTUAL BACKGROUND[2]**

**I.    Federal Agents Serve and Execute Search Warrant and Conduct Immigration Raid—and Surveille Peaceful Protesters.**

On the morning of June 6, 2025, agents from the United States Department of Homeland Security (DHS), the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and Immigration and Customs Enforcement (ICE), served and executed a search warrant at the Ambiance Apparel warehouse in downtown Los Angeles, California.  The search warrant was issued on June 5, 2025, by Magistrate Judge Margo A. Rocconi in Case No. 2:25-mj-03427.  Bednarski Declaration, Ex. A.  The warrant was limited to one premises (2415 East 15th Street, Los Angeles, California, 90021) and authorized the seizure of records, documents, media, and digital devices related to Ambiance's suspected violations of federal immigration laws and related criminal activities.  *See id.*  It did not authorize the arrest or detention of individuals.  *See id.*  Federal agents served the search warrant at 9:20 a.m. and conducted the search for the next few hours.  *See* Ex. B.  Along with the execution of the search warrant, at some point, federal agents arrested individuals

---

[2]  The factual representations in this motion should not be disputed as they are based almost entirely on descriptions and materials produced by the government or images that speak for themselves (*e.g.*, Exhibits M, N, and O, which are videos of Mr. Huerta's arrest gathered from public sources).  If the government raises any disputes of fact that the Court believes have to be resolved as part of this motion, Mr. Huerta respectfully requests additional discovery and an evidentiary hearing.

for suspected violations of federal immigration laws.  Supervisory officers were also present at the target address and for the search.

Other officers, however, were assigned roles to monitor and conduct countersurveillance of anticipated protest activity.   One, DHS Officer Jeremy Crossen, was assigned "in an undercover capacity to document potential protestors" and arrived at Ambiance around 9:00 a.m. on June 6.  *See* Ex. C.  Wearing "all black clothing with a cross-shoulder bag, to move surreptitiously through a potential crowd and blend in with as if part of any potential protestors," Officer Crossen patrolled in front of the Ambiance front gate and among the crowd, speaking with and taking photos and videos of individuals arriving at the location.  *Id.* at 2–3; Ex. D at 1–2. He texted photos, videos, and commentary to Homeland Security Group Supervisor Ryan Ribner, including relaying the number of people arriving at the gate and the fact that they were filming and "calling people."  *Id.* at 1.  He texted that the protest was "organized" and noted that "[i]t's going to be *fun* going through this video later." *Id.* (emphasis added).

As protesters continued to arrive, Officer Crossen continued to pretend to be part of the outside group to film and text updates to Agent Ribner.  One woman, who he identified as from "CHIRLA"[3] was filming, "on the phone narrating," and "[c]alling out officers descriptions!!!"  *Id.* at 2–3.  Agent Ribner responded "ID her," and Crossen noted that "[s]o far she's peaceful but non-stop phone calls and calling out agency markings and description."  *Id.* at 3.  Officer Crossen continued to identify different protesters and their organizations, providing videos, photos, and specific information about them and their vehicles to Agent Ribner.  *See id.*  While the protesters were loud, no produced records show the protesters taking any action

---

[3] The Coalition for Humane Immigrant Rights (CHIRLA) is a leading immigrants advocacy organization in Los Angeles, California.

to threaten or try to interfere with the law enforcement activities occurring inside the gate, but rather show them peacefully demonstrating on a public sidewalk.  Officer Crossen also spoke with members in the crowd, including telling Agent Ribner that he "got a bunch of them to go to the wrong side. I told them there was a gate in the alley I think." *Id.* at 5.

## II.    Mr. Huerta Joins Peaceful Protest Outside Ambiance Apparel.

As the search progressed unabated inside the Ambiance warehouse, the demonstration grew on the public sidewalk outside the front gate—with individuals filming, chanting, and yelling profanities at the officers standing by the gate.  Ex. B. at 7.  David Huerta, the president of SEIU California, arrived at the protest outside Ambiance, more than *two hours* after the search warrant was served and operations began inside the gate, at approximately 11:49 a.m.  *See* Ex. P.  He joined with the other protesters congregating on the public sidewalk at the front gate of Ambiance, walked up to the gate, and began criticizing and heckling the officers.  At around 11:55 a.m., Mr. Huerta briefly participated in a sit-in at the front gate.  *See* Ex. I. Agent Ribner and Officer Carey Crook stood on the other side of the gate:



*See id.*  Mr. Huerta asked them, "How are you keeping us safe?"  Agent Ribner's response was: "You are gonna go to jail. You are not impeding us.  You are not

impeding us.  You're going to jail, [unintelligible from 0:00:09–00:11] and you're going to jail." *Id.* at 0:00:01–00:12.  Mr. Huerta then repeatedly asked him, "What are you doing?" and told him, "I can't hear you through your fuckin' mask," and pointed at Agent Ribner. *Id.* at 0:00:14–00:17.  Agent Ribner can be heard replying: "You're gonna go to jail, you're going to jail." *Id.* at 0:00:17.  For the next few minutes, Mr. Huerta continued to protest in front of the gate, including conversing with Agent Ribner, Officer Crook, and other officers, including, according to agents' after-the-fact reports, "aggressively"[4] asking the officers to identify themselves, stating "What are you going to do… Where's your fucking badge number… What's your fucking name?"  Ex. B at 9.  He also allegedly stated: "You're not police!  You're not fucking police!  You're not keeping me safe!"  Ex. C at 6.  At around 11:59 a.m., Mr. Huerta participated in a picket line with other protesters, where they walked in a circle on the public sidewalk in front of the gate. *See* Ex. J; Ex. C at 7.  For each of these actions, from approximately 11:49 a.m. to 12:14 p.m., no law enforcement activity was occurring in front of or behind the gate.  No vehicles tried to enter in or out, and the gate remained closed between the protesters and law enforcement.

The reports and video evidence provided by the government suggest that Mr. Huerta heckled Agent Ribner, criticizing the immigration enforcement policies of President Donald Trump, and "asked either about the purpose or legit impact of agents' duties."  Ex. B at 9.  "Based on" Mr. Huerta's actions above, Agent Ribner texted Officer Crossen to "watch HUERTA by indicating 'red shirt[.]'" *Id.* at 9; *see also*, Ex. D at 4.  He spoke to DEA agents and "informed them that HUERTA . . .

---

[4] DHS uses the term "aggressive" liberally throughout its reports to describe benign activities, for example, describing a man in a kerchief and a beret as having "an "aggressive appearance."  Ex. B at 8.  They described Mr. Huerta as "appear[ing] to be "aggressive and angry by his voice, demeanor, and facial features." *Id.* at 9.

would highly likely block or impede law enforcement vehicles, cause damage to USG property, or commit a battery against agents as they attempt to depart." *Id.* at 9–10.  The evidence produced shows *only* Mr. Huerta's questioning, heckling, and protest activity—but there is nothing to indicate that he would block, cause damage, or commit battery.

At no time before Mr. Huerta's arrest did government reports describe any violent activity, fighting words, or true threats.  Nor do they describe Mr. Huerta at any point getting physical with any officer or undercover agent.  Instead, reports describe the crowd as "walking around and looking inside and making comments." *Id.* at 9.  A truck played loud music "with lyrics that stated, 'Fuck Donald Trump…' repeatedly." *Id.* at 10.  In his report, Agent Ribner only conjectured: "the controlled chaos was done purposely to create a tense environment to implement an atmosphere of intimidation which could cause agents to make mistakes that could ultimately disrupt and impede the law enforcement operation." *Id.* at 10.  Agent Ribner prophesized to another agent "the high potential for an arrest due to an incident." *Id.*

At approximately 12:02 p.m., Agent Ribner was informed by other federal agents that a white government van, a "prisoner van" to transport detainees, would arrive at Ambiance for transport of individuals detained *inside* the facility.  *Id.*  Agent Ribner stated in his report that he was concerned about the protesters damaging or blocking the vehicle, and planned for federal agents to protect the van.  *Id.*  DHS reports additionally state that Agent Ribner "went on and informed HUERTA again not to block or impede the USG vehicle. HUERTA said that the truck isn't owned by him, referring to the pickup truck that was partially blocking the driveway. SSA Ribner told HUERTA that he was not referring to the truck, but rather HUERTA himself shouldn't block or impede the USG vehicle that would be arriving. HUERTA loudly repeated, 'it's a public sidewalk.'" *Id.*

### III.    Agent Ribner and Officer Crook Retaliate Against Mr. Huerta with Brutal Takedown and Arrest.

At approximately 12:15 p.m., the unmarked white government transport van arrived, with dashboard and front grill emergency lights, which the driver briefly activated as he approached and entered the driveway to Ambiance. *See* Ex. K.  At that point, the gate was closed such that the van could not enter the premises in any event. *Id.*  As the gate was then opened, Officer Crook, followed closely behind by Agent Ribner, exited the front gate and made a beeline for Mr. Huerta, and the van turned on its "air horn."[5]  Ex. L at 3; Ex. K at 0:00:03–00:12.  The video evidence produced by the government shows Mr. Huerta standing at an angle off to the side of the van's front bumper, with his hands on his hips.  Ex. K at 0:00:03–00:12.  It does not show him in front of the van.  However, at least three other protesters stood

---

[5] The van driver stated that he activated the van's lights and "air horn . . . to let *law enforcement* at [Ambiance] *know* he was there"—and *not* to disperse the protesters who had amassed on the sidewalk by the gate.  Ex. L at 3 (emphasis added).

in the driveway, directly in front of the vehicle, and Agent Ribner and Officer Crook rushed right past them to confront Mr. Huerta. *See id.*



Ex. K at 00:00:09–00:11.

As Mr. Huerta, already to the side of the van, took an additional step away, Officer Crook pushed him back two more steps. *Id.* at 00:00:10–00:12. With two hands, Officer Crook shoved Mr. Huerta to the ground. *Id.* at 00:00:12–00:13. Both shoves are captured on government video:

 

*See* Ex. K.  Mr. Huerta never laid a hand on either officer that day.  After he was shoved to the ground, Mr. Huerta fell hard onto his back.  Officer Crook then turned to move others out of the front of the van.  He did not shove them to the ground or tackle them.  Instead, he simply spread out his arms and stated "Move, move, move," *see* Ex. L, or at one point, picked a protester up and moved her out of the way.  Ex. K at 0:00:30.  Agent Ribner ran over to Mr. Huerta, and rolled him over onto his stomach, then his hands and knees, Ex. K at 0:00:15, repeating, as he did before the van was even on the scene: "You're going to jail."  Ex. N at 00:00:01–00:05. *See* Ex. N.  None of the other people actually standing in front of the van, including the woman who Officer Crook picked up and removed, were arrested or charged.

Officer Crook then returned to Mr. Huerta and Agent Ribner, crossing in front of the van to do so.  Ex. K at 0:00:34.  He jumped on top of Mr. Huerta, who at this point is lying on his stomach on the ground, Ex. O at 0:00:01, with his forehead mere inches from a curb.  Ex. M at 0:00:19.  Agent Ribner pinned his back with one of his knees.  *See id.*  Agent Ribner and Officer Crook tugged at Mr. Huerta's arms (despite the fact that agents essentially were sitting on top of him) and attempted to remove Mr. Huerta's arms from beneath his body.  Despite the fact that Mr. Huerta put up no resistance, Officer Crook moved off of Mr. Huerta's back, and Agent Ribner then sprayed pepper spray into the palm of his (Agent Ribner's) hand and rubbed it all over Mr. Huerta's face, including his eyes, nose, and mouth, while banging his head into the curb.  *See* Ex. M at 0:00:01–00:08.  Agent Ribner and Cooks then climbed on top of him again, and continued to try to pull his arms out from underneath him. *Id.* at 0:00:08–00:22.  When he couldn't pull out Mr. Huerta's arm, Officer Crook got off of Mr. Huerta's back and pushed down roughly on Mr. Huerta's shoulder. *Id.* at 0:00:37–00:39.  Mr. Huerta repeatedly stated, "I'll get up."  *Id.* at 0:00:45. Agent Ribner instructed him to put his hands behind his back, and Mr. Huerta, repeated again that he will get up, but that he has a bad shoulder.  *Id.* at 0:00:45–

9

01:03.  Agent Ribner and Officer Crook wrenched Mr. Huerta's arms behind his back regardless, and video evidence shows Mr. Huerta's face twisting in pain.  *Id.* at 0:01:03–01:12.  Agents then lifted him up by his shoulders to a standing position.  *Id.* at 0:01:12–01:24.  The protesters nearby loudly denounced the agents' actions, but for the duration of the arrest, none came close to interrupting, as Mr. Huerta, Agent Ribner, and Officer Crook were completely surrounded by other agents.

 

*See* Ex. M.  In his interview about the events that day taken *three months later* by prosecutors on September 10, 2025, Agent Ribner declared that "HUERTA and other protesters are 'vicious, horrible people,'" in reference to being shown a still photo of the takedown video of Mr. Huerta.  Ex. F at 3.

Mr. Huerta is not the first or only protester who has been brutalized and detained for his protected activities in the past months as part of the administration's new policies.  Other incidents where anti-ICE protesters were targeted have been

well documented.  *See* Meg Anderson, *Tackles, projectiles and gunfire: Many fear ICE tactics are growing more violent*, NPR (Oct. 13, 2025), https://www.npr.org/2025/10/13/nx-s1-5566785/ice-dhs-immigration-tactics-more-violent; *see also*, *Los Angeles Press Club v. City of Los Angeles*, 2025 WL 2640421, at *2 (C.D. Cal. Sept. 10, 2025)  (detailing excessive force used against journalists during protests in Los Angeles); *Illinois v. Trump*, 2025 WL 2886645, at *4 (N.D. Ill. Oct. 10, 2025) (detailing excessive force used against protesters during in Illinois); *Chicago Headline Club v. Noem*, 2025 WL 3240782, at *19 (N.D. Ill. Nov. 20, 2025) (same).

## IV.    The Charge Filed Against Mr. Huerta, Downgraded to A Misdemeanor.

The government initially charged Mr. Huerta on June 8, 2025, with violating 18 U.S.C. § 372, a felony of conspiring to "impede" an officer.  *United States v. Huerta*, No. 2:25-mj-03504, ECF 1 (C.D. Cal.) (Complaint).  The criminal complaint in that charge describes or attempts to address what Mr. Huerta is actually alleged to have done.  It contends, for example, that Mr. Huerta "stood in front" of the path of the unmarked government van "with his hands on his hips," *see* Compl. ¶ 23, and that *other protesters* "continued to block the van and had to be physically removed from the van's path" to permit it to enter through the front gate.  *Id.* ¶ 25.  However, the government dismissed that charge and instead is proceeding on a Section 1501 misdemeanor, which criminalizes different conduct.   Again, no other person described as "blocking the van" was arrested or charged—only Mr. Huerta, who had engaged verbally and directly with Officers Crossen and Agent Ribner.

The Information charging Mr. Huerta with violating Section 1501 was filed on October 17, 2025.  ECF 29.  The Information's description of his alleged criminal activity is conclusory and uninformative, and states, that on June 6, 2025, Mr. Huerta "and others known and unknown, each aiding and abetting the other, did knowingly

11

and willfully, obstruct, resist, and oppose an officer of the United States, and any such other person duly authorized, in serving and attempting to serve and execute . . . a search warrant for the premises at 2415 East 15th Street, Los Angeles, California 90021 [Ambiance Apparel]."  ECF 29.  Since then, when asked to specify what conduct Mr. Huerta had engaged in that constituted his unlawful activity, the government stated its "theory of liability" was Mr. Huerta's "course of conduct." Specifically,

> Mr. Huerta's course of conduct from approximately 11:49 a.m., when he arrived at Search Warrant location, to approximately 12:15 p.m., when he was detained by federal agents. This course of conduct includes, but is not limited to, Mr. Huerta (a) blocking the entrance to the Search Warrant location; (b) encouraging other individuals, both verbally and nonverbally, to sit down on the ground and similarly block the entrance; (c) encouraging individuals to form a circle blocking the entrance to the Search warrant location; (d) encouraging others to "stop the vehicles" attempting to enter the Search Warrant location; and (e) blocking the pathway of a law enforcement vehicle attempting to enter the Search Warrant location.

Ex. P.

## ARGUMENT

Under the First Amendment, Mr. Huerta has an inalienable right to criticize, challenge, and protest government actions—even when such protest is directed at law enforcement activities.  Dismissal of the Information is proper on three constitutional grounds.  First, the first sentence of 18 U.S.C. § 1501 is facially overbroad in violation of the First Amendment, as its three operative verbs—obstruct, resist, and oppose—criminalize substantial protected First Amendment activities.  Second, and alternatively, the statute is unconstitutionally vague as

applied to Mr. Huerta, as his criminal charge rests solely on protected speech and protest, and the statute draws no discernable line between protected speech and unprotected conduct.  Third, the charge arose from federal agents' retaliatory, brutal arrest of Mr. Huerta for his protected speech in violation of the First and Fourth Amendments, and this Court should exercise its supervisory authority to dismiss the Information.

## I.    Protest, Criticisms, and Challenges of Law Enforcement Actions are Protected Speech Under the First Amendment.

There is no more sacred an American right than the right to dissent against government abuse of its people.  For this reason, "[e]xpression[s] of disapproval" toward law enforcement, no matter how profane or critical, fall "squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech—such as stopping or hassling the speaker—is categorically prohibited by the Constitution." *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990).

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987).  It is well established that passionate or aggressive rhetoric and even profanity are considered protected speech. *See Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Speech that stirs passions, resentment or anger is fully protected by the First Amendment."); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982) ("Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases."); *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995) ("Even when crass and inarticulate, verbal challenges to the police are protected.").  This speech is entitled to comparably more protection when directed at government officials or law enforcement. *See United States v. Poocha*, 259 F.3d 1077, 1082 (9th Cir. 2001) (finding speech directed at law enforcement is subject to greater First Amendment protections); *Garrison v. Louisiana*, 379 U.S.

13

64, 73–74 (1964) (holding that even some unprotected speech may not be the basis of liability when directed at a public official "if the freedoms of expression are to have the breathing space that they need to survive"); *Hamilton v. City of San Bernardino*, 325 F. Supp. 2d 1087, 1092 (C.D. Cal. 2004) ("There is a particularly pronounced constitutional interest in protecting speech critical of law enforcement."). And aggressive gestures do not reduce the constitutional protections on speech. *See Poocha*, 259 F.3d at 1082 (defendant "clenching his fists and sticking out his chest" did not strip his speech of First Amendment protection).[6]

The First Amendment's protection goes beyond verbal challenges of law enforcement. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1212 (W.D. Wash. 2020) ("[P]eople have a right to demonstrate and protest government officials, police officers being no exception."). "[M]arch[ing] and other protest activities clearly constitute protected speech." *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999); *Collins*, 110 F.3d at 1371 ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment."). And the First Amendment protects a certain level of civil disobedience, such as sit-ins in public places or marches in public streets. *See City of Houston*, 482 U.S. at 472 ("[T]he First Amendment recognizes, wisely we think, that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive."); *Porter v. Martinez*, 68 F.4th 429, 438 (9th Cir. 2023) (listing "staging a sit in" as a type of conduct that is protected speech under the First Amendment); *Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966) (holding

---

[6] True, incitement, fighting words, and true threats are not protected by the First Amendment. But these exceptions are narrow, and none are at issue here.

14

that a silent sit-in to protest racial segregation in a public library was protected expression).

Spirited or silent, profane or polite, criticism and protest of law enforcement activities constitute highly protected speech under the First Amendment. "[T]he job of police officers requires a thick skin." *Resek v. City of Huntington Beach*, 41 F. App'x 57, 59 (9th Cir. 2002). Statutes that prohibit and chill such speech are subject to the highest levels of scrutiny, and arrests and charges resulting from them should be viewed with significant skepticism.

## II. The First Sentence of Section 1501 is Facially Overbroad, in Violation of the First Amendment.

As "even minor punishments can chill protected speech," overbroad criminal statutes pose a particular threat to the exercise of First Amendment rights. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). If a "statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications." *United States v. Hansen*, 599 U.S. 762, 770 (2023). "Criminal statutes must be scrutinized with particular care," and "those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston*, 482 U.S. at 459.

The statute at issue here, Section 1501, states:

Whoever knowingly and willfully obstructs, resists, or opposes any officer of the United States, or other person duly authorized, in serving, or attempting to serve or execute, any legal or judicial writ or process of any court of the United States, or United States magistrate judge; or

Whoever assaults, beats, or wounds any officer or other person duly authorized, knowing him to be such officer, or other person so duly

15

authorized, in serving or executing any such writ, rule, order, process, warrant, or other legal or judicial writ or process—

Shall, except as otherwise provided by law, be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 1501. According to the Information, Mr. Huerta was only charged for violations of the first sentence, for "knowingly and willfully obstruct[ing], resist[ing], and oppos[ing] an officer of the United States . . . in serving and attempting to serve and execute . . . a search warrant." ECF 29. This sentence's plain language sweeps in a wide swath of protected speech, including criticisms, challenges, objections, and protest of law enforcement policies and activity. Such speech "is not a crime." *Duran*, 904 F.2d at 1377. Any true criminal activity or unprotected speech is instead punished under the second sentence of the statute.

Mr. Huerta's arrest and resulting criminal charge under Section 1501's first sentence reveal its unconstitutional overbreadth. Striking a portion of a criminal statute for facial overbreadth may be "strong medicine," *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), but the first sentence requires this precise prescription. This Court should strike the first sentence from Section 1501 and dismiss the Information.

A.   **Prohibition of Obstructing, Resisting, or Opposing Federal Law Enforcement Activities Criminalizes a Substantial Amount of Protected Speech.**

The plain language of the first sentence of Section 1501 criminalizes First Amendment-protected activities. Its operative verbs, obstruct, resist, and oppose, cover verbal criticism and challenges to law enforcement activities, as well as assembly, protest and picketing, and its other clauses provide no meaningful limitations. Particularly when viewed in contrast to the second sentence of the

16

statute, as well as in the context of Mr. Huerta's charged activity, it is clear that its plainly legitimate sweep prohibits a substantial amount of protected speech.

Assessment of a statute's breadth begins with its text. *See United States v. Williams*, 553 U.S. 285, 293 (2008). The term "opposes" has the clearest unconstitutional ramifications. In *City of Houston*, the Supreme Court invalidated a Texas ordinance, Code of Ordinances, City of Houston, Texas, § 34–11(a) (1984), criminalizing mere opposition to a law enforcement officer for unconstitutional overbreadth. 482 U.S. at 467. There, an individual was arrested after shouting at police officers to "pick on somebody your own size," under the part of the ordinance that made it "unlawful for any person to . . . in any manner *oppose*, molest, abuse or interrupt any policeman in the execution of his duty." *Id.* at 454–55 (emphasis added). Construing the plain terms of the ordinance, the Supreme Court found that the prohibition of opposition and interruption of police officers criminalized "verbal criticism and challenge directed at police officers," which is protected by the First Amendment. *Id.* at 461. In coming to this conclusion, *City of Houston* emphasized a now well-established principle: "The freedom of individuals verbally to *oppose* or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63 (emphasis added).

*City of Houston*'s interpretation of "oppose" makes sense in light of its definitions. "To oppose" can mean "to confront (a person) with hard questions or objections," "to interrogate, question," "to set (something) against or in opposition to," "to place or position as an obstacle," "to contend, fight," and "to be antagonistic or hostile to." Oppose, Oxford English Dictionary (revised ed. 2004). According to the Fifth Circuit opinion affirmed in *City of Houston*, it can also mean to have "an adverse opinion concerning" or "to offer arguments against." *Hill v. City of Houston*, 764 F.2d 1156, 1163 (5th Cir. 1985). As the Fifth Circuit noted, "[i]f a

17

mother pleads with a policeman to 'spare my baby' while the policeman arrests her son in front of their home, she has 'opposed' the policeman in the execution of his duties." *Id.*

These same definitions apply to Section 1501's term "opposes."  Opposition to law enforcement activity includes myriad forms of protected speech—particularly verbal criticism and challenges of their policies and actions.  *See, e.g.*, *Guice v. City of Fairfield*, 2006 WL 8458911, at *3 (E.D. Cal. Nov. 16, 2006) ("[A] refusal to consent to a search is a verbal opposition to police action and, consequently, protected speech.").  Here, Mr. Huerta stood on a public sidewalk and protested the federal government's immigration enforcement policies, and agents' enforcement thereof, a key issue of public debate.  He chanted, questioned, and heckled law enforcement officers standing on the other side of the gate.  His speech was rousing, passionate, antagonistic, and unquestionably protected by the First Amendment.  But in the government's view, he *opposed* the law enforcement activity occurring at Ambiance.

Like "opposes," the other two verbs, "obstructs" and "resists" also sweep in protected speech.  The term "obstruct" is "broad."  *Marinello v. United States*, 584 U.S. 1, 7 (2018).  It can mean "[t]o block or stop up; to close up or close off," "[t]o make difficult or impossible; to keep from happening; hinder" or "[t]o cut off a line of vision; to shut out."  Obstruct, Black's Law Dictionary (12th ed. 2024).  The term "resist" means "stop or hinder (a moving body); "to obstruct the passage of, to block," "to impede," "to strive against, fight or act in opposition to, oppose," "to contrive not to yield to; to withstand, be unaffected by the action or influence of." Resist, Oxford English Dictionary (revised ed. 2010).

The ambit of these two terms particularly sweeps in protected expressive actions, such as picketing, sit-ins, or protest.  But such actions are no less protected under the First Amendment.  Protest and picketing, particularly in public forums, are

18

"pristine and classic" forms of protected speech.  *Edwards v. South Carolina*, 372 U.S. 229, 235–36 (1963); *see also*, *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 99 (1972) ("[P]icketing plainly involves expressive conduct within the protection of the First Amendment[.]"); *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (emphasizing that public forums, like parks and sidewalks, "occup[y] a special position in terms of First Amendment protection.") (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)).  In the government's view, however, Mr. Huerta's brief sit-in and picketing activities, as well as protesting in front of the front gate, constitute obstruction and resistance of the execution of the search warrant.

It is important to note that obstruction and resistance still include protected verbal speech as well.  Courts have found arrests unconstitutional under statues prohibiting obstruction and resistance when the underlying crime was simply verbal speech.  *See Wilson v. Kittoe*, 229 F. Supp. 2d 520, 530 (W.D. Va. 2002), *aff'd*, 337 F.3d 392 (4th Cir. 2003) (finding arrest unconstitutional where, under a Virginia law prohibiting "obstruct[ion]" of police officers, an attorney was arrested after he "attempted to inquire into the well-being of his neighbor's son and wished to offer his services in support" and "peacefully attempted to remind the officer of the boy's constitutional rights."); *Hoyland v. McMenomy*, 869 F.3d 644, 652 (8th Cir. 2017) (finding possible First Amendment retaliation where officers arrested individual after he yelled profanities at the police, under Minnesota statute prohibiting "intentionally ... obstruct[ing], resist[ing], or interfer[ing] with a peace officer while the officer is engaged in the performance of official duties."); *Carter v. State,* 222 Ga.App. 397, 397–98 (1996) (concluding that defendant's "loud, unruly statements and using profane language" while being questioned by police may constitute misdemeanor obstruction under state law); *Brooks v. N. Carolina Dep't of Correction*, 984 F. Supp. 940, 955 (E.D.N.C. 1997) (finding a North Carolina statute that criminalizes "resist[ing], delay[ing], or obstruct[ing] a public officer" was

19

facially overbroad, as it "punishes speech directed at a police officer unless conveyed in an 'orderly and peaceable manner.'").

The overbreadth of the first sentence becomes apparent when contrasted with the second sentence's prohibited conduct—which separately criminalizes "assault[ing], beat[ing], or wound[ing]" federal officers serving or executing writs or process.  The term "assaults," specifically, includes true threats and fighting words, which are not protected by the First Amendment.  *See United States v. Sommerstedt*, 752 F.2d 1494, 1496 (9th Cir. 1985), *as amended*, 760 F.2d 999 (9th Cir. 1985) (defining assault in the context of Section 1501 as "either a willful attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.").  The second sentence also covers physical obstruction or resistance against an officer, as well as any battery or action that results in physical harm to an officer.  The scope of this sentence therefore covers the majority of the unprotected speech or conduct that could otherwise be read into the first sentence—but does so with a lesser scienter requirement.  It demonstrates not only that Congress could have written the statute to only cover unprotected speech and conduct, but that it actually separated out the majority of this conduct into the second sentence.  The true scope of the first sentence's prohibitions accordingly covers only the minimal amounts of unprotected speech or non-expressive conduct that exists outside of the second sentence's ambit.  It certainly does not cover force or physical violence.  *See, e.g.*, *Miller v. United States*, 230 F.2d 486, 488 (5th Cir. 1956) (Section 1501 "reflects a purpose to forbid, under the broader terms of the first [sentence], those acts which constitute obstruction, resistance or opposition but which do not involve physical violence."); *United States v. McDonald*, 26 Fed.Cas. 1074, 1077 (C.C.E.D. Wis. 1879) (jury charge) (Section 1501 "includes also willful acts of obstruction or opposition; and to obstruct is to

20

interpose obstacles or impediments, to hinder, impede or in any manner interrupt or prevent, and this term does not necessarily imply the employment of direct force").

The remaining components of the first sentence—its scienter requirement and its object, a federal officer executing or serving a warrant—create additional unconstitutional breadth. First, the scienter requirement of the statute transforms its restrictions on obstruction and resistance into content-based restrictions on speech, like opposition. That an individual must act knowingly and willfully means that the intent and purpose of the criminalized activity must be to obstruct, oppose, or resist a federal officer's activities. While this somewhat limits the protected speech within the statute's scope, it limits that speech by *content*, and statutes that prohibit speech "because of the topic discussed or the idea or message expressed" are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Both "oppose" and "resist" require a defendant's activities to be in some way hostile or antagonistic to the law enforcement officer's actions. Applying the canon of *noscitur a sociis*, which instructs that "the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it," *United States v. Bonds*, 784 F.3d 582, 593 (9th Cir. 2015), the term "obstruct" takes on those same connotations. The statute therefore criminalizes intentional opposition to federal law enforcement but does not restrict similarly disruptive intentional *support* of their actions. If Mr. Huerta stood in front of the Ambiance gate *cheering* for the federal agents, for example, this activity would not fall within the statute's ambit. For this reason, the core activities prohibited by the first sentence—intentional obstruction, resistance, and opposition to law enforcement activities—only criminalize speech taking a position against law enforcement.

This targeted, content-based restriction is particularly susceptible to abuse because the same law enforcement agents standing in opposition to speakers are also

21

the ones interpreting the scope of the statute and making arrests.  Agent Ribner told Mr. Huerta that he was "going to jail" long before his actual arrest, solely on the basis that he was one of the loudest, most active protesters.  Officer Crook singled him out for force and arrest despite numerous other protesters actually blocking the van.   Both officers had been on the receiving end of Mr. Huerta's heckling, challenges, and gestures, and their anger at his speech led to retaliatory targeting. Agent Ribner even characterized Mr. Huerta and other protesters as "vicious, horrible people," and federal agents have even expressly admitted to similar biases in other cases regarding anti-immigration protests.  *See Chicago Headline Club*, 2025 WL 3240782, at *79 (Federal agent defendants "admit that they would treat pro-ICE and CBP demonstrators more favorably").

Second, object of the sentence provides no meaningful narrowing of the criminalized activity.  The inclusion of an object, such as "any officer," certainly implies some level of focus of the speech or activities on one or more officers conducting the specified activities.  But, as discussed below in Argument Section III, this "limitation," particularly in the government's interpretation of the statute, is entirely vague and provides no real temporal or spatial guidance.  It simply provides the content or recipient of the protected speech—law enforcement serving or executing a warrant.  For example, preemptive media reporting on a high-profile arrest could oppose or obstruct the execution of the warrant—no proximity to the warrant location required.  And the mere fact that such opposition, obstruction, or resistance targets an officer who is executing a search or arrest pursuant to a warrant should not provide speech any less protection than it would receive in the context of any other type of police action, like conducting a warrantless search or arrest.

There is no question that, under its plainly legitimate scope, the first sentence has legitimate prohibitions.  The First Amendment does not protect, for example, shredding files, locking a process server in a coat closet, or running away from an

arresting officer.  But law may be facially overbroad under the First Amendment "even though it has lawful applications." *Tucson v. City of Seattle*, 91 F.4th 1318, 1327 (9th Cir. 2024).  In choosing the terminology of the statute, "Congress said what it meant and meant what it said." *United States v. Rundo*, 990 F.3d 709, 718 (9th Cir. 2021).  By using broad terms like oppose, obstruct, and resist, and separating them from the second sentence, Congress included and criminalized a substantial swath of protected speech, along with any legitimate applications.  And, as demonstrated by case law and Mr. Huerta's own charged offense, its application to protected speech is not confined to hypotheticals.  For this reason, the first sentence is overbroad and subject to severance from Section 1501.

### B.    No Limiting Construction Remedies the First Paragraph's Overbreadth.

Striking the first sentence, rather than imposing a limiting construction, is the appropriate remedy for its overbreadth.  The remaining second sentence of the statute covers the majority of unprotected speech and conduct that this Court would otherwise "save" by imposing a limiting construction.  To attempt to "save" this overbroad sentence would be for a court to literally rewrite it, providing definitions and applications not included in the law Congress enacted.

Courts are required to construe a statute to preserve its constitutionality but cannot do so atextually.  In applying a limiting construction, courts have applied several canons of statutory construction to narrow the terms in this statute to unprotected activities.  One method applies the canon of *noscitur a sociis* where the string of verbs includes necessarily unprotected activities, such as beating or wounding.  *See People v. Vasquez*, 465 Mich. 83, 111–12 (2001) (finding that the inclusion of the term "obstruct" as part of a list containing "resist, oppose, assault, beat [and] wound" supports "restricting the first three terms in the list to behavior involving actual or threatened physical harm or physical interference.").  But where

23

these words are accompanied by less clearly physical verbs, such as "hinder" or "impede," courts have found that the three verbs in Section 1501's first sentence cannot be not so limited.  *See King v. Ambs*, 519 F.3d 607, 611 (6th Cir. 2008) (including "obstruct[ ]" with "resist[ ], impede[ ], hinder[ ] or oppose[ ], presents "a less apparently physical context in which to interpret the term.").  Since the first sentence's verbs are separated from the second sentence's unprotected activities, *noscitur a sociis* does not support a limitation to non-expressive conduct.

For similar reasons, the first sentence cannot be limited to unprotected verbal speech, such as fighting words or true threats.  As noted in Argument Section II.A, the *second* sentence of Section 1501 already encompasses such unprotected speech into the word "assaults."  Limiting the first sentence to apply to this same speech would render it superfluous.

In addition, courts have looked to modifiers within a statute's text to limit the application of these verbs, such as the term "forcibly."  For example, 18 U.S.C. § 111 criminalizes anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes" with federal officers completing official duties.  In determining that Section 111 is *not* overbroad, courts have relied on the modifier "forcibly," which ensures that the statute does "not restrict protected speech in the form of purely verbal, non-threatening opposition."  *United States v. Reyes-Lopez*, 141 F. App'x 533, 533 (9th Cir. 2005); *United States v. Contreras*, 2025 WL 2858034, at *5 (W.D. Tex. Sept. 18, 2025) (finding that, in an as-applied challenge to Section 111, the jury could find that the defendant's activity was "forceful, and, thus, unprotected under the First Amendment.").  Section 1501's first sentence is often compared to Section 111, and courts have concluded that the lack of a similar modifier in Section 1501 ensures that no force is actually required.  *United States v. Giampino*, 680 F.2d 898, 902 (2d Cir. 1982) (in Section 1501, "[t]here is no mention of force, nor use of a verb that connotes the use of force, nor any logical reason why such obstruction,

resistance, or opposition cannot occur without force."); *United States v. Moore*, 958 F.2d 646, 650 (5th Cir. 1992) ("The only factual element required for a § 111 violation that is not included within a § 1501 violation is the threat or use of force."); *United States v. Gonzalez*, 122 F.3d 1383, 1388 (11th Cir. 1997) ("[T]he element of force was required for a conviction under section 111 but not for conviction under section 1501.").

The plain language and application of first sentence criminalize substantial protected First Amendment activities, and its language and context eliminate any possibility of a limiting construction. This Court should strike this first sentence from Section 1501 and dismiss the Information.

### III.    Section 1501 is Unconstitutionally Vague in Violation of the First Amendment and the Due Process Clause.

If this Court finds that Section 1501 is not facially overbroad, then as applied to Mr. Huerta, it is unconstitutionally vague under the First and Fifth Amendments. A statute is void for vagueness where it "(1) fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited; (2) impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application; or (3) abuts upon sensitive areas of basic First Amendment freedoms, operating to inhibit the exercise of those freedoms." *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) (cleaned up). Where "the law interferes with the right of free speech . . . a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside*, 455 U.S. 489, 499 (1982).

Mr. Huerta's charged "course of conduct" is based entirely on activities protected by the First Amendment. In the time period set forth in the government's interpretation of the information, Mr. Huerta protested and criticized law enforcement activity, and the government considers his protected First Amendment

actions to be criminal activity under this statute.  Mr. Huerta protested on a public sidewalk, outside of one entrance of a location being searched under a warrant.  But Section 1501 provided him with no notice of when his protected speech became criminal.  The first sentence's failure to provide any indication or differentiation between speech protected by the First Amendment and non-expressive activities that could otherwise be prohibited ensures that no individual can have proper notice of when their actions cross a line from constitutional to criminal under this statute and renders it unconstitutionally vague.

The government's interpretation here demonstrates its susceptibility to misinterpretation.  According to the Arrest Investigation Report, Agent Ribner "has knowledge from incidents and at least one investigation that there have been past criminal activities with a few activist groups."  Ex. B at 6.  Examples of this "criminal activity," as written in the report, include:

- "[W]orking in a concerted effort to provide training videos to the public on how to spot DHS law enforcement vehicles"
- "[U]tiliz[ing] two-way radios and patrol neighborhoods to identify HSI/ICE operations."
- "[Y]ell[ing] and mak[ing] threatening remarks aimed at intimidating agents"
- "[U]tiliz[ing] social media and verbal yelling to obtain compliance from LAPD officers to leave traffic control positions during HSI search warrants"
- "[A]ct[ing] as 'agent provocateurs' by using megaphones to amplify emotionality within the crowd."

*Id.* at 6, 9.  The government further alleges in its report that "[o]verall, the above actions cause increased officer and public safety concerns and are believed to be utilized in totality to thwart and impede U.S. Government policies toward

26

immigration enforcement objectives." *Id.* at 6. These interpretations are extraordinary in light of the Supreme Court and Ninth Circuit precedent stating the exact *opposite*. Moreover, courts across the country have noted the "troubling trend" of federal agents "equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning, and criticizing their government, and those who are obstructing, assaulting, or doing violence." *Trump*, 2025 WL 2886645, at *5. This general confusion leads to arrests and charges for obstruction that conflict with protected First Amendment rights.

The sphere of the statute's temporal and geographic coverage is similarly vague, as it provides no notice to Mr. Huerta on how close his activities must be to the officer executing or serving the writ or process. As described in Argument Section II, the statute requires neither touching nor force. Mr. Huerta certainly did not touch (or even have any physical contact with) an officer during his "course of conduct"—that is, until he was pushed over by Officer Crook. And Mr. Huerta had no notice under the statute that *the public sidewalk* could fall within the area that this statute applies. If he had, for example, protested across the street from the gate, would that still have constituted unlawful opposition? Was it his mere proximity to a government van—with no relationship to the search warrant—that rendered his speech a criminal act? Did he himself need to be standing in front of the van, or was his presence at the protest enough to aid and abet other protesters' conduct? The fact that these questions remain unanswered by the statute ensures that individuals do not know where, when, or how they *can* exercise their constitutional rights to protest police activities before someone alleges their conduct is criminal.

But the most substantial risk of Section 1501's vagueness is the fact that, due to its subject matter, it "poses heightened risks of arbitrary enforcement." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022). Law enforcement officers have a greater likelihood of arresting individuals under Section 1501's first sentence as they

27

themselves are the targets of its prohibited activities.  But "while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment."  *Duran*, 904 F.2d at 1378.

There is no better demonstration of this abuse than Officer Crook and Agent Ribner's targeted arrest of Mr. Huerta and the subject matter of his speech.  The evidence in this case shows that, in the events leading up to Mr. Huerta's arrest, federal agents engaged in a coordinated, deliberate course of conduct designed to suppress and silence Mr. Huerta and other anti-ICE protesters.  DHS's reports on this case indicate that the presence of allegedly violent protesters at other immigration enforcement events led them to anticipate that such violence would occur at Ambiance as well.  Ex. B at 6.  However, June 6, 2025, marked the first day in the federal government's escalated approach to immigration enforcement in Los Angeles.[7]  At that point, no significant protest activity had occurred in the city in response to immigration raids, and although the protests had occurred in other cities, federal agents had no reason to assume that a protest at Ambiance would lead to violence.  Before a single protester arrived at Ambiance, and with no specific intelligence of plans for violent actions, the government assigned a federal agent to go undercover and conduct surveillance of the anticipated protest—an agent who deliberately mislead protesters into going to an incorrect location and filmed protesters to gather their identities.  Another agent took pictures of protesters from a

---

[7]  Bill Hutchinson, *LA protests timeline: How ICE raids sparked demonstrations and Trump to send in the military*, ABC News (June 11, 2025), https://abcnews.go.com/US/timeline-ice-raids-sparked-la-protests-prompted-trump/story?id=122688437.

window inside Ambiance.[8]  The government would not have taken such steps for a neighborhood barbeque popping up in the front entrance.

Mr. Huerta was a specific target for Agent Ribner and Officer Crook, despite the fact that he stood as one of a crowd protesting their actions.  He had targeted his speech directly at them, standing on the other side of the locked gate, specifically criticized and argued with them about their activities, leading to visible frustration.  Based solely on Mr. Huerta's words, Agent Ribner repeatedly threatened him with arrest while he was simply exercising his right to protest, and even specifically identified Mr. Huerta to other federal agents as a *potential* violent protester, with no other basis than his strong, protected speech.  *See* Ex. B at 9–10.  The moment the gate opened for the transport van, Agent Ribner and Officer Crook rushed past at least three protesters *actually* standing in front of the van to confront Mr. Huerta, who stood to its side, and conducted a particularly (and unconstitutionally) brutal arrest.

The arrest and charge against Mr. Huerta showcase how the government understands Section 1501's prohibition on obstruction, resistance, and opposition to agents effectuating a search warrant, to be a justification for pre-emptively targeting and silencing anti-law enforcement speech, and a vehicle for retribution against those whose speech they do not like.  This is the exact type of vague statute that the First and Fifth Amendments seek to protect against.

---

[8] Of course, law enforcement is entitled to take measures to protect itself.  And in DHS investigation reports, Agent Ribner and others cite examples of other anti-ICE protests where law enforcement experienced actual violence.  *See generally*, Ex. B. But "[t]he many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others.").  *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817, 834 (9th Cir. 2020).

IV.    **The Information Results From the Government's Retaliatory and Brutal Arrest of Mr. Huerta, in Violation of his First and Fourth Amendment Rights.**

A court may exercise its supervisory powers to dismiss an indictment "for three reasons: to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct."  *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).  All three are applicable here.

The government's pre-meditated, brutal arrest of Mr. Huerta violated his First and Fourth Amendment rights, and the trumped-up charge against him rest entirely on protected First Amendment speech.  Mr. Huerta has no redress for these violations outside of dismissal of the Information, as civil suits against federal agents for constitutional violations have been essentially eliminated.  Without this Court's action here, the federal officers that committed these violations will continue to do so undeterred.

A.    **Mr. Huerta was Arrested in Retaliation for His Protected Speech.**

Law enforcement "action designed to retaliate against and chill political expression strikes at the heart of the First Amendment."  *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir.1986), *cert. denied*, 479 U.S. 1054 (1987).  Such acts can range from arrests to unusually aggressive uses of force to surveillance.  While law enforcement can take general measures to ensure their safety against violence, it is well-established that "the proper response to potential and actual violence is . . . to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure."  *Collins*, 110 F.3d at 1373 (internal citations omitted).  And "[d]iscrete acts of police surveillance and

30

intimidation directed solely at silencing" protesters are prohibited.  *Gibson*, 781 F.2d at 1338.

To prove retaliation, a defendant must show (1) "he engaged in constitutionally protected activity," (2) "as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity," and (3) "there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022).

As set out in Argument Sections II and III, Mr. Huerta engaged in First Amendment-protected speech during the entire "course of conduct" he is charged under.  Mr. Huerta questioned, heckled, and chanted at law enforcement, and interacted with Officer Crook and Agent Ribner in particular.  He spoke and criticized matters of critical public importance while standing in a public forum.  *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.") (quoting *Claiborne Hardware Co.*, 458 U.S. at 913 (internal quotations and citation omitted)).

The pre-meditated targeting of anti-ICE protests, the pre-emptive surveillance of individual protesters, like Mr. Huerta, and the targeted arrest and harassment of Mr. Huerta (threatening him with "arrest" immediately once he harangued the agents) constitute adverse actions.  When Mr. Huerta and other protesters arrived, stood and protested, Officer Crook took out his phone and walked back and forth in front of the gate, overtly filming his and other protesters' faces—a clear attempt to intimidate and silence their activities.  *See* Ex. Q.  While Mr. Huerta criticized the agents and participated in the sit-in in front of the gate, Agent Ribner repeatedly threatened him with arrest.  On that basis alone, Agent Ribner assumed that Mr. Huerta would engage in violence, and reported this assumption to other agents,

31

solely based on his protected activities.  And Officer Crook and Agent Ribner made a beeline for Mr. Huerta the moment they could exercise their "awesome power" to manufacture an excuse for arrest.  And it is particularly notable that, despite substantial evidence of other protesters standing directly in front of the van, only Mr. Huerta was charged.

The brutality of Mr. Huerta's arrest is an additional adverse action against him.  The moment the gate opened for the white van, Agent Ribner and Officer Crook rushed past at least three protesters actually standing in front of the van to confront Mr. Huerta, who stood to its side.  Without taking a breath, Officer Crook shoved Mr. Huerta, and then when Mr. Huerta regained his feet, shoved him to the ground.  Agent Ribner took over and essentially tackled Mr. Huerta—who was already on the ground—to begin effectuating his arrest.  Mr. Huerta was flipped onto all fours, held down by his neck, and flipped again onto his stomach, with Agent Ribner and two other agents piling on top of him, and his forehead barely hovering above a concrete curb.  Unable to get Mr. Huerta's arms behind his back, Agent Ribner sprayed pepper spray into his hand and rubbed it all over Mr. Huerta's fact and eyes, knocking Mr. Huerta's head into the curb.  Mr. Huerta repeatedly stated that he couldn't breathe.  *See* Ex. B at 12.  Despite Mr. Huerta calmly repeating that he had a bad shoulder and requesting that Agent Ribner not handcuff him behind his back, Agent Ribner wrenched his arm behind his back and handcuffed him, and then the other agent lifted him from the ground using his handcuffed arms.  Mr. Huerta can be seen screaming in pain.  It is telling that the majority of other agents used no force at all in their crowd control methodology.  Most simply spread their arms wide and the protesters around them backed away from the van.  Protestors were also given an instruction to move, an instruction that Agent Ribner and Officer Crook failed to give Mr. Huerta before violently taking him down.

The causal relationship between Mr. Huerta's speech and Agent Ribner and Officer Crook's brutality is apparent from these facts. Mr. Huerta heckled and spoke to Agent Ribner and Officer Crook specifically, and they took out their anger and frustration on him at the first opportunity.   Their undue aggression is a strong indicator that the use of force and arrest was in retaliation for the message of his protest. *See Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020) ("[S]ome of the aggressive conduct described in the declarations, such as shooting a reporter with a rubber bullet even though it does not appear she was engaged in illegal activity or posed a threat of any kind, raises a serious question as to whether some of the uses of force described in those declarations was in reaction to the anti-police message of the protests and aimed at intimidating protesters to deter such speech."); *see also*, *NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F. Supp. 3d 382, 399–400 (N.D. Cal. 2021) ("[G]iven that the protestors were specifically protesting police misconduct, it is reasonable to allege that the protestors' viewpoint was a substantial or motivating cause – even if not necessarily the sole cause – behind the [officers' uses of force]).

Agent Ribner, and his superiors at DHS, have a documented history of disdain towards protesters.   For example, in his interview, "Ribner stated HUERTA and other protesters are "vicious, horrible people."   In addition, in *Los Angeles Press Club*, when the court granted a preliminary injunction against the excessive and retaliatory force used by law enforcement during the Los Angeles anti-ICE protests in summer 2025, the court found that the evidence "suggests that [Defense Secretary Kristy] Noem ratified [law enforcement's] practice of meeting First Amendment protected activities with force." 799 F. Supp. 3d at 1067.[9]

---

[9] Citing *"Train Wreck Mayor": Kristi Noem Slams LA Official* (June 10, 2025), Fox News,  https://www.youtube.com/watch?v=ymYIXrH9pjg ("The more that they protest and commit acts of violence against law enforcement officers, the harder ICE

33

The photos, videos and interview statements make clear that, if not for Mr. Huerta's anti-ICE messaging and his criticism directed at Agent Ribner and Officer Crook, he would not have been the target of such brutality. For this reason, Agent Ribner and Officer Crook's aggressive and unconstitutional uses of force violated Mr. Huerta's First Amendment rights.

**B.    In Effectuating Mr. Huerta's Arrest, the Government Used Unreasonable Excessive Force, in Violation of the Fourth Amendment.**

Agent Ribner's and Officer Crook's uses of force were also unconstitutionally excessive. "An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances." *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 428 (2017). In determining whether unconstitutional excessive force has occurred, courts look to the totality of the circumstances and weigh a number of factors, "including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively

---

is going to come after them ..."); *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, Forbes (July 12, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 ("[V]iolence is anything that threatens [ICE agents] and their safety, so it is ... videotaping them, where they're at, when they're out on operations."); Declaration of Ryan Shapiro ¶ 3, Ex. A at 3 [Dkt. 34-19] ("One of the most common methods of threatening [Law Enforcement Officers] comes from online doxing ... Other tactics include ... livestreaming [Law Enforcement Officer] interactions ..."). In addition, in the recent assault trial under 18 USC §111 of Mr. Brito Ramos in the Central District of California, U.S. Border Patrol Sector Chief Gregory Bovino was questioned about his past comments calling undocumented immigrants "scum." Brittny Mejia & James Queally, Protester found not guilty of assault despite top Border Patrol official's testimony, L.A. Times (Sept. 17, 2025), https://www.latimes.com/california/story/2025-09-17/immigration-protest-case-trial-los-angeles.

resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The most important factor is whether the suspect posed an immediate threat." *Fortson v. City of Los Angeles*, 628 F. Supp. 3d 976, 988 (C.D. Cal. 2022). Pushing an unarmed, nonviolent, non-fleeing, nearly 60-year-old alleged misdemeanant to the ground, tackling him, having agents piling on and throwing him around, rubbing pepper spray into his eyes, and then handcuffing him behind his back despite a known shoulder injury, constitutes excessive force.

At the time of his arrest, Mr. Huerta was not pushing, assaulting, contacting or doing anything violent to an officer, and the charge against him is a misdemeanor. Obstruction crimes are generally considered "far from severe." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013); *Carr v. Cnty. of San Diego*, 2021 WL 4244596, at *14 (S.D. Cal. Sept. 17, 2021) (collecting cases). In *Headwaters II*, the Ninth Circuit held "that police officers employ excessive force in violation of the Fourth Amendment when they use pepper spray upon an individual who is engaged in the commission of a non-violent misdemeanor and who is disobeying a police officer's order but otherwise poses no threat to the officer or others." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1168 (9th Cir. 2011) (summarizing *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002), *as amended* (Jan. 30, 2002)). Mr. Huerta also was entirely under the officers' control when Agent Ribner deployed pepper spray—in fact, he was essentially at the bottom of a dog pile. *See Headwaters II*, 276 F.3d at 1130 ("Where officers had control over the protestors it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control."). And despite the fact that Mr. Huerta informed him of his shoulder injury, Agent Ribner still handcuffed him behind his back, causing visible, immeasurable pain. *See Palmer v. Sanderson*, 9 F.3d 1433, 1434–35 (9th Cir. 1993) (finding excessive force claim where officer allegedly pulled a 67-year-old man with mobility issues out of a car, "handcuffed

35

him, and pushed him into the back seat of the patrol car with such force that Palmer fell over sideways . . . . [and] refused his request to loosen them."); *Blankenhorn v. City of Orange*, 485 F.3d 463, 478–79 (9th Cir. 2007) (holding officers used excessive force when they "gang-tackled" a suspect who had committed misdemeanor trespass and the suspect neither posed an immediate threat nor attempted to flee).

On balance, the government's interest in effectuating any force against Mr. Huerta was negligible at best, and yet they arrested him with unquestionable brutality. This violated his Fourth Amendment right to be free of excessive force.

### C.    Dismissal Provides the Only Remedy for These Violations.

This Court should dismiss the Information using its supervisory powers. In arresting and charging Mr. Huerta, the government violated his First and Fourth Amendment rights. The charge against him stem entirely from the exercise of his First Amendment right to criticize and protest government actions—and the government's unclear charge against him may even include Mr. Huerta's actions during his arrest. None of his First Amendment-protected activities can be validly placed before a jury. Finally, no adequate mechanism exists to deter federal agents from continuing to commit these constitutional violations in the future. After the Supreme Court decided *Egbert v. Boule*, 596 U.S. 482, 498 (2022), the opportunity for redress for victims of such retaliatory excessive force under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 (1971), is slim to none. *See Goldey v. Fields*, 606 U.S. 942, 942 (2025) (emphasizing that the Supreme Court has not implied any new constitutional cause of action under *Bivens* since 1980 and instructing courts should not do so "in all but the most unusual circumstances"). For this reason, "suppression of the evidence and dismissal of the indictment are the only relief available . . . [and] the only adequate deterrent for the officers' conduct." *United States v. Quintanilla-Chavez*, 2025 WL 2982191, at *18 (W.D. Tex. Oct. 20,

36

2025) ("[D]ismiss[ing] the indictment based on the constitutionally excessive force deployed during the Defendant's arrest" in part due to the need for deterrence). Suppression of evidence would provide no remedy, as the evidence against Mr. Huerta was not gathered as a result of his unconstitutional arrest.  In light of the lack of a valid charge against him, and the clear constitutional violations by the arresting officers, the Information should be dismissed.

## CONCLUSION

For the foregoing reasons, Mr. Huerta respectfully requests that this Court strike the first sentence of Section 1501 as unconstitutionally overbroad and dismiss with prejudice Mr. Huerta's charge that arises from this unconstitutional statute.  In the alternative, this Court should find that, as applied to Mr. Huerta, Section 1501 is unconstitutionally vague, in violation of the First and Fifth Amendments, and dismiss the Information with prejudice.  Finally, as a separate and independent reason for dismissing the Information, this Court should exercise its supervisory powers to dismiss with prejudice, as the Information arises out of a retaliatory arrest using excessive force, in violation of Mr. Huerta's First and Fourth Amendment rights.  As no adequate deterrence mechanisms exist for similar future violations, and as Mr. Huerta has no other avenues of redress, dismissal with prejudice is appropriate.

A Proposed Order is attached to this motion.


Dated: January 6, 2026                     Respectfully submitted,

LOWELL & ASSOCIATES, PLLC

By:   _/s/ Abbe David Lowell_
         Abbe David Lowell

MCLANE, BEDNARSKI & LITT, LLP

37

By:   _/s/ Marilyn E. Bednarski_____
       Marilyn E. Bednarski

*Attorneys for Defendant David Huerta*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Mr. Huerta, certifies that this brief contains 37 pages, totaling 11,300 words, which complies with the page limit set by the Court's Order, dated January 6, 2026.  ECF 54.

Dated: January 6, 2026                          */s/ Abbe David Lowell*
                                                            Abbe David Lowell