MARILYN E. BEDNARSKI, SBN 105322
E-Mail: mbednarski@mbllegal.com
McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

ABBE DAVID LOWELL, *pro hac vice*
DAVID A. KOLANSKY, *pro hac vice*
E-Mail: alowellpublicoutreach@lowellandassociates.com
E-Mail: dkolansky@lowellandassociates.com
Lowell & Associates, PLLC
1250 H Street, NW, Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116

Attorneys for Defendant
DAVID HUERTA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> DAVID HUERTA, <br><br> *Defendant*. | CASE NO.: 2:25-CR-00841-SB <br><br> **DEFENDANT'S OMNIBUS REPLY IN SUPPORT OF HIS MOTIONS TO DISMISS THE INFORMATION** |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

I.     THE INFORMATION SHOULD BE DISMISSED FOR FAILURE TO STATE A CRIME. ......................................................................................2

    A.    The Information Facially Fails to Provide Notice of Charged Conduct. ..................................................................................................3

    B.    A Bare-Bones Information Does Not Immunize the Government from Challenges to Its Charge. .......................................................5

II.    SECTION 1501'S FIRST PARAGRAPH IS FACIALLY OVERBROAD...6

    A.    The Government's Limited Construction is Not Supported By Text or Precedent. ..........................................................................6

    B.    Section 1501's Plainly Legitimate Sweep Includes Substantial Protected Activities. .......................................................15

        1.    Mr. Huerta's Own Charge Shows the Actual Overbreadth of the Statute. ..............................................................15

        2.    Though Rarely Charged, Section 1501's Paragraph is Most Often Applied Unconstitutionally.......................................19

III.   SECTION 1501 IS UNCONSTITUTIONALLY VAGUE AS-APPLIED TO MR. HUERTA ...............................................................21

IV.    THIS CHARGE RESULTS FROM THE GOVERNMENT'S RETALIATORY AND BRUTAL ARREST OF MR. HUERTA, IN VIOLATION OF HIS FIRST AND FOURTH AMENDMENT RIGHTS, AND MR. HUERTA WAS PREJUDICED. .................................................25

CONCLUSION ..................................................................................................28

i

# TABLE OF AUTHORITIES

**Cases**

*Avery v. King*, 110 F.3d 12 (6th Cir. 1997) ............................................................21

*Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146 (C.D. Cal. 2022) ....................27

*Blake v. United States*, 71 F. 286 (1st Cir. 1895) ....................................................4

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ..............................27

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ...........................................................18

*City of Houston v. Hill*, 482 U.S. 451 (1987) ...........................................11, 12, 13

*Cheek v. United States*, 498 U.S. 192 (1991) .........................................................13

*Coleman v. United States*, 268 F. 468 (6th Cir. 1920) ...........................................20

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ..........................................................18

*Edwards v. City of Coeur d'Alene*, 262 F.3d 856 (9th Cir. 2001) ..........................16

*Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788 (9th Cir. 2020)
................................................................................................................................24

*Hamling v. United States*, 418 U.S. 87 (1974) .........................................................2

*Hibbs v. Winn*, 542 U.S. 88 (2004)...........................................................................9

*Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020)
................................................................................................................................16

*Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010) ......................................16

*King v. Ambs*, 519 F.3d 607 (6th Cir. 2008)...........................................................10

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).....................................................15

*N.Y. Times v. Sullivan*, 376 U.S. 254 (1964) .........................................................17

*Nicodemus v. City of S. Bend*, 137 F.4th 654 (7th Cir. 2025) ................................14

*Norton v. Ashcroft*, 298 F.3d 547 (6th Cir. 2002) ..................................................14

*People v. Vasquez*, 465 Mich. 83 (2001).................................................................10

*Pettibone v. United States*, 148 U.S. 197 (1893).......................................................4

*Reno v. Am. C.L. Union*, 521 U.S. 844 (1997) .........................................................6

*Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984)....................18

*United States v. Atkinson*, 232 F.3d 897 (9th Cir. 2000)..........................................13

*United States v. Bear Ribs*, 562 F.2d 563 (8th Cir. 1977)......................................10

*United States v. Brakke*, 934 F.2d 174 (8th Cir. 1991) ..........................................21

*United States v. Buck*, 24 F. Cas. 1289 (E.D. Pa. 1860)..........................................20

*United States v. Carpenter*, 2012 WL 292480 (W.D. La. Jan. 31, 2012) ..............20

*United States v. Crow*, 824 F.2d 761 (9th Cir. 1987)................................................2

*United States v. Grace*, 461 U.S. 171 (1983) .........................................................16

*United States v. Lopez*, 4 F.3d 1455 (9th Cir. 1993) ...............................................28

*United States v. Menasche*, 348 U.S. 528 (1955)......................................................9

*United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014)..........................................17

*United States v. Peifer*, 474 F. Supp. 498 (E.D. Pa. 1979)......................................21

*United States v. Phomma*, 561 F. Supp. 3d 1059 (D. Or. 2021) .............................11

*United States v. Pugh*, 90 F.4th 1318 (11th Cir. 2024) ..........................................8, 9

*United States v. Rundo*, 990 F.3d 709 (9th Cir. 2021) ...............................13, 17, 18

*United States v. Sanders*, 966 F.3d 397 (5th Cir. 2020)............................................3

*United States v. Schaffner*, 715 F.2d 1099 (6th Cir. 1983) .....................................21

*United States v. Simmons*, 96 U.S. 360 (1877).........................................................2

*United States v. Stands Alone*, 11 F.4th 532 (7th Cir. 2021).....................................9

*United States v. Stevens*, 559 U.S. 460 (2010) ..................................................17, 19

*United States v. Stowell*, 27 F. Cas. 1350 (C.C.D. Mass. 1854) ...............................4

*United States v. Tinklepaugh*, 28 F. Cas. 193 (C.C.S.D.N.Y. 1856).........................4

*United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998)....................................17

*United States v. Williamson*, 903 F.3d 124 (D.C. Cir. 2018) ....................................2

*Virginia v. Am. Booksellers Assn., Inc.*, 484 U.S. 383 (1988)..................................7

*Williams v. Taylor*, 529 U.S. 362 (2000)..................................................................9

**Statutes**

18 U.S.C. § 1071...........................................................................................................13

18 U.S.C. § 1073...........................................................................................................13

18 U.S.C. § 111 ...............................................................................10, 11, 12

18 U.S.C. § 1501 ..................................................................................*passim*

18 U.S.C. § 1509 .........................................................................................11

18 U.S.C. § 2101 .........................................................................................13

18 U.S.C. § 2231 .........................................................................................12

18 U.S.C. § 2232 .........................................................................................12

18 U.S.C. § 231 ..................................................................................8, 11, 12

18 U.S.C. § 248 ...........................................................................................14

Act of June 25, 1948, Pub.L. No. 80-772, 62 Stat. 683 ..............................8

Rev. Stat. § 5398 .......................................................................................4, 8

The Crimes Act of April 30, 1790, § 22, 1 Stat. 112. ............................8, 19

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)...........................................................................................................7

Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419 (2013)...........................................................................................8

Black's Law Dictionary (1st ed. 1891)....................................................8, 9

Earl M. Maltz, *Slavery, Federalism, and the Constitution: Ableman v. Booth and the Struggle over Fugitive Slaves*, 56 Clev. St. L. Rev. 83 (2008) ...............................20

Nathan Bailey & George Gordon, *Dictionarium Britannicum* (1730).....................8

Oxford English Dictionary (3d ed. 2021)..............................................4, 7

Oxford English Dictionary (revised ed. 2004) ...........................................8

Anne Enquist & Laurel Currie Oates, *Just Writing: Grammar, Punctuation, and Style for the Legal Writer* (3d ed. 2009)..................................................................3

Theodore Parker, *The trial of Theodore Parker: for the "misdemeanor" of a speech in Faneuil Hall against kidnapping, before the Circuit Court of the United States, at Boston, April 3, 1855*, Library of Congress (1870)................................................20

**Rules**

Fed. R. Crim. P. 7 ........................................................................................................2

**INTRODUCTION**

In opposing Mr. Huerta's motions to dismiss, the government revealed more about its actual theory of the charge against him than it has at any point of this case.[1] While better late than never, all its explanation (not provided in the Information itself but rather in a motions pleading three months later) has confirmed is that the charge against Mr. Huerta is nothing more than an allegation that he exercised his First Amendment rights to speak and associate in a public forum about issues of pressing societal and political importance.

There are four bases for the Court to dismiss the charge against Mr. Huerta. First, it can dismiss the charge on the basis that the Information failed to state a crime by simply reciting the words of a broad statute. Second, it can sever Section 1501's overly broad first paragraph from the rest of the statute. Third, it can find that the statute is unconstitutionally vague as applied to Mr. Huerta, as the charge against him does not provide sufficient notice of the difference between protected speech and criminal activities. Fourth and finally, this Court can exercise its supervisory powers to dismiss the charge, as Mr. Huerta has no other redress for the violation of his First and Fourth Amendment rights. Each outcome is an independent basis for dismissal. Taken together, however, they form a mandate to protect against and deter the use of criminal charges to repress free speech and retaliatory government abuse of its power.

---

[1] For the Court's convenience, and because the government filed an omnibus opposition to Mr. Huerta's two motions to dismiss (ECF 55, 56), Mr. Huerta files this omnibus reply brief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

## I.   THE   INFORMATION   SHOULD   BE   DISMISSED   FOR FAILURE TO STATE A CRIME.

The point of Federal Rule of Criminal Procedure 7(c)(1)'s requirement than an Information contain a "plain, concise and definite written statement of the essential facts" is to provide notice to a defendant on the offense charged and enable him to formulate a defense.  *See United States v. Simmons*, 96 U.S. 360, 362 (1877) (finding that it is "fundamental in the law of criminal procedure, that the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him, to the end that he may prepare his defence, and plead the judgment as a bar to any subsequent prosecution for the same offence").  The Information here provides no such notice.

For broadly worded statutes like Section 1501, notice requires more than a mere recitation of the statutory text.  *See United States v. Crow*, 824 F.2d 761, 762 (9th Cir. 1987) ("The use of a 'bare bones' information—that is one employing the statutory language alone—is quite common and entirely permissible *so long as the statute sets forth fully, directly and clearly all essential elements of the crime to be punished*") (emphasis added).  Statutory text "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged."  *Hamling v. United States*, 418 U.S. 87, 117–18 (1974).  At the very least, it must specify the time and place of the offense.  *See United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018).  Moreover, the very core of the offense of Section 1501's first paragraph is obstruction, resistance, or opposition to a specific officer in the process of serving or executing a specific warrant.  The Information's failure to include either the specific activity or the specific officer deprives Mr. Huerta of sufficient

notice.  The government's generic, all-encompassing "course of conduct" theory for charging Mr. Huerta will not suffice.

### A. The Information Facially Fails to Provide Notice of Charged Conduct.

As set forth in Mr. Huerta's motion, the Information's text alone fails to state an offense.  *See* ECF 56 at 1.  As written, the Information charges Mr. Huerta with knowingly and willfully obstructing, resisting, and opposing "an officer of the United States, and any such other person duly authorized, in serving and attempting to serve and execute" the search warrant.  ECF 29.  But the government's opposition reveals that significant statutory interpretation errors are its reason for the Information's lack of factual support, leading it to argue that information about the underlying search warrant is sufficient to provide Mr. Huerta with notice of his alleged offense.  It is not.

Section 1501's first paragraph has a straightforward grammatical construction: a subject ("whoever"), a string of three transitive verbs ("obstructs, resists, or opposes"), and their direct object, ("an officer, or any duly authorized person").  It has two modifiers: the adverbial phrase ("knowingly and willfully") and the prepositional phrase ("in serving, or attempting to serve or execute, any legal or judicial writ or process of any court of the United States, or United States magistrate judge").  Typical English grammar instructs that the direct object receives the action specified by transitive verbs.  *See* Anne Enquist & Laurel Currie Oates, *Just Writing: Grammar, Punctuation, and Style for the Legal Writer*, 166 (3d ed. 2009) (stating that a direct object "receive[s] the action of the verb"); *see also United States v. Sanders*, 966 F.3d 397, 406 (5th Cir. 2020) (explaining that direct objects "receiv[e] the action of a transitive verb").  In Section 1501, the direct object is the officer, not just the search warrant.  Applying these basic principles, the obstruction, resistance, and opposition criminalized in Section 1501 must impact a specific officer or

authorized person who is in the process of serving or executing a warrant, because the officer is the object of the verbs.[2]  An impact on the ultimate execution of the warrant itself is necessary for the crime, but not sufficient.  As written, the Information only provides notice to charge Mr. Huerta with obstructing a search warrant, not an officer.  It is therefore insufficient.[3]

The government argues it is enough that the Information merely "identifies the specific 'judicial writ of a court or signed by a Magistrate Judge' that the

---

[2] Prepositional phrases that include gerunds, like "serving" or "attempting," are "equivalent in sense to a temporal clause introduced by *when, while, if*."  *In*, prep., def. II.21(b), *Oxford English Dictionary* (3d ed. 2021, rev. online 2024).  The effect of this type of prepositional phrase is to set out what the object is doing at the time that it is impacted by the verb—here, serving or executing a warrant.

[3] The government asserts *Pettibone v. United States*, 148 U.S. 197, 206 (1893), is inapplicable because its "description" of Section 1501's predecessor statute, Rev. Stat. § 5398, was that of a United States district court opinion.  Opp. at 11 n.2 (citing *United States v. Tinklepaugh*, 28 F. Cas. 193, 193 (C.C.S.D.N.Y. 1856)).  Setting aside the fact that the Supreme Court relied on its characterization to find that an indictment under a similar statute must provide facts supporting a defendant's knowledge of an officer's official acts, the district court's opinion remains persuasive, as well as the only case to address this issue.  The government's citation to *United States v. Stowell*, 27 F. Cas. 1350, 1351 (C.C.D. Mass. 1854), is inapposite because it solely addresses whether the authority of the court or officer that *approved* the process must appear on the face of the warrant.  *Blake v. United States*, 71 F. 286, 288 (1st Cir. 1895), also cited by the government, discusses an indictment charged under Section 1501's second paragraph, which specified that the defendant "knowingly and willfully, with force and arms," "beat" and "wound[ed]" "a deputy marshal of the United States" named "Noah M. Prescott" who was "executing a warrant." While it discusses the same issue as *Stowell*, regarding whether the warrant itself was legal, that indictment provides far greater detail than the one issued by the government here. It also differentiates between the first and second paragraphs of Section 1501, noting that the first paragraph may require greater detail about the warrant itself.  *See id.* at 289 ("It is to be borne in mind that this indictment is not for resisting an officer under the first part of [Rev. Stat.] 5398, but for assaulting him under the latter part.  Therefore, it is clear that the allegations touching the warrant do not come in as the essence of the offense.").

4

defendant is being charged with obstructing," and that it provides the "Warrant Location." Opp. at 10. But the location of the search provides no information about the location or timing of the actual offense under Section 1501. Under the government's own description of the facts and law, 56 federal agents (and anyone hired to help them) were "executing" the search warrant over a period of several hours, moving in and out of the search warrant location. Opp. at 2. Unless the government is arguing that the obstruction, resistance, or opposition must occur at the address of the search location (which Mr. Huerta never set foot inside until after his arrest), the location of the search is not necessarily the location of the offense. These officers could be anywhere in the four-thousand square miles of Los Angeles County, or forty-thousand square miles of the Central District of California, "executing" the search warrant. With this reasoning, the Information is not specific enough to notify Mr. Huerta that his protest activity on a sidewalk near the search warrant location was the cause of his alleged crime, particularly as the government had changed its theory since issuing the original Complaint.

**B.    A Bare-Bones Information Does Not Immunize the Government from Challenges to Its Charge.**

The Court should resist the government's attempt to transform Mr. Huerta's motion into a challenge to the sufficiency of the evidence.[4] Opp. at 12. Mr. Huerta's challenge to the one-paragraph, eleven-line Information properly described government allegations and factual findings to demonstrate that the government's fluid conception of Mr. Huerta's alleged criminal conduct—from agents'

---

[4] Mr. Huerta disputes the government's claim that it can show sufficient evidence of the charge against him. As the government continues to provide additional, piecemeal discovery, as recently as January 24, 2026 (Production 9), Mr. Huerta reserves the right to respond to the government's erroneous factual contentions in a later motion.

contradictory statements that he threw himself on top of a government van unrelated to serving or executing the search warrant, to coordinating a protest to walking in front of a gate, to somehow cutting short a search that had gone on for hours—*could not* be noticed by this Information charging obstruction, resistance, or opposition to an officer who was serving or executing a search warrant.  The motion also correctly referred to the allegations that show that Mr. Huerta's charged activities were protected by the First Amendment, demonstrating the inherent vagueness of the statute's terms, and providing an additional reason that the government must specify the actual acts that violated the statute.  In these circumstances, there is no reason for the Court to ignore the true nature of the government's charge against Mr. Huerta. An Information broad enough to enable the government to change the actual conduct charged every time it is challenged is not an Information that states an offense.  For these reasons, the Information fails to state an offense against Mr. Huerta.

## II.    SECTION 1501'S FIRST PARAGRAPH IS FACIALLY OVERBROAD.

### A. The Government's Limited Construction is Not Supported By Text or Precedent.

In response to Mr. Huerta's arguments that Section 1501's first paragraph is unconstitutionally overbroad, the government does not contest that, if read to include its wide scope, Section 1501's first paragraph would sweep in protected activity. Rather, it claims that the scope of the statute is limited to "physical" obstruction or "obstructive conduct."  Opp. at 16, 19.  As this argument reduces the three terms "obstructs, resists, or opposes" into a single meaning and imports the term "physical" into the statutory text, it is a limiting construction.  While this Court may impose a limiting construction to avoid constitutional infirmities, it may do so "only if it is 'readily susceptible' to such a construction." *Reno v. Am. C.L. Union*, 521 U.S. 844, 884 (1997).  Courts cannot "'rewrite a ... law to conform it to constitutional

6

requirements.'" *Id.* at 884–85 (quoting *Virginia v. Am. Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1988)).  The government's limiting construction finds no support in the statute's text, context, or application, and it fails to argue that the statute would be constitutional without its narrowed construction.  The better reading of the statute covers expressive speech and activities, including certain types of physical obstruction.  The three verbs cannot be as limited as the government argues without impermissibly rewriting the statute, so the first paragraph must be struck from Section 1501.

As evidenced by their dictionary definitions, obstruct, resist, and oppose include far more than physical obstruction.  ECF 55 at 17–18.  And each verb contains definitions that include First Amendment-protected actions, such as being hostile to law enforcement, to strive against law enforcement actions, or to hinder. *See id.*  To support its limited definitions, the government relies on a patchwork of cherry-picked definitions to argue that the plain meaning of the three verbs is simply physical obstruction.  Opp. at 16–17, 19.  Statutory interpretation does not permit the government to ignore definitions that contradict their arguments without reason.[5] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012) ("[W]here there are multiple dictionary definitions, the Court must apply "the contextually appropriate ordinary meaning, unless there is reason to think otherwise.").   For example, the government cites to the one Oxford English Dictionary definition of "obstruct": "'block or impede passage along,' 'to place or be an  obstacle in,' or 'to render impassable or difficult of passage,'" Opp. at 16–17, that is relevant to obstruction of "an opening, thoroughfare, waterway, etc." and "a physical action or movement."  *Obstruct*, Oxford English Dictionary (revised ed.

---

[5] This court need not look farther than the actual cited definitions to see that the government has chosen the ones that support its position, while ignoring specifically applicable definitions that do not.

2004).  It omits all other definitions, such as the definition the dictionary specifies as relevant to law: "[t]o impede, stand in the way of, or retard the progress or course of (proceedings, a plan, an intention, etc.); (*Law*) to commit the offence of intentionally hindering." *Id.*; *see also*, Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 423 (2013) ("Although many people assume that the first sense listed in a dictionary is the 'main' sense, that is often quite untrue. . . . Using a dictionary knowledgeably requires a close reading of the principles discussed at the outset.").  The Eleventh Circuit's definitions of "obstruction" in 18 U.S.C. § 231(a)(3), in *United States v. Pugh*, 90 F.4th 1318, 1330 (11th Cir. 2024), do not substantiate the government's narrow vision of the terms obstruct, resist, and oppose in Section 1501.  *See* Opp. at 17.  The Eleventh Circuit limited the term "obstruct" by relying on dictionaries from when Section 231 was passed, in 1963.  *See id.*  But Section 1501 has been transposed, in near-identical form, since its original passage in 1790.[6]  Dictionaries from that era include broader definitions of "obstruct," such as "to hinder."[7]  Even if we are restricted to the legal meaning of this term, as derived from the most applicable version of Black's Law Dictionary, as in *Pugh*, the broader definition remains.  The first edition of Black's Law Dictionary, published in 1891, specified that the definition of "obstruct" that applied to "*obstruct[ing] an officer in the execution of his duty*," meant "[t]o impede or hinder; to interpose obstacles or impediments, to the hindrance or frustration of

---

[6] Section 1501 was passed, in near-identical terms, as Section 22 of the Act of April 30, 1790, 1 Cong. Ch. 9, 1 Stat. 112.  It was transposed into the Revised Statutes as Section 5398 and officially codified into Title 18 as Section 1501 in 1948.  *See* Act of June 25, 1948, Pub.L. No. 80–772, 62 Stat. 683.

[7] *See, e.g.*, Nathan Bailey & George Gordon, *Dictionarium Britannicum* (1730), https://books.google.com/books?id=CoRZAAAAcAAJ&pg=PP631#v=onepage&q &f=false (defining "to obstruct" as "to stop or shut up, to hinder"; defining "to resist" as "to withstand, to oppose, to be against"; and "to oppose" as "to set against, to put in composition, to withstand or thwart").

some act or service."  Obstruct, Black's Law Dictionary (1st ed. 1891), available at https://law.digital.georgetown.edu/handle/10822/707612.  The definition closest to the one the government cites here, "to block up; to interpose obstacles; to render impassable; to fill with barriers or impediments," applied to the context of "*obstruct[ing] a road.*"  *Id.*  Even if this court adopts *Pugh*'s principle that a statute's text must be defined by the definitions of terms at the time of its passage, the three verbs cannot be reasonably limited to physical impediments based on the physical definitions of "obstruct," as the government argues.

Determining the appropriate definition among many requires assessment of context, including ensuring that the statutory text is "construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted).  Courts "must 'give effect, if possible, to every clause and word of [the] statute.'"  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).  But the government reads three different verbs to *only* consider *physical* obstruction and conduct, including "oppose," the only verb that it acknowledges "is susceptible to multiple meanings."  Opp. at 17.  It justifies this determination through a misapplication of the doctrine of *noscitur a sociis*—that words in a list may inform the proper definitions of the others—ignoring the fact that "obstruct," "resist," and "oppose" also share common definitions that are unrelated to physical obstruction or obstructive conduct.  The government's reading renders "resist" and "oppose" superfluous, as it makes physical obstruction or obstructive conduct a requirement for all three verbs.  *See United States v. Stands Alone*, 11 F.4th 532, 535 (7th Cir. 2021) (declining to require each verb in 18 U.S.C.

§ 111(a)(1) to require "assault" as that "would render the remaining five verbs superfluous.").

As Mr. Huerta argued in his motion, *noscitur a sociis* counsels the opposite approach. The government's cited cases prove this point. In *People v. Vasquez*, 465 Mich. 83, 89 (2001), the Michigan Supreme Court interpreted "oppose" out of a list of five words, including obstruct, resist, assault, beat, and wound. It found definitions of these five words, relying on definitions from *Random House Webster's College Dictionary* (1991). It noted, however, that the combination of "obstruct, resist, oppose" *with three necessarily threatening or conduct-based words*, "assault, beat, wound" evinced an intention to find a common physical requirement. *Id.* at 90. In contrast, where obstruct, resist, and oppose were accompanied by different terms—impede and hinder—the "physical" limitation found in *Vasquez* did not apply. *See King v. Ambs*, 519 F.3d 607, 611 (6th Cir. 2008) ("In contrast to the state statute in *Vasquez,* the list of terms in the Columbia Township Ordinance, "obstruct[], resist[], impede[], hinder[] or oppose[]," presents a less apparently physical context in which to interpret the term "obstruct."). Like in *King*, the necessarily physical terms in Section 1501 are cabined to the second paragraph of Section 1501, not the first.[8] As Section 1501's first paragraph uses broadly defined

---

[8] The government agrees that these paragraphs "serve distinct purposes and criminalize[] distinct conduct," but draws the line between physical obstruction (the first paragraph) and physical violence (the second paragraph). Its case citations do not draw this same distinction, nor do they analyze the scope of Section 1501 beyond the question of force. Nor could they, as the "assault" does not require violence— or even touching—at all. *See, e.g.*, *United States v. Bear Ribs*, 562 F.2d 563, 564 (8th Cir. 1977) ("The common law offense of simple assault ... requires the showing of an offer or attempt by force or violence to do a corporal injury to another.").

10

verbs, without requiring physical or violent actions, the government's limiting construction finds no support from the doctrine of *noscitur a sociis*.

The most natural reading of the three verbs, as Mr. Huerta argues in his motion, includes a broad array of speech as well as conduct.  If Congress intended to limit Section 1501's first paragraph to physical conduct, it could have done so.  For example, Section 231 has avoided invalidation from overbreadth challenges, as its inclusion of the term "to act" excludes speech-based convictions.  *See United States v. Phomma*, 561 F. Supp. 3d 1059, 1068 (D. Or. 2021) ("The words 'any act' imply that the statute is directed towards conduct rather than speech.").  That Congress expressly provided such limitations in other statutes in the same chapter as Section 1501 category shows that this omission was intentional.[9]  *See, e.g.*, 18 U.S.C. § 1509 (prohibiting obstruction or interference "by threats or force").  Other obstruction statutes do the same.  *See, e.g.*, 18 U.S.C. § 111 ("*forcibly* assaults, resists, opposes, impedes, intimidates, or interferes with any" federal officer "while engaged in or on account of the performance of official duties.").

The government's attempt to distinguish *City of Houston v. Hill*, 482 U.S. 451 (1987), demonstrates is misunderstanding of the overbreadth doctrine, and First Amendment law in general.  Its first two arguments are easily disposed.  First, *Houston* remains binding precedent that statutes broadly criminalizing *opposing* law enforcement activities are overbroad in violation of the First Amendment.  The government's reading of the opinion to apply only to the term "interrupt" is an extraordinary stretch when the opinion treats the terms "interrupt" and "oppose" as equally abhorrent to free speech, going as far as to state that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking

---

[9] Section 1501 has retained its near-verbatim form since its original passage in 1790. However, Congress has revised its text on a few occasions, but has only made minor changes, and never to the string of verbs.

arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63.  Second, the city's concession that the physical and verbal assaults were preempted makes the case *more* analogous to Section 1501's first paragraph, as both species of assault are expressly prohibited by the second paragraph of Section 1501.

The government's argument that *Houston* is inapplicable because a footnote states that its holding does not invalidate statutes prohibiting "physical obstruction" fails to grasp that "obstruct" was not at issue, since it was not in the statute.  But the government's argument demonstrates the common thread of error throughout its opposition: a statute's overbreadth is not defeated by a single constitutional application.  There is no question that the government may impose restrictions on physical obstruction of law enforcement, so long as these restrictions survive the applicable level of First Amendment scrutiny.  The government does not argue that Section 1501's first paragraph would do so.  Nor could it.  It is not a time, place, and manner restriction on speech, nor is it narrowly tailored.  In fact, any example of obstruction, resistance, or opposition that the government argues is constitutional is directly addressed in other, more specific sections of the criminal code.  *See* 18 U.S.C. § 111; 18 U.S.C. § 231 ("commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder . . ."); 18 U.S.C. § 2231 ("forcibly assaults, resists, opposes, prevents, impedes, intimidates, or interferes with any person authorized to serve or execute search warrants or to make searches and seizures while engaged in the performance of his duties with regard thereto or on account of the performance of such duties[.]"); 18 U.S.C. § 2232 ("before, during, or after any search for or seizure of property by any person authorized to make such search or seizure, knowingly destroys, damages, wastes, disposes of, transfers, or otherwise takes any

12

action, or knowingly attempts to destroy, damage, waste, dispose of, transfer, or otherwise take any action, for the purpose of preventing or impairing the Government's lawful authority to take such property into its custody or control or to continue holding such property under its lawful custody and control."); 18 U.S.C. § 1071 ("harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person."); 18 U.S.C. § 1073 (fleeing prosecution, process, or testimony); 18 U.S.C. § 2101 (making it a crime "to incite a riot . . . to participate in, or carry on a riot . . .to commit any act of violence in furtherance of a riot; or . . . to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot.") (as narrowed by *United States v. Rundo*, 990 F.3d 709, 721 (9th Cir. 2021)).

Finally, the government argues that Section 1501's scienter requirement sufficiently limits its scope. Not so. Like in *Houston*, 482 U.S. at 469, n.18, a specific intent requirement provides little protection to First Amendment rights under this type of statute. *See United States v. Atkinson*, 232 F.3d 897, at *1 (9th Cir. 2000) ("A defendant's view as to the unconstitutionality or invalidity of the law is irrelevant to the issue of willfulness." (citing *Cheek v. United States*, 498 U.S. 192 (1991))). Nor will it help speakers or law enforcement interpret the line between speech and criminal conduct. Rather, it would incentivize law enforcement to criminalize the content of speech: that in opposition to, rather than support of, federal officers' service or execution of federal court writs and orders.

Section 1501's prohibition of "opposition" alone to law enforcement activity demonstrates a content-based restriction. Providing law enforcement with the discretion to arrest those who oppose their activities is an invitation for content-based discrimination. *See Nicodemus v. City of S. Bend*, 137 F.4th 654, 666 (7th

13

Cir. 2025) (finding that, in *Houston*, "the Supreme Court found the words "oppose," "molest," "abuse," or "interrupt" were too generic, giving police too much discretion to 'arrest individuals for words or conduct that annoy or offend them.' In other words, the ordinance effectively allowed the police to discriminate against speech based on its content") (internal citations omitted).  One cannot both "oppose" the execution of a warrant and "support" it.  The scienter requirement exacerbates this issue.  Opposition to law enforcement actions indicates a viewpoint—one that does not support the activities of the federal agents—and the scienter requirement ensures that that position is intentionally expressive.

The government's analogies to the FACE Act are entirely inapposite.  The FACE Act is limited to uses of force, true threats, and physical obstruction, for which it provides a specific definition.  18 U.S.C. § 248(e)(4) (prohibiting physical obstruction that "render[s] impassable ingress to or egress" of certain facilities).  The statute specifies that "Nothing in this section shall be construed . . . to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution."  18 U.S.C. § 248(d).  Courts have found that, while "the Act might incidentally affect some conduct with protected expressive elements, such as peaceful but obstructive picketing," it survived intermediate scrutiny.  *Norton v. Ashcroft*, 298 F.3d 547, 552 (6th Cir. 2002).  When contrasted against the FACE Act, the overbreadth of Section 1501's first paragraph is far more apparent.  It provides no definitions for any of its three verbs, nor does it specify where speakers should avoid standing to prevent violation of the law.  And it does not contain a word as inherently viewpoint based as "oppose."

The plain meaning of Section 1501's, when properly deduced, covers anything that obstructs, resists, or opposes an officer's service or execution of a warrant—whether those activities include verbal speech or expressive conduct, in a

14

public forum or in a house, so long as those activities hinder, stop, challenge, or contest the officer's actions.  It contains no limitations to unprotected speech, or any textual indication of tailoring at all.    The government's proffered limiting construction therefore has no basis in the text and should be rejected.

### B.    Section 1501's Plainly Legitimate Sweep Includes Substantial Protected Activities.

First Amendment overbreadth challenges are a "singular context" where "even a law with 'a plainly legitimate sweep' may be struck down in its entirety." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  For this reason, the government's identification of a few constitutional applications, such as running away from a law enforcement officer, does not materially impact the statute's full reach.  But the government argues that the statute's reach is confined to a few hypothetical examples—which it claims are not enough to show unconstitutional overbreadth.  Opp. at 20.  Its attempts to undermine the unconstitutionality of the charge against Mr. Huerta instead undermine this argument.

It is true that Section 1501's first paragraph is rarely charged.  The few examples that exist, however, demonstrate its substantial unconstitutional application.  From abolitionists protesting the Fugitive Slave Act of 1850 to an off-duty sheriff verbally contesting the arrest of his neighbor, Section 1501's first paragraph and its virtually identical predecessors have been quietly used for over two hundred years to criminalize dissent against law enforcement.  As it is currently being used for this same purpose against Mr. Huerta, there is little doubt that its substantial unconstitutional application is more than hypothetical.

### 1. Mr. Huerta's Own Charge Shows the Actual Overbreadth of the Statute.

Mr. Huerta's motion provided that the government's charge against him consists solely of allegations that he protested and heckled law enforcement agents

15

on a public sidewalk, which is quintessential First Amendment activity. The government's own briefing confirms this interpretation. Although the government claims that Mr. Huerta "is not being charged for protesting, or for any speech or criticism he uttered," it also describes his allegedly criminal conduct as "physically blocking the entrance to the Warrant Location," describing his protests on the public sidewalk, "sitting down on the ground to block the entrance to the Warrant Location," which describes Mr. Huerta's brief sit-in, and "through *his words* and conduct" "aiding and abetting other individuals . . . to do the same," describing their allegations that Mr. Huerta participated in and encouraged a protest. Opp at 21. It concedes that his activities conveyed a clear, political message, *see id.* at 21, 29, but appears to erroneously believe that statutes can criminalize any expressive activity so long as the government it labels it "conduct." *See id.* at 1 ("For example, defendant's argument that 18 U.S.C. § 1501 is overbroad fails because the statute prohibits obstructive conduct, not protected speech."). This is not the case.

Expressive conduct, like protests, marches, picketing, and sit-ins, is considered "speech." *See Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 830 (9th Cir. 2020) ("Public demonstrations . . . are clearly protected by the First Amendment"); *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 861 (9th Cir. 2001) ("It is well established that peaceful picketing and parading are forms of expressive communication protected by the First Amendment."). For expressive conduct in public forum, such as on public sidewalks, the government may regulate this speech through content-neutral time, place, and manner restrictions, such restrictions must be narrowly drawn and provide ample other avenues for expression. *See United States v. Grace*, 461 U.S. 171, 180 (1983). Even police dispersal orders are subject to scrutiny. *See, e.g.*, *Keating v. City of Miami*, 598 F.3d 753, 764 (11th Cir. 2010) (finding that the dispersal of a crowd demonstrators who were exercising

16

their freedom of expression violated the protestors' First Amendment rights).[10] There are also categories of verbal or expressive conduct that are considered unprotected: "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citations omitted). But even these categories no not enjoy "talismanic immunity from constitutional limitations." *N.Y. Times v. Sullivan*, 376 U.S. 254, 268 (1964).

Although it acknowledges that even Mr. Huerta's "conduct" is expressive, the government does not explain how Mr. Huerta's activities fall outside of the First Amendment's protection under these long-standing precedents. Mr. Huerta stood on the public sidewalk to engage in a nonviolent protest against the federal officers' activities. The government does not accuse Mr. Huerta of engaging in a category of unprotected speech, like true threats; it does not cite a reasonable time, place, and manner restriction limiting his right to protest on a public sidewalk; and it does not provide any other avenue by which the government may lawfully proscribe his speech.

One example stands out in particular. Although the government states that it is not charging Mr. Huerta for his protected *verbal* speech, it states that it is charging him for "encourag[ing] other individuals to join him in blocking the entrance of the Warrant Location in the same manner eventually contributing to LAPD declaring a riot at the Warrant Location." Opp. at 25. But the Ninth Circuit has "conclude[d]" that the First Amendment protects speech tending to "encourage" or "promote" a riot. *Rundo*, 990 F.3d at 717. It is too attenuated from any actual riot for there to be

---

[10] The government's own cited cases spell out these requirements. *United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998) (FACE Act satisfied intermediate scrutiny); *United States v. Osinger*, 753 F.3d 939, 944 (9th Cir. 2014) (finding 18 U.S.C. § 2261A constitutional as the "conduct" defined in the statute only included speech integral to criminal conduct).

incitement to imminent lawless action. *See id.* (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969)).

Furthermore, it would be incongruous with foundational principles of First Amendment jurisprudence to force Mr. Huerta to wait for others to be unconstitutionally prosecuted under this statute to find it invalid on its face. Pre-enforcement challenges are permitted in the First Amendment context "because of a judicial prediction or assumption that [a] statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984). For criminal statutes, "the threat" of criminal sanctions deters "almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963). And "[t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

Section 1501's first paragraph may be forming the basis of arrests and detentions without filed charges to substantiate its application. The government has made no secret of its arrests pursuant to obstruction of justice statutes of protesters allegedly obstructing or opposing ICE operations. Bill Essayli, currently serving as the First Assistant United States Attorney for the Central District, has repeatedly stated that he views protected protest activities as obstruction of justice. On June 27, 2025, Mr. Essayli reposted a video to X, stating, "anyone who touches an agent or gets in the way of an operation, you will be arrested…you will be charged with a crime…it's a felony." Inside California Politics (@CaliforniaICP), X, https://x.com/californiaicp/status/1938703893019394453?s=46. Mr. Essayli has maintained this position, posting on X, "I can't be anymore [sic] clear. If anyone touches our agents or gets in our way, you will be arrested and charged with a federal crime." Bill Essayli (@USAttyEssayli), X,

https://x.com/usattyessayli/status/1948865784916443293?s=46.  In fall 2025, Mr. Essayli stated in an interview, "[t]hings have quieted down a lot [in Los Angeles]…We've charged about 100 individuals, mostly the leaders of these activists…They are [] very loud and very organized, we have to dismantle them." Bill     Essayli     (@USAttyEssayli),     X     (Oct.     25,     2025), https://x.com/usattyessayli/status/1982142755980861487?s=46.     He has since stated that "[a]ssault and obstruction of law enforcement cannot be normalized," calling the anti-ICE protests in Minnesota an "insurrection" that the federal government "will put down . . . just as we did in Los Angeles." Bill Essayli (@USAttyEssayli),     X     (Jan     16,     2026), https://x.com/USAttyEssayli/status/2012043025741140200.

This Court cannot assume the government will apply its self-imposed limited construction for future charges, particularly where it has not done so here.  Courts cannot "uphold an unconstitutional statute merely because the Government promised to use it responsibly."  *Stevens*, 559 U.S. at 480.  Like in *Stevens*, "[t]his prosecution is itself evidence of the danger in putting faith in government representations of prosecutorial restraint."  *See id.*  Evidence of Mr. Huerta's own unconstitutional charge is sufficient to show the substantial overbreadth of Section 1501's first paragraph.

### 2.  Though Rarely Charged, Section 1501's Paragraph is Most Often Applied Unconstitutionally.

To the extent that this Court, like the government, requires more, records of charges under Section 1501's first paragraph are few and far between, but still support its substantial overbreadth.

Its application largely begins in the public record in the mid-nineteenth century, where Section 1501's predecessor statute, Section 22 of the Act of April 30, 1790, was used to prosecute abolitionists advocating against the Fugitive Slave Act

of 1850. For example, on April 3, 1855, Minister Theodore Parker was charged with a violation of Section 1501's predecessor for obstruction, resistance, and opposition, after he preached against federal law enforcement kidnapping formerly enslaved persons and returning them to their "masters." *See* Theodore Parker, *The trial of Theodore Parker: for the "misdemeanor" of a speech in Faneuil Hall against kidnapping, before the Circuit Court of the United States, at Boston, April 3, 1855*, Library of Congress (1870), transcript available at: https://tile.loc.gov/storage-services/service/ll/llst/001/001.pdf. Speaking in his own defense, Minister Parker decried that the charges against him "would make my daily talk a 'misdemeanor,' my public preaching and my private prayers a 'crime,' nay, my very existence is constructively an "obstruction" to the marshal." *Id.* He argued the charge "is a quo warranto against all Freedom of Speech," noting that everyone who expressed dissent—from clergymen to newspapers—would be guilty of a misdemeanor for "opposition" under this act. *Id.* Similar charges were brought against other vocal abolitionists. *See* Earl M. Maltz, *Slavery, Federalism, and the Constitution: Ableman v. Booth and the Struggle over Fugitive Slaves*, 56 Clev. St. L. Rev. 83, 97 (2008) (discussing underlying charges against Sherman Booth, an abolitionist activist, including one under Section 1501's first paragraph); *United States v. Buck*, 24 F. Cas. 1289 (E.D. Pa. 1860) (charges against abolitionist dismissed under Section 1501's predecessor statute).

Few examples exist in the last century, but the balance still favors overbroad application. In *United States v. Carpenter*, 2012 WL 292480, at *2 (W.D. La. Jan. 31, 2012), *aff'd*, 500 F. App'x 331 (5th Cir. 2012), an off-duty police chief was convicted of violating Section 1501's first paragraph after he, in a "very animated," "very confrontational, very excitable" way verbally challenged federal officers' arrest of one of his neighbors. In *Coleman v. United States*, 268 F. 468, 469 (6th Cir. 1920), the defendant was charged with two counts of violating Section 1501—

one for the first paragraph and one for the second.  He had used "abusive language" to the officer executing an arrest warrant and fired his revolver at him.  It is no mystery which action was "assault", and which was "opposition."  In *United States v. Brakke*, 934 F.2d 174, 177 (8th Cir. 1991), an individual was charged with "passive resistance to the marshals' requests that he vacate his vehicle" under Section 1501's first paragraph.  In *United States v. Peifer*, 474 F. Supp. 498, 500 (E.D. Pa. 1979), *aff'd*, 615 F.2d 1354 (3d Cir. 1980), the defendant was convicted of violating Section 1501, where he or his employee moved vehicles to block federal agents from accessing parts of his property during the execution of a search warrant.  Other cases are also indicative.  In *Avery v. King*, 110 F.3d 12, 13 (6th Cir. 1997), the Sixth Circuit found that an officer had probable cause to arrest a woman under Section 1501 because she was "agitated, insulting and verbally abusive" to federal officers executing a search warrant, including telling them that "they had no right to be on her property" and refusing to leave the scene.  In *United States v. Schaffner*, 715 F.2d 1099, 1101 (6th Cir. 1983), the court found that a defendant could be charged under Section 1501 when he "gave counsel, and advice to a witness in a criminal prosecution to avoid service of a subpoena."  Adding Mr. Huerta's case to these cases, the balance tips in favor of unconstitutional overbreadth.

## III.    SECTION 1501 IS UNCONSTITUTIONALLY VAGUE AS-APPLIED TO MR. HUERTA[11]

Section 1501's first paragraph is fatally vague as applied to Mr. Huerta.  Mr. Huerta stood on a public sidewalk and protested outside of a location where a search warrant happened to be being executed.   He engaged in prototypical protest activities—such as chanting, heckling, and briefly joining a sit-in and picket-line

---

[11] Mr. Huerta has never raised a facial vagueness challenge to Section 1501's first paragraph, as he does not contend that the statute is unconstitutional in *all* of its applications.

outside of the closed gate of the Ambiance warehouse. This conduct is not clearly proscribed by the statute, and as argued in Section II, if it is, then the charge is unconstitutional under the First Amendment. Without any guidance for the spatial or temporal proximity necessary to obstruct, resist, or oppose an officer, or any reasonable method for differentiating between First Amendment protected activities and unprotected or non-expressive activities, Mr. Huerta could not have had notice for when his activities could violate the statute, or cross a line from constitutional to criminal. These deficiencies render it unconstitutionally vague as applied to Mr. Huerta.

The government's own opposition demonstrates the statute's vagueness. Under its new allegations of Mr. Huerta's "course of conduct," it does not accuse Mr. Huerta of any activities that are clearly proscribed by the statute. First, it states that the activity clearly proscribed by the statute was Mr. Huerta's "conduct in blocking the entrance to the Warrant Location." Opp. at 24. Section 1501's first paragraph requires obstruction, resistance, or opposition to an *officer*, *see supra*, Section I.A, but the government constructs its arguments entirely around Mr. Huerta's alleged obstruction of a physical location. Obstructing an entrance is not proscribed by the statute. The statute's vagueness regarding spatial and temporal proximity to the officer becomes apparent in the government's interpretation, because it reads the statute to prohibit standing near any place of ingress or egress from a search location as sufficient to obstruct the specific officer.

Next, the government alleges that Mr. Huerta blocked a government van and its path, thereby blocking a federal officer or duly authorized person serving or executing the warrant. Opp. at 12–15. Setting aside that Mr. Huerta did not do so, the government van at issue was not being driven by a federal officer or duly authorized person executing *this* search warrant. The government chastises Mr. Huerta for arguing the transport van at issue was used only to "transport detainees,"

*id.* at 12, stating instead (without any citation) that the van "also transported federal agents from the Warrant Location to the Federal Building" and positing the van "could have been used for many other purposes." *Id.* at 13, n.3. But it was the government's *own interview notes* of that van driver, Brian Gonzalez, which recorded that *he stated* the van at issue was used to "transport 10 detainees" and had returned to the location "as there were more outstanding detainees." ECF 55-13, Ex. L at 3. Neither these notes nor the government's other produced evidence indicate that the van Mr. Huerta allegedly obstructed was used to ferry federal officers executing the search warrant. Rather, it apparently was only ever used to transport detainees. Worse, the government's hypothetical, Opp. at 13, n.3, blends the *actual van* at issue (driven by Mr. Gonzalez, seen approaching at approximately 12:15 p.m.) with the numerous other vans at the search location that day, which are irrelevant to its allegation.

Additionally, these detainees were not arrested pursuant to, or even incident to, the specific search warrant underpinning the Section 1501 offense alleged here. True, the government states that the van "was designed to helped marshal the nearly 69 employees to a secure location while federal agents continued to search the Warrant Location for evidence," Opp. at 14, as part of its "limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 13 (citation omitted). But a pre-operation HSI PowerPoint, produced by the government, specified that these 69 employees had been pre-identified "of the one-hundred fifty-one (151) employees" that had allegedly "utilized fraudulent documents and/or identification (ID) and/or had expired documents." *See* M. Bednarski Declaration, Ex. R (HSI PowerPoint Deck). It directed the federal agents to "administratively arrest anyone that is on the list of 69 employees" and to "administratively arrest anyone additional believed to be illegal." *Id.* The government's contention that these detainees were simply employees detained incident to the search that day is a

23

misrepresentation, as these individuals were *administratively arrested*, not temporarily detained on the basis of the search warrant process. Executing a search warrant is entirely distinct from serving or executing an administrative warrant or detainer for arrest, or a warrantless arrest based on probable cause suspicion. Specifically, search warrants are issued by *federal courts* and therefore are considered "legal or judicial writ[s] or process[es] of any court of the United States, or United States magistrate judge," under Section 1501. They do not pre-authorize arrests. By contrast, administrative arrests for immigration enforcement are authorized by *administrative agencies and law enforcement officers*, not by United States courts. *See Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 798 (9th Cir. 2020) (describing administrative arrests and warrants for immigration enforcement). As the search warrant itself did not (and could not) authorize the administrative arrest of 69 employees, some or all of whom the government then transported offsite, there is no connection between the van driver used to transport such detainees and the execution of the search. The government's misinterpretation of the statute demonstrates its vagueness.

The government's remaining allegations (again all in pleadings and not in the Information itself) are even more attenuated from the statute. It accuses Mr. Huerta of creating the conditions, through his protest activity, in which that same government van's tire was allegedly slashed. Opp. at 15. It accuses him of participating in a protest that federal agents were assigned to observe, taking resources away from the search. *Id.* at 14–15. It even accuses him of creating the conditions of an allegedly violent protest, which only occurred after federal officers physically assaulted Mr. Huerta in front of a crowd during his arrest. *Id.* at 15. These allegations are so attenuated from obstruction of an officer that only an unconstitutionally vague statute could sustain them.

24

Nor does the government meaningfully rebut Mr. Huerta's argument that the statute is unconstitutionally vague in that it fails to draw lines between constitutionally protected conduct and criminal conduct.  The government concedes that the non-verbal activities it is charging "were taken with the intent to communicate a message," *see* Opp. at 21, and even identifies this message.  *Id.* at 29.   Although the government claims that Mr. Huerta was not arrested for his "message," *id.* at 22, he was still arrested for engaging in constitutionally protected speech.   His physical actions of standing and walking cannot be separated from his speech and expression, including verbal chanting and questioning of federal officers, as the whole of his alleged conduct consists of quintessential protected speech. Section 1501 did not provide Mr. Huerta with notice of where and how his protected speech could become criminal.

As Mr. Huerta argued in his motion, the law provides nearly unlimited discretion to law enforcement to decide which expressive activity is protected—and which expressive activity is criminal.   The government's arguments that Mr. Huerta's actions were "clearly proscribed" by Section 1501's first paragraph are specious at best.  This Court should find that the statute is unconstitutionally vague, as applied to Mr. Huerta, in violation of the First and Fifth Amendments.

## IV.   This Charge Results from the Government's Retaliatory and Brutal Arrest of Mr. Huerta, in Violation of His First and Fourth Amendment Rights, and Mr. Huerta was Prejudiced.

The government's retaliatory and violent arrest of Mr. Huerta violated his First and Fourth Amendment rights.  The charge against him rests entirely on his exercise of his First Amendment rights to speech and assembly.  The government does not contest that Mr. Huerta has no redress for these violations outside of dismissal of the Information, and its opposition makes clear that without this Court's action, federal officers will remain undeterred in committing similar violations of

constitutional rights.  Outside of reiterating that Mr. Huerta was not arrested for protected First Amendment activities, which is addressed in Section II.B.1, the government provides three arguments in response to Mr. Huerta's points, none of which are persuasive.

The government first claims that the facts do not show retaliatory arrest, because agents waited until the gate needed to be opened before arresting Mr. Huerta, that Mr. Huerta was warned against impeding, and that it was "a reasonable step" to "mov[e] him out of the way." Opp. at 30.  The government cites no evidence that any agent told Mr. Huerta to move when the van arrived.  It does not dispute that Officer Crook and Agent Ribner ignored and walked past several protesters literally standing in front of the van to confront Mr. Huerta, who was off to the side. In fact, the government's statement that because "[t]he officers on the scene were outnumbered by those blocking the driveway; it makes sense that they would prioritize the individuals in the van's path," Opp. at 30, works against them, as *many* protesters stood in the path of the van, yet these officers ignored them to takedown and arrest Mr. Huerta.  Nor does the fact that the agents waited for an opportunity to open the gate to arrest Mr. Huerta support the government's contention that the arrest was not retaliatory.  These assertions do not stand up to scrutiny, and this Court should find that Mr. Huerta's arrest was retaliatory in violation of the First Amendment.

The government next argues Agent Ribner and Officer Crook did not use excessive force in arresting Mr. Huerta, and that any use of force was justified. Many of its characterizations have no evidentiary support, or are directly contradicted by video evidence.[12]  *Compare, e.g.*, Opp. at 32 ("defendant "resist[ed]

---

[12] For example, the government alleges that "federal law enforcement repeatedly instructed the defendant to 'get out of the way'" before his arrest, but provides no citation for this assertion, and Mr. Huerta cannot find it in any produced evidence.

the agent's attempts to get defendant to stand back up on his feet"), *with* ECF 55-14, Ex. M (showing a concussed Mr. Huerta being unable to properly stand after being tackled and pepper sprayed).  Even if the government's version of events was correct—and it is clearly not—the officers' use of force would still be excessive.  An individual who stepped back when an officer moved them out of the way was not resisting, but even if that person did not move, shoving them to the ground is not a reasonable use of force.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007) (finding that non-threatening resistance to arrest does not justify being tackled by law enforcement).  The use of pepper spray on an individual already restrained on the ground by three officers, and surrounded by other officers, is similarly unreasonable.  This is particularly true in light of the Ninth Circuit's finding that some resistance to restraint is reasonable when an individual has already been the subject of excessive force or retaliation.  *See Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146, 1182 (C.D. Cal. 2022) ("[T]he Ninth Circuit has recognized that 'a person has the limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic.'") (quoting *Blankenhorn*, 485 F.3d at 479).  The fact that the arrest took place during a protest against law enforcement activity did not justify the use of force, particularly because a wall of federal agents stood between Agent Ribner and Officer Crook and the "hostile crowd."  ECF 55-14, Ex. M.  Indeed, the officers here "unnecessarily creat[ed] [their] own sense of urgency," *S.R. Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019), as the formerly peaceful crowd responded to the officers' brutal uses of force in arresting Mr. Huerta.  None of the government's excuses for Agent Ribner's and Officer Crook's uses of force demonstrate that their actions were objectively reasonable.

Finally, the government argues that the Court should not dismiss this case because Mr. Huerta was not prejudiced.  Prejudice, in the context of a court's use of its supervisory powers to dismiss an Information for outrageous conduct, typically

means that government misconduct "had at least some impact on the verdict and thus redounded to [the defendant's] prejudice." *United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir. 1993).   But as Mr. Huerta argues, in effect, that the dismissal of the Information should be made as an extension of the exclusionary rule, prejudice may not be required.   Regardless, Mr. Huerta is prejudiced by the retaliatory and brutal arrest.   The officers that arrested him in violation of his First and Fourth Amendment rights are the same officers that the government relies on to prove that Mr. Huerta was obstructing, resisting, or opposing an officer executing a search warrant.   The retaliatory nature of the arrest continues to infect the case against him, causing actual prejudice.

## CONCLUSION

For the foregoing reasons, and those stated in Mr. Huerta's operative motions to dismiss (ECF 55, 56), this Court should dismiss the Information.

Dated: January 28, 2026

Respectfully Submitted,

LOWELL & ASSOCIATES, PLLC

By:  */s/ Abbe David Lowell*

    Abbe David Lowell

MCLANE, BEDNARSKI & LITT, LLP

By:  */s/ Marilyn E. Bednarski*

    Marilyn E. Bednarski

*Attorneys for Defendant David Huerta*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Mr. Huerta, certifies that this brief contains 9,008 words, which complies with the word limit set by court order.

Dated: January 28, 2026                    */s/ Abbe David Lowell*

                                                          Abbe David Lowell
                                                          LOWELL & ASSOCIATES, PLLC

                                                          *Attorney for Defendant David Huerta*