TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
NEIL THAKOR (Cal. Bar No. 308743)
CHRIS S. BULUT (Cal Bar No. 352016)
Assistant United States Attorneys
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6595 / 6738
    Facsimile: (213) 894-0141
    E-mail: neil.thakor@usdoj.gov
              chris.bulut@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID JOSE HUERTA,<br><br>Defendant. | No. CR 2:25-cr-00841-SB<br><br>**GOVERNMENT'S TRIAL MEMORANDUM**<br><br>Trial Date: February 17, 2026<br>Trial Time: 8:30 a.m.<br>Location: Courtroom of the Hon. Stanley Blumenfeld Jr.<br><br>Information: December 12, 2025<br>Pretrial Conf.: February 3, 2026<br>Trial: February 17, 2026<br>Last Day: March 28, 2026 |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Neil Thakor and Chris S. Bulut, hereby files its Trial

//

//

Memorandum.

Dated: January 28, 2026

Respectfully submitted,

TODD BLANCHE
Deputy Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

　　　　/s/
NEIL THAKOR
CHRIS S. BULUT
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TRIAL MEMORANDUM

## I. SUMMARY OF FACTS

### A. Federal Agents Obtain a Warrant to Search Ambiance Apparel and Seize Evidence of Federal Crimes

In 2025, an I-9 audit was conducted on Ambiance Apparel, a business that had previously been convicted of eight felonies, revealing it was illegally hiring unlawful aliens as employees using fraudulent documents and stolen social security numbers. On June 5, 2025, federal agents obtained a warrant to search Ambiance Apparel's business and warehouse locations and seize evidence of violations of: 8 U.S.C. § 1324(a) (Harboring Aliens); 8 U.S.C. § 1324a (Unlawful Employment of Aliens); 18 U.S.C. § 1001 (False Statements); 18 U.S.C. § 1015(e), (False Statements Regarding Naturalization or Citizenship); 18 U.S.C. § 1546 (Fraud/Misuse of Visas or Permits); and 42 U.S.C. § 408(a)(7)(B) (Fraudulent Use of Social Security Numbers). The warrant was supported by probable cause and signed and approved by Magistrate Judge Margo Rocconi.

The warrant authorized agents to search multiple locations for the business, including the premises on East 15th Street, Los Angeles, California 90021 (the "Warrant Location"), among two other locations not at issue in this case. In addition, it authorized agents to seize evidence of employment records, identification documents of the employees, and digital devices, among other things.

### B. Federal Agents Plan a Full-Day Operation to Execute the Search Warrant

Federal agents planned an operation to execute the search warrant at the Warrant Location, which was estimated to take up an entire day. The operation included approximately 56 federal agents split up into different functions including: (a) searching for evidence and interviewing employees; (b) detaining individuals located inside the premises; and (c) securing the perimeter of the business. In addition, the government

hired a private contractor to help transport any detainees from the Warrant Location to the Federal Building at 300 N. Los Angeles Street.

On June 6, 2025, between 9:00 a.m. and 9:30 a.m., federal agents served and began executing the warrant at the Warrant Location. Because the business initially denied agents entry into the location, they did not gain access to execute the warrant until after 9:30 a.m.

### C. Demonstrators, Including Defendant, Block the Entrance to the Warrant Location

Shortly thereafter, between 10:30 a.m. and 11:45 a.m., demonstrators began to show up at the Warrant Location and congregated near the entrance to the front gate. During this initial period, before defendant arrived, the demonstrators did not block the driveway and repeatedly allowed vehicles to enter and exit the Warrant Location through the front gate.

A little after 11:30 defendant arrived at the Warrant Location. He immediately positioned himself directly in middle of the driveway of the front gate and began yelling at agents and reaching into the gate's entrance. Other demonstrators followed suit and joined the defendant in the middle of the driveway blocking the entrance to the Warrant Location.

Within a few minutes of arriving, defendant sat down in the middle of the driveway to the entrance of the front gate. Two other demonstrators joined the defendant on siting on the ground blocking the entrance. Defendant repeatedly gestured and yelled commands to others, such as "sit down!" and "keep making a circle" in order to further block the entrance. During this time, defendant continued to yell at agents on the other side of the gate.

### D. Defendant's Actions Blocked Law Enforcement Vehicles from Entering The Search Warrant Location

Defendant's actions obstructed at least two vehicles attempting to enter the search warrant location.

At approximately 12:15 p.m., a government contractor arrived and attempted to enter the Warrant Location through the front gate. The van was clearly associated with the search warrant execution, and not the protestors, as evidenced by the fact that it had police lights and sirens activated, and because agents both signaled for the vehicle to enter and opened the gate entrance for it as it pulled into the driveway. As agents inside the premises opened the gate for the van to enter, the crowd, including defendant, converged in the middle of the driveway blocking its path.

Because the van's entry was obstructed, the agents inside the gate then left their posts and walked into the driveway in order to clear the van's path. On the video of the incident, agents can be heard telling demonstrators repeatedly to "get out the way." Multiple individuals scattered around the front of the van, and some continued to walk in front of the van as if it was not there attempting to enter. Defendant saw the van with police lights activated, heard the repeated police sirens, and heard the agent's instructions to "get out the way," but he did not; instead, defendant positioned himself in front of the left bumper of the van with his hands on his hips. During this time the van was blocked from entering the Warrant Location, one of its rear tires was slashed on the side by a demonstrator. The van was ultimately able to drive inside the premises, and the gate was closed, but the van could not be used immediately to assist in the operations because of the deflated tire. The officers on the scene spent approximately 30 minutes trying to locate a forklift to replace the tire.

E.   **LAPD Is Called And Federal Agents and Officers from the Warrant Location**

At approximately 1:00 p.m., Los Angeles Police Department ("LAPD") arrived at the Warrant Location and formed a line protecting the entrance. LAPD then evacuated the Warrant Location. As a result, the operation to execute the search warrant had to be cut short and certain evidence and information could not be seized. Because the agents could not exit the location through the front gate out of fear for their safety, they had to effectively escape out of the back gate of the Warrant Location, which was previously

3

locked. As a result, federal agents were not able to collect all the information they sought to obtain from the search warrant.

## II. ELEMENTS OF THE OFFENSE

Defendant is charged by information with a violation of 18 U.S.C. § 1501 for knowingly and willfully obstructing a federal officer of the United States in serving and attempting to serve and execute a judicial writ of a court or signed by a Magistrate Judge.

The elements of the offense are:

First, an officer or agent of the United States was attempting to execute a search warrant;

Second, the defendant obstructed, resisted, or opposed the officer or agent; and

Third, defendant acted knowingly and willfully in obstructing, resisting, or opposing the officer or agent executing the search warrant.

The defendant, however, does not need to know that the officer or agent was attempting to execute the search warrant.

See 18 U.S.C. § 1501; United States v. Peifer, 474 F.Supp. 498, 505 (E.D. Pa. 1979), aff'd, 615 F.2d 1354 (3d Cir. 1980); Coleman v. United States, 268 F. 468, 471 (6th Cir. 1920).

## III. TIME ESTIMATE

The government currently estimates calling four to five witnesses, including the lead agent in charge of the operation of the search warrant, two law enforcement officers who observed defendant's conduct, the driver of the van that was obstructed, and the driver of the Jeep that was obstructed. In total, the government estimates its case-in-chief to take two days.

## IV. APPLICABLE LEGAL AND EVIDENTIARY ISSUES

### A. Pending Motions In Limine

The parties have filed four motions in limine, two of which are unopposed. The government has moved in limine: (1) to admit the search warrant and application to the search warrant; (2) to preclude jury nullification; and (3) to exclude any alleged injuries of defendant from his arrest, which is unopposed by the defense. The defendant has moved in limine to (4) exclude Rule 404(b) evidence, which is unopposed by the government.

### B. Arguments That Defendant's Conduct Is Protected by The First Amendment

The government anticipates that legal arguments mirroring those made in defendant's motions to dismiss the indictment, specifically that defendant's actions are protected by the First Amendment, may come up in trial. However, the issue of defendant's actions being protected by the First Amendment will be resolved pre-trial, and the jury instructions will adequately inform the jurors of the necessary elements of the offenses. As a result, evidence and argument that the First Amendment permits defendants' alleged conduct is a legal issue for the Court, not a fact issue for the jury. See Sparf v. United States, 156 U.S. 51, 87 (1895) ("It would be absurd to say that the determination of the law belongs to the jury, not court, if the court has power to set aside that which the jury determines.") (citation omitted). During trial, the government intends to object to any argument to the jury that the defendant's conduct is protected by the First Amendment.

### C. Audio and Video Recordings

The government intends to offer into evidence video recordings and photographs of defendant from the incident. A recording is admissible upon a showing that it is "accurate, authentic, and generally trustworthy." United States v. King, 587 F.2d 956, 961 (9th Cir. 1978). Testimony that a recording depicts evidence that the witness

1  observed is sufficient to authenticate the recording.  Fed. R. Evid. 901(b); United States
2  v. Smith, 591 F.3d 974, 979-80 (8th Cir. 2010).

3  All duly admitted recordings must be played in open court.  The foundation that
4  must be laid for the introduction into evidence of recorded conversations is a matter
5  largely within the discretion of the trial court.  There is no rigid set of foundational
6  requirements.  Rather, the Ninth Circuit has held that recordings are sufficiently
7  authenticated under Federal Rule of Evidence 901(a) if sufficient proof has been
8  introduced "so that a reasonable juror could find in favor of authenticity or
9  identification," which can be done by "proving a connection between the evidence and
10 the party against whom the evidence is admitted" and can be done by both direct and
11 circumstantial evidence.  United States v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir.
12 1995), opinion amended on denial of reh'g, 98 F.3d 1100 (9th Cir. 1996).  Federal Rule
13 of Evidence 901 requires only that the government make "a prima facie showing of
14 authenticity so that a reasonable juror could find in favor of authenticity or
15 identification," and the "probative force of the evidence offered is, ultimately, an issue
16 for the jury."  United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989).

### D. Admissibility of Defendant's Statements

At trial, the government will offer into evidence some of defendant's prior statements.  A defendant's statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay.  Fed. R. Evid. 801(d)(2); see United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).

The government's admission of defendant's statements, however, does not allow defendant to offer his own out-of-court statements into evidence.  When offered by the defendant, such statements are hearsay.  In Ortega, the Ninth Circuit held that non-self-inculpatory statements, even if made contemporaneously with other self-inculpatory statements, are inadmissible hearsay, and the rule of completeness does not allow for admission of that inadmissible hearsay.  203 F.3d at 682; see also United States v.

Collicott, 92 F.3d 973, 983 (9th Cir. 1996) (otherwise inadmissible hearsay not admitted regardless of Federal Rule of Evidence 106).

This rule does not prevent defendant from presenting his defense at trial, including by testifying. Defendant simply is not permitted to place any of his prior statements before the Court without subjecting himself to cross-examination. See Ortega, 203 F.3d at 682; United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988) (per curiam). Thus, defendant may not introduce his prior statements through defense witnesses or by cross-examining government witnesses with defendant's hearsay statements.

### E. Cross-Examination of Defendant

The government does not know whether defendant intends to testify at trial. If defendant testifies, the government should be permitted to cross-examine him fully because a defendant who testifies at trial waives his right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony. See Ohler v. United States, 529 U.S. 753, 759 (2000) ("It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination[.]") (internal quotations omitted). A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence. United States v. Miranda-Uriarte, 649 F.2d 1345, 1354 (9th Cir. 1981). The scope of a defendant's waiver is co-extensive with the scope of relevant cross-examination. United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992).

### F. Reciprocal Discovery and Affirmative Defenses

Federal Rule of Criminal Procedure 16 creates reciprocal discovery obligations for a defendant to produce three categories of materials that a defendant intends to introduce as evidence at trial: (1) documents and tangible objects; (2) reports of any examination or tests; and (3) expert witness disclosures. Rule 16 imposes on defendant a continuing duty to disclose this discovery. Fed. R. Crim. P. 16(b)(1)(A), (b)(1)(C), & (c). When a party, including a defendant, fails to produce discovery as required, Rule 16 empowers

the district court to "prohibit that party from introducing the undisclosed evidence; or enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2). The Ninth Circuit has held that where a defendant fails to produce reciprocal discovery, it is well within the district court's discretion to exclude such defense evidence, especially where the defense disclosure was made after the start of trial. See <u>United States v. Scholl</u>, 166 F.3d 964, 972 (9th Cir. 1999), <u>as amended on denial of reh'g</u> (Mar. 17, 1999) (affirming exclusion under Rule 16 of documents that defense counsel had possessed for some time but did not disclose until after the jury was sworn in, preventing the government from fully investigating the issues raised by the documents).

On July 17, 2025, the government requested reciprocal discovery. The defense has not yet provided any reciprocal discovery.

## V.  MEET AND CONFER

The parties have agreed to the following statement regarding its meet and confer efforts over all trial documents, including this trial memorandum:

As the parties were addressing outstanding discovery issues and waiting for a new case schedule, there was no meet and confer over these documents. The defense is not consenting to any of the substance of the documents and will be prepared to submit the remainder of the filings based on a new schedule requested and set by the Court.

8