MARILYN E.  BEDNARSKI, SBN 105322
E-Mail: mbednarski@mbllegal.com
McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

ABBE DAVID LOWELL, *pro hac vice*
DAVID A. KOLANSKY, *pro hac vice*
E-Mail: alowellpublicoutreach@lowellandassociates.com
E-Mail: dkolansky@lowellandassociates.com
Lowell & Associates, PLLC
1250 H Street, NW, Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116

Attorneys for Defendant
DAVID HUERTA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff,* <br><br> *v.* <br><br> DAVID HUERTA, <br><br> *Defendant.* | CASE NO.: 2:25-CR-00841-SB <br><br> **DEFENDANT'S OMNIBUS MOTION TO DISMISS THE FIRST SUPERSEDING INFORMATION** <br><br> Date: Aug. 4, 2026 <br> (Hearing Length Estimate: 1 hour) <br> Time: TBD <br> Ctrm: 6C (1st Street U.S. Courthouse) |

### <u>NOTICE OF MOTION</u>

Defendant David Huerta, by and through undersigned counsel, brings this Omnibus Motion to Dismiss the First Superseding Information, pursuant to Federal Rule of Criminal Procedure 12(b), and respectfully moves this Court for an order dismissing the Superseding Information against him, as it fails to state a crime and charges a violation of a statute that is overbroad on its face, in violation of the First Amendment, or in the alternative, unconstitutionally vague in violation of the First and Fifth Amendments.

On June 15, 2026, defense counsel conferred with the government by e-mail and advised of its intention to file this Omnibus Motion to Dismiss the Superseding Information, and government counsel indicated that it would oppose the motion.

Dated: June 22, 2026     Respectfully Submitted,


         LOWELL & ASSOCIATES, PLLC


         By: /s/ *Abbe David Lowell*
         Abbe David Lowell


         *Attorney for Defendant David Huerta*

i

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................2

I.    The June 6, 2025, Dual Operation at Ambiance Apparel. ...................2

II.   Procedural History .................................................................. 10

ARGUMENT ..............................................................................................................11

I.    THE SUPERSEDING INFORMATION FAILS TO STATE A CRIME ...........................................................................................................12

    A.    On the Face of the SI, the Government Fails to State an Offense. ...........................................................................................13

        1.    Section 1501 Requires Obstruction, Resistance, or Opposition Directed at an Officer Actively Executing a Qualifying Writ. ...........................................................13

        2.    The SI Fails to Plead These Elements with Sufficient Specificity.......................................................................15

        3.    The Allegations Still Do Not State a Violation of Section 1501. ...............................................................16

    B.    The Superseding Information Charges First Amendment Protected Activities...................................................................20

II.   SECTION 1501 VIOLATES THE FIRST AMENDMENT, FACIALLY AND AS APPLIED TO MR. HUERTA .......................25

    A.    Section 1501 Is Facially Overbroad in Violation of the First Amendment...................................................................................25

        1.    "Obstruct, Resist, or Oppose" Reach Substantial Protected Speech. ...................................................................25

        2.    Section 1501's Unconstitutional Sweep Is Not Hypothetical. ...................................................................32

    B.    Section 1501 Is Void for Vagueness. .......................................35

CONCLUSION............................................................................................................37

i

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234 (2002)..................................................................................................25

*Astorga v. Cnty. of Los Angeles,*
2024 WL 3313747 (C.D. Cal. May 28, 2024) .........................................................23

*Avery v. King,*
110 F.3d 12 (6th Cir. 1997) ......................................................................................34

*Bailey v. United States,*
568 U.S. 186 (2013)..................................................................................................19

*Berger v. City of Seattle,*
569 F.3d 1029 (9th Cir. 2009)...................................................................................21

*Brandenburg v. Ohio,*
395 U.S. 444 (1969)..................................................................................................22

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973)..................................................................................................25

*Brooks v. N. Carolina Dep't of Correction,*
984 F. Supp. 940 (E.D.N.C. 1997)............................................................................29

*Butcher v. Knudsen,*
38 F.4th 1163 (9th Cir. 2022)....................................................................................36

*Carey v. Brown,*
447 U.S. 455 (1980)..................................................................................................21

*Cheek v. United States,*
498 U.S. 192 (1991)..................................................................................................30

*City of Houston v. Hill,*
482 U.S. 451 (1987)............................................................................................ passim

*Coleman v. United States,*
268 F. 468 (6th Cir. 1920).........................................................................................34

*Collins v. Jordan,*
110 F.3d 1363 (9th Cir. 1996).............................................................................. passim

*Cox v. New Hampshire,*
312 U.S. 569 (1941)..................................................................................................22

*De Jonge v. State of Oregon,*
299 U.S. 353 (1937)..................................................................................................22

*Duran v. City of Douglas,*
904 F.2d 1372, 1378 (9th Cir. 1990).........................................................................36

*Edwards v. City of Coeur d'Alene,*
262 F.3d 856 (9th Cir. 2001).....................................................................................20

ii

*Eisenstadt v. Baird,*
  405 U.S. 438 (1972)............................................................................................21

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012)...........................................................................................35

*Garrison v. Louisiana,*
  379 U.S. 64 (1964).............................................................................................21

*Hill v. City of Houston,*
  764 F.2d 1156 (5th Cir. 1985)...........................................................................27

*Index Newspapers LLC v. United States Marshals Serv.,*
  977 F.3d 817 (9th Cir. 2020).............................................................................20

*King v. Ambs,*
  519 F.3d 607 (6th Cir. 2008).............................................................................29

*Laizure v. Washington Cnty.,*
  2018 WL 3638124 (D. Or. July 13, 2018).........................................................23

*Marinello v. United States,*
  584 U.S. 1 (2018) ...............................................................................................27

*Michigan v. Summers,*
  452 U.S. 692 (1981).....................................................................................18, 19

*Miller v. United States,*
  230 F.2d 486 (5th Cir. 1956).............................................................................28

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024)...........................................................................................25

*NAACP v. City of Richmond,*
  743 F.2d 1346 (9th Cir. 1984)...........................................................................21

*NAACP v. Claiborne Hardware Co.,*
  458 U.S. 886 (1982)...........................................................................................21

*Nicodemus v. City of S. Bend,*
  137 F.4th 654 (7th Cir. 2025)............................................................................31

*Packingham v. North Carolina,*
  582 U.S. 98 (2017).............................................................................................21

*People v. Vasquez,*
  465 Mich. 83 (2001)...........................................................................................29

*Perez Cruz v. Barr,*
  926 F.3d 1128 (9th Cir. 2019)...........................................................................19

*Police Dept. of City of Chi. v. Mosley,*
  408 U.S. 92 (1972).......................................................................................21, 22

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)...........................................................................................31

iii

*Reno v. ACLU,*
    521 U.S. 844 (1997)...................................................................................32

*Resek v. City of Huntington Beach,*
    41 F. App'x 57 (9th Cir. 2002) ...............................................................24

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995)............................................................................31, 32

*Tucson v. City of Seattle,*
    91 F.4th 1318 (9th Cir. 2024)..................................................................32

*United Food & Com. Workers Loc. 99 v. Bennett,*
    934 F. Supp. 2d 1167 (D. Ariz. 2013).....................................................21

*United States v. Atkinson,*
    232 F.3d 897 (9th Cir. 2000) ...................................................................30

*United States v. Boren,*
    278 F.3d 911 (9th Cir. 2002)....................................................................12

*United States v. Brakke,*
    934 F.2d 174 (8th Cir. 1991)....................................................................34

*United States v. Buck,*
    24 F. Cas. 1289 (E.D. Pa. 1860)..............................................................33

*United States v. Carpenter,*
    2012 WL 292480 (W.D. La. Jan. 31, 2012) ...........................................34

*United States v. Davis,*
    588 U.S. 445 (2019)..................................................................................15

*United States v. Hansen,*
    599 U.S. 762 (2023)..................................................................................25

*United States v. Kilbride,*
    584 F.3d 1240 (9th Cir. 2009)..................................................................35

*United States v. Kiselev,*
    2023 WL 4771179 (N.D. Cal. July 25, 2023) .........................................12

*United States v. Kozminski,*
    487 U.S. 931 (1988)..................................................................................14

*United States v. McDonald,*
    26 Fed. Cas. 1074 (C.C.E.D. Wis. 1879) ................................................28

*United States v. Metcalf,*
    156 F.4th 871 (9th Cir. 2025)...................................................................15

*United States v. Nukida,*
    8 F.3d 665 (9th Cir. 1993)........................................................................12

*United States v. Osinger,*
    753 F.3d 939 (9th Cir. 2014)....................................................................35

*United States v. Peifer*,
  474 F. Supp. 498 (E.D. Pa. 1979) ............................................................. 34

*United States v. Pope*,
  613 F.3d 1255 (10th Cir. 2010) .................................................................. 12

*United States v. Rundo*,
  990 F.3d 709 (9th Cir. 2021) .......................................................... 22, 30, 32

*United States v. Sanders*,
  966 F.3d 397 (5th Cir. 2020) ..................................................................... 14

*United States v. Schaffner*,
  715 F.2d 1099 (6th Cir. 1983) ................................................................... 34

*United States v. Shortt Accountancy Corp.*,
  785 F.2d 1448 (9th Cir. 1986) ............................................................ 11, 12

*United States v. Sommerstedt*,
  752 F.2d 1494 (9th Cir. 1985) ................................................................... 28

*United States v. Stevens*,
  559 U.S. 460 (2010) ................................................................................... 32

*United States v. Tinklepaugh*,
  28 F. Cas. 193 (C.C.S.D.N.Y. 1856) ........................................................ 15

*United States v. Williams*,
  553 U.S. 285 (2008) ................................................................................... 25

*United States v. Willis*,
  844 F.3d 155 (3d Cir. 2016) ...................................................................... 11

*Virginia v. Am. Booksellers Assn., Inc.*,
  484 U.S. 383 (1988) ................................................................................... 32

**Statutes**

18 U.S.C. § 111 ............................................................................................. 29

18 U.S.C. § 231 ............................................................................................. 29

18 U.S.C. § 1071 ........................................................................................... 30

18 U.S.C. § 1073 ........................................................................................... 30

18 U.S.C. § 1501 .................................................................................. *passim*

18 U.S.C. § 2101 ........................................................................................... 30

18 U.S.C. § 2231 ........................................................................................... 30

18 U.S.C. § 2232 ........................................................................................... 30

**Rules**

Fed. R. Crim. P. 12 ....................................................................................... 11

v

**Other Authorities**

Anne Enquist & Laurel Currie Oates, Just Writing: Grammar, Punctuation, and Style for the Legal Writer 166 (3d ed. 2009) ............................................................... 14

The American Heritage Dictionary 373 (New College Ed. 1981) ........................... 14

Oxford English Dictionary (3d ed. 2021) ............................................................... 14

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......................................................................................................... 28

Theodore Parker, *The trial of Theodore Parker: for the "misdemeanor" of a speech in Faneuil Hall against kidnapping, before the Circuit Court of the United States, at Boston, April 3, 1855*, Library of Congress (1870) .................... 33

Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 423 (2013) ...................................................................................... 28

Earl M. Maltz, *Slavery, Federalism, and the Constitution: Ableman v. Booth and the Struggle over Fugitive Slaves*, 56 Clev. St. L. Rev. 83 (2008) .......................... 33

**INTRODUCTION**

On June 6, 2025, David Huerta, the president of the Service Employees International Union of California ("SEIU"), joined a protest of a federal immigration raid on a warehouse in Los Angeles, California.  There, after only peacefully protesting, chanting, and marching, Mr. Huerta was shoved to the ground, tackled, dog-piled, pepper-sprayed, and arrested.  Unknown to Mr. Huerta, federal agents at the warehouse were also executing a search warrant, and he was charged with violating 18 U.S.C. § 1501.

On May 6, 2026, "[g]iven the constitutional interests implicated in this case and the government's evolving theories," the Court ordered the government to file an amended information.  The Order specifically directed the government to "clarify the factual basis of the charge" and directed the government to "specify which of § 1501's prohibitions—resisting, obstructing, or opposing—it charges Defendant with violating."  ECF 102.  The First Superseding Information ("SI") does not cure the defects in the government's case.  The government still fails to state a violation of Section 1501, still impermissibly criminalizes Mr. Huerta's First Amendment-protected activity, and still relies on a statute that is overbroad on its face and vague as applied to Mr. Huerta, in violation of the First Amendment.

Mr. Huerta is set to go to trial on August 31, 2026.  The government charged Mr. Huerta with a Class A *misdemeanor* nearly a year ago, and yet, it still cannot present a coherent basis for this charge.  The SI should be dismissed with prejudice.

1

## BACKGROUND

### I.      The June 6, 2025, Dual Operation at Ambiance Apparel.

On the morning of June 6, 2025, "more than 50 federal agents, officers, employees, and contractors from various agencies" arrived at the Ambiance Apparel warehouse in downtown Los Angeles, California, for a dual-purpose operation. Superseding Information ("SI"), ECF 104 2:21-24.

The operation's first purpose was to execute a search warrant issued by Magistrate Judge Margo A. Rocconi, which authorized the seizure of employment records, employee identification documents, and digital devices.  SI 2:1-11; ECF 55-2.  The relevant warrant to the SI was limited to the single premises, 2415 E. 15th Street, and did not authorize the arrest or detention of any individual.  ECF 55-2.

The operation's second purpose was to detain individuals on-site whom the government believed to be "engaged in immigration fraud," SI 3:18.  Prior to the June 6 operation, agents were briefed with a Homeland Security Investigations ("HSI") PowerPoint presentation directing them to "administratively arrest anyone that is on the list of 69 employees" that were suspected of illegal activity, and to "administratively arrest anyone additional believed to be illegal."  Ex. A.

The dual operation was planned with specificity.  The warehouse was "surrounded by high black metal perimeter fencing around a shared lot with the neighboring building" with an "entrance to the Search Warrant Location [that] was a gate at the front of the lot on 15th Street."  SI 2:12-17.  Agents were assigned to multiple teams, including: "(a) searching for evidence and interviewing employees; (b) detaining individuals located inside the premises; and (c) securing the perimeter of the business."  Gov't Opp., ECF 61 at 2:24-28.  The government had also hired "vehicles to transport seized evidence gathered during the execution of the Warrant," and "vehicles used to remove any non-law-enforcement individuals who were detained during the execution of the Warrant."  SI 3:11-15.  The government had

hired other vehicles driven by federal contractors "to assist with the transportation of any individuals who were detained or arrested at the premises[] during the execution of the search." *Id.* 3:16-21.

Protests were expected.  The operation assigned a perimeter team in part for this purpose—both to prevent individuals inside the operation's location from leaving without permission, and also to prevent interference from protesters.  HSI Group Supervisor Ryan Ribner, Drug Enforcement Administration ("DEA") Group Supervisor Michael Flanigan, and Immigration and Customs Enforcement ("ICE") Supervisory Deportation and Detention Officer Carey Crook, and Deportation Officer Allison Sasso, were among the 8-10 officers who guarded "Gate 1," the building's front gate, during the operation.  Ex. G.  According to Flanigan, he "volunteered his group of all DEA agents to work gate 1 'in case there was a protest' because he has experience in deescalating and talking to the public."  Ex. E.  Ribner "requested and received permission from HSI management to place an undercover agent (UCA) inside of the crowd to document any criminal activities which would be aimed at targeting HSI operations, assets, and personnel."  Ex. B.

On the morning of the operation, between 9:00 a.m. and 9:30 a.m., approximately 56 federal agents arrived at the Ambiance location.  SI 2:21-24; Gov't Opp, ECF 61, at 2:24.  The team lead, HSI Special Agent Jenae Combest-Smith, served the Search Warrant.  Ex. H.  The search commenced.  And so did the arrests.

Over several hours, federal agents paraded individuals outside the warehouse in handcuffs and other restraints.  They took breaks to administer photoshoots of the restrained individuals, loaded them into transport vehicles, and drove them out of the Warehouse.  According to a spokesperson for the U.S. Department of Homeland Security, "[i]n all, 44 people were 'administratively' arrested" at the three Ambiance

3

locations raided that day.[1]

Outside the gate surrounding the warehouse, DHS Officer Jeremy Crossen was assigned "in an undercover capacity to document potential protestors" and arrived at Ambiance around 9:00 a.m. on June 6. *See* Ex. C. Wearing "all black clothing with a cross-shoulder bag, to move surreptitiously through a potential crowd and blend in with as if part of any potential protestors," Crossen patrolled in front of the Ambiance front gate and among the crowd, speaking with and taking photos and videos of individuals arriving at the location. *Id.* at 2-3; Ex. D at 1-2. He texted photos, videos, and commentary to Ribner, including relaying the number of people arriving at the gate and the fact that they were filming and "calling people." Ex. D at 1. He texted that the protest was "organized" and noted that "[i]t's going to be *fun* going through this video later." *Id.* (emphasis added).

As more protesters arrived, Crossen continued to pretend to be a part of the outside group to surreptitiously film and text updates to Ribner. One woman, whom he identified as being with "CHIRLA"[2] was filming, "on the phone narrating," and "[c]alling out officers descriptions!!!" *Id.* at 2-3. Ribner responded "ID her," and Crossen noted that "[s]o far she's peaceful but non-stop phone calls and calling out agency markings and description." *Id.* at 3. Crossen continued to identify different protesters and their possible organization affiliations, providing videos, photos, and specific information about them and their vehicles to Ribner. *See id.* While some protesters were loud at times, no allegation in the new SI states—and no produced records show—the protesters taking *any* action to threaten or try to interfere with the

---

[1] *45 people arrested during ICE raids at 3 downtown LA locations*, NBC Los Angeles (June 6, 2025), https://perma.cc/PN8P-QPKW; Lara Korte & Rachel Uranga, *Fear grips LA's Fashion District after ICE arrests at garment manufacturer*, LA Public Press (June 11, 2025), https://perma.cc/K3BU-YBFV.

[2] The Coalition for Humane Immigrant Rights ("CHIRLA") is a leading immigrants advocacy organization in Los Angeles, California.

4

law enforcement activities occurring inside the gate, but rather show them peacefully demonstrating on a public sidewalk. Crossen also spoke with members in the crowd, including telling Ribner that he "got a bunch of them to go to the wrong side. I told them there was a gate in the alley I think." *Id.* at 5.

David Huerta arrived at the protest at approximately 11:49 a.m.—after the search had been underway inside the gate for more than two hours. Although the government's own past pleadings confirm this timing, *see* ECF 61 at 3 ("At approximately 11:49 defendant arrived at the Warrant Location"), the SI now alleges Mr. Huerta arrived at approximately 11:20 a.m. SI 4:4-5.[3] Either way, Mr. Huerta joined the demonstrators on the public sidewalk at the front gate, walked up to the gate, and began criticizing and heckling the officers. Ex. B; Ex. C.

As the search progressed unabated inside the Ambiance warehouse, the demonstration grew on the public sidewalk outside the front gate—with individuals filming, chanting, and yelling profanities at the officers standing by the gate. Ex. B at 7. At around 11:55 a.m., Mr. Huerta briefly participated in a sit-in at the front gate for approximately 1-2 minutes. *See* Ex. I. Ribner and Crook stood on the other side of the gate.

Mr. Huerta asked them, "How are you keeping us safe?" Ribner's response was: "You are gonna go to jail. You are not impeding us. You are not impeding us. You're going to jail, [unintelligible from 0:00:09-00:11] and you're going to jail." *Id.* at 0:00:01-00:12. Mr. Huerta then repeatedly asked him, "What are you doing?" and told him, "I can't hear you through your fuckin' mask," and pointed at Ribner. *Id.* at 0:00:14-00:17. Ribner can be heard replying: "You're gonna go to jail, you're

---

[3] This disparity appears to result from one still photograph with a wrong time stamp taken by an agent (J. McKenzie) who was photographing from inside the Ambiance warehouse. The government neither mentions the photograph nor explains that it is now apparently relying on that photograph in the SI.

5

going to jail." *Id.* at 0:00:17.  For the next few minutes, Mr. Huerta continued to protest in front of the gate, including conversing with Ribner, Crook, and other officers, including, according to agents' after-the-fact reports, "aggressively"[4] asking the officers to identify themselves, stating "What are you going to do… Where's your fucking badge number… What's your fucking name?"  Ex. B at 9.  He also allegedly stated: "You're not police!  You're not fucking police!  You're not keeping me safe!"  Ex. C at 6.  At around 11:59 a.m., Mr. Huerta participated in a picket line with other protesters, where they walked in a circle on the public sidewalk in front of the gate.  *See* Ex. J; Ex. C at 7.

Government-produced reports and video discovery suggest that Mr. Huerta heckled Ribner, criticizing the immigration enforcement policies of President Trump, and "asked either about the purpose or legit impact of agents' duties."  Ex. B at 9.  "Based on" Mr. Huerta's actions above, Ribner texted Officer Crossen to "watch HUERTA by indicating 'red shirt[.]'"  *Id.* at 9; *see also* Ex. D at 4.  Ribner claims to have "informed" DEA agents "that HUERTA . . . would highly likely block or impede law enforcement vehicles, cause damage to USG property, or commit a battery against agents as they attempt to depart."  *Id.* at 9-10.

But at no time before Mr. Huerta's arrest did government reports describe any violent activity, fighting words, or any true threats.  Nor do they describe Mr. Huerta at any point getting physical with any officer or undercover agent.  Instead, reports describe the crowd as "walking around and looking inside and making comments."  *Id.* at 9.  A truck nearby played loud music "with lyrics that stated, 'Fuck Donald Trump…' repeatedly."  *Id.* at 10.  In his report, Ribner speculated: "the controlled

---

[4] HSI uses the term "aggressive" liberally throughout its reports to describe benign activities, for example, describing a man in a kerchief and a beret as having "an "aggressive appearance."  Ex. B at 8.  Agents describe Mr. Huerta as "appear[ing] to be "aggressive and angry by his voice, demeanor, and facial features."  *Id.* at 9.

6

chaos was done purposely to create a tense environment to implement an atmosphere of intimidation which could cause agents to make mistakes that could ultimately disrupt and impede the law enforcement operation." *Id.* at 10.  But altogether, Mr. Huerta's actions during this time, according to the government, included protesting at the gate, briefly participating in a sit-in at the front gate, SI ¶ 11(a), briefly joining a picket line, *id.* ¶ 11(b), and instructing other protesters to "keep making a circle" and "sit down," in conjunction with the brief sit-in and picket line.  *Id.* ¶ 11(f).

According to the SI, at 11:28 a.m., as alleged in the SI, HSI Special Agent Seth Tugg (identified as "S.T."), attempted to drive his vehicle through the front gate, but was apparently "delayed in entering the premises." *Id.* ¶ 12(a).

Then, at approximately 12:15 p.m., an unmarked white Enforcement and Removal Operations van ("ERO Van"), driven by federal contractor Brian Gonzalez (identified as "B.G."), approached the front gate.  *Id.* ¶ 12(b); Ex. B at 12.

The van had dashboard and front-grill emergency lights, which Gonzalez briefly activated to alert law enforcement (*not the crowd gathered*) as he entered the driveway to Ambiance.  *See* Ex. K at 0:00:00-00:12.  At that point, the gate was closed such that the van could not enter the premises regardless of the presence of Mr. Huerta or any other protester.  *Id.*  As the gate opened, Crook, followed closely behind by Ribner, quickly exited the front gate and made a beeline for Mr. Huerta, and the van turned on its "air horn."[5]  Ex. L at 3; Ex. K at 0:00:03-00:12.  The video produced by the government shows Mr. Huerta standing at an angle off to the side of the van's front bumper, with his hands on his hips.  Ex. K at 0:00:03-00:12.  It never shows him in front of the van.  However, at least three other protesters stood in the driveway, directly in front of the vehicle, and Ribner and Crook rushed right

---

[5] The van driver stated that he activated the van's lights and "air horn . . . to let *law enforcement* at [Ambiance] *know* he was there"—and *not* to disperse the protesters who had amassed on the sidewalk by the gate.  Ex. L at 3 (emphasis added).

7

past them to confront Mr. Huerta.  *See id.*

As Mr. Huerta, already to the side of the van, took an additional step backward, Crook pushed him back two more steps.  *Id.* at 00:00:10-00:12.  With two hands, Crook shoved Mr. Huerta to the ground.  *Id.* at 00:00:12-00:13.  Mr. Huerta never laid a hand on either officer that day, or on the ERO van.  After he was shoved in the chest, Mr. Huerta fell hard onto his back.  Crook then turned around to move others out from in front of the van.  He did not shove them to the ground or tackle them.  Instead, he simply spread out his arms and stated "Move, move, move," *see* Ex. L, or at one point, just picked a protester up and moved her out of the way.  Ex. K at 0:00:30.  Ribner then ran over to Mr. Huerta, and rolled him over onto his stomach, then his hands and knees, *id.* at 0:00:15, repeating, as he did before the van was even on the scene: "You're going to jail."  Ex. N at 00:00:01-00:05.  None of the other people actually standing in front of the van, including the woman who Crook picked up and removed, were handcuffed, arrested, or charged.

Crook then returned to Mr. Huerta and Ribner, crossing in front of the van to do so.  Ex. K at 0:00:34.  He jumped on top of Mr. Huerta, who at this point is lying on his stomach on the ground, with his forehead mere inches from a curb.  Ex. O at 0:00:01.  Ribner pinned his back with one of his knees and the weight of Crook's leg was on Mr. Huerta's back at the same time.  *See id.*  Ribner and Crook tugged at Mr. Huerta's arms (though the agents were essentially sitting on top of him) and attempted to remove Mr. Huerta's arms from beneath his body.  Though Mr. Huerta put up no resistance, Crook moved off of Mr. Huerta's back.  Ribner then drenched his hand in pepper spray and rubbed it all over Mr. Huerta's face, including in his eyes, nose, and mouth, while pinning his head to the curb.  *See* Ex. M at 0:00:01-00:08.  Ribner and Crook then climbed on top of Mr. Huerta again and continued to try to pull his arms out from underneath him.  *Id.* at 0:00:08-00:22.  When he could not access Mr. Huerta's arm, Crook moved and pushed down roughly on Mr.

8

Huerta's shoulder. *Id.* at 0:00:37-00:39. Mr. Huerta can be heard repeatedly stating, "I'll get up." *Id.* at 0:00:45. Ribner instructed him to put his hands behind his back, and Mr. Huerta, repeated that he will get up, but that he has a bad shoulder. *Id.* at 0:00:45-01:03. Ribner and Crook wrenched Mr. Huerta's arms behind his back regardless, and video evidence shows Mr. Huerta's face twisting in pain. *Id.* at 0:01:03-01:12. Agents then lifted him up by his shoulders to a standing position. *Id.* at 0:01:12-01:24. The protesters nearby loudly denounced the agents' actions, but for the duration of the arrest, none came close to interrupting, as Mr. Huerta, Ribner, and Crook were completely surrounded by other agents standing around them. The crowd became the most energized it had been that day during and after Mr. Huerta's arrest—and watching the way he was shoved to the ground and physically handled by agents.

In his interview about the events that day taken *three months later* by prosecutors on September 10, 2025, Ribner declared that "HUERTA and other protesters are 'vicious, horrible people,'" in reference to being shown a still photo of the takedown video of Mr. Huerta. Ex. F at 3. Mr. Huerta is not the first or only protester who has been brutalized and detained for his protected activities in the past months as part of the administration's new policies. Other incidents where anti-ICE protesters were targeted have been well documented.[6]

After arresting Mr. Huerta, who was still suffering the effects of the pepper spray, agents brought him inside the gate and transported him to a hospital for

---

[6] *See* Meg Anderson, *Tackles, projectiles and gunfire: Many fear ICE tactics are growing more violent*, NPR (Oct. 13, 2025), https://perma.cc/85JE-EKLC; *see also*, *Los Angeles Press Club v. City of Los Angeles*, 2025 WL 2640421, at *2 (C.D. Cal. Sept. 10, 2025) (detailing excessive force used against journalists during protests in Los Angeles); *Illinois v. Trump*, 2025 WL 2886645, at *4 (N.D. Ill. Oct. 10, 2025) (detailing excessive force used against protesters in Illinois); *Chicago Headline Club v. Noem*, 2025 WL 3240782, at *19 (N.D. Ill. Nov. 20, 2025) (same).

treatment.  Ex. B at 14.

## II.    Procedural History

On June 8, 2025, the government initially charged Mr. Huerta with violating 18 U.S.C. § 372.  *United States v. Huerta*, No. 2:25-mj-03504, ECF 1 (C.D. Cal. June 8, 2025).  It dismissed that charge and proceeded on a Section 1501 misdemeanor.  Mr. Huerta moved to dismiss the Information for failure to state an offense and for constitutional violations.  ECF 55, 56.  On May 6, 2026, citing "the constitutional interests implicated . . . and the government's evolving theories," the Court ordered the government to amend the Information.  ECF 102.  The SI was filed on May 18, 2026.  ECF 104.

The SI sets out the specifics of Mr. Huerta's charged activity in two parts. First, it identifies the criminal activities that Mr. Huerta "and others, each aiding and abetting the other" allegedly engaged in that constitute obstruction, resistance, "and" opposition:

a. Physically blocking the entrance/exit to the Search Warrant Location by sitting down in the middle of the driveway;

b. Physically blocking the entrance/exit to the Search Warrant Location by walking in circles in the middle of the driveway to the entrance of the Search Warrant Location;

c. Physically blocking the entrance/exit to the Search Warrant Location by standing in front of a van as it attempted to enter the Search Warrant Location.

d. Failing to comply with lawful commands to not block the entrance of the Search Warrant Location;

e. Resisting attempts by federal officers, agents, employees, and contractors to clear the driveway by refusing to move out of the way and/or moving away from one officer only to return from another angle when the officer attempted to remove someone else.

10

  f. Coordinating with each other to block the gate, including defendant instructing others to "keep making a circle," and to "sit down" on the driveway in front of the gate.

SI 4:16-5:10. Then, it explains how the above actions purportedly impacted those officers "in serving, and attempting to serve and execute the Warrant":

  a. Impeded the pathway of a vehicle driven by federal agent S.T., which arrived and was delayed in entering the premises at approximately 11:28 a.m.;

  b. Impeded the pathway of a vehicle driven by federal contractor B.G., which arrived and was delayed in entering the premises at approximately 12:15 p.m.;

  c. Contributed to the federal officers, agents, employees, and contractors from being unable to complete the execution of the Warrant;

  d. Endangered the safety of the federal officers, agents, employees, and contractors executing the Search Warrant and efficacy of the search by drawing resources to the Front Gate to respond to the safety concerns created by defendant and others present.

SI 5:11-6:5.

## ARGUMENT

Under Rule 12, a court can make a pretrial ruling on "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12. A motion to dismiss is generally "capable of determination" before trial "if it involves questions of law rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986).

The government's second effort to charge Mr. Huerta under Section 1501 fails on similar grounds to its first. Dismissal of the SI is proper on four grounds. First, "the specific facts alleged" on the face of the SI "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016). Second, the government charges Mr. Huerta for

engaging in protected First Amendment activity, which cannot constitute a crime. Third, the relevant clause of Section 1501 is facially overbroad in violation of the First Amendment, as its three operative verbs—obstruct, resist, and oppose— criminalize substantial protected First Amendment activities.   Fourth, and alternatively, the statute is unconstitutionally vague as applied to Mr. Huerta, as his criminal charge rests solely on protected speech and protest, and the statute draws no discernable line between this protected speech and unprotected criminal conduct.

Under the First Amendment, Mr. Huerta has an inalienable right to criticize, challenge, and protest government actions—even when such protest is directed at law enforcement activities.  The SI fails to state an offense and violates Mr. Huerta's constitutional rights.  The Court should dismiss the SI with prejudice.

## I.    THE SUPERSEDING INFORMATION FAILS TO STATE A CRIME

In ruling on a motion to dismiss for failure to state an offense, courts are "bound by the four corners of the [information]," and "the court must accept the truth of the allegations in the [charging instrument] in analyzing whether a cognizable offense has been charged."  *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  As Mr. Huerta's motion to dismiss "presents legal, rather than factual, issues," *Shortt Accountancy*, 785 F.2d at 1452, it should be resolved pre-trial.[7]

---

[7] The Court may consider some undisputed information not available on the face of the SI, such as facts that cannot be reasonably disputed by the government, as they were set forth in the government's omnibus opposition to Mr. Huerta's first motions to dismiss, ECF 61, and are consistent with facts set forth in the SI.  It is permissible for a Court to make "preliminary findings of fact necessary to decide the legal questions presented by the motion" so long as it does not invade the province of the jury.  *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993).  In addition, "an exception" exists "when the motion is based on agreed facts, the government offers no objection to the consideration of those facts, and the motion is capable of resolution as a matter of law."  *United States v. Pope*, 613 F.3d 1255, 1258 (10th

The SI fails to state the elements of a Section 1501 misdemeanor.  It charges Mr. Huerta with obstructing and opposing *locations* and the operation in its totality, rather than officers.  For the few officers it mentions, the SI fails to show that they were actively engaged in the execution of the search warrant, instead of other aspects of the dual operation.  And all of Mr. Huerta's charged actions are protected by the First Amendment and cannot form the basis of a criminal charge.  Each of these arguments provides a sufficient basis for dismissal.

### A.   On the Face of the SI, the Government Fails to State an Offense.

#### 1. Section 1501 Requires Obstruction, Resistance, or Opposition Directed at an Officer Actively Executing a Qualifying Writ.

The government charges Mr. Huerta with violating 18 U.S.C. § 1501, which states:

> Whoever knowingly and willfully obstructs, resists, or opposes any officer of the United States, or other person duly authorized, in serving, or attempting to serve or execute, any legal or judicial writ or process of any court of the United States, or United States magistrate judge; or
>
> Whoever assaults, beats, or wounds any officer or other person duly authorized, knowing him to be such officer, or other person so duly authorized, in serving or executing any such writ, rule, order, process, warrant, or other legal or judicial writ or process—

will face criminal penalties.  Mr. Huerta is charged with a violation of the first clause.

Section 1501's plain text provides the clearest guidance on its requirements.

---

Cir. 2010) (Gorsuch, J.).  Finally, "[a] court may take judicial notice of court records but cannot accept as true any disputed facts in those records."  *United States v. Kiselev*, No. 22-cr-00428-JSW, 2023 WL 4771179, at *4 (N.D. Cal. July 25, 2023).  While the SI inexplicably contradicts previous representations to this Court, and the records produced to Mr. Huerta, including changing Mr. Huerta's arrival time from 11:49 a.m. to 11:20 a.m., the SI must be taken as true for the purpose of this Motion.

*See United States v. Kozminski*, 487 U.S. 931, 939 (1988) ("Federal crimes are defined by Congress," so courts "must give effect to Congress' expressed intention concerning the scope of conduct prohibited."). The best reading of the first clause requires the government to show: (1) specific intent; (2) obstruction, resistance, or opposition; (3) directed at an authorized officer; (4) who is actively engaging in the service, or the attempted service or execution; (5) of a qualifying federal court-issued writ or process.

Section 1501 requires that obstruction, resistance, and opposition directly impact a specific *officer* or authorized *person*. The relevant portion of Section 1501 sets out the criminal act with a string of three transitive verbs ("obstructs, resists, or opposes"), matched with a direct object ("an officer, or any duly authorized person"). Because the officer is the direct object of the verbs, the best reading of the statute is for the officer to receive a defendant's actions, not the warrant or the operation. *See* Anne Enquist & Laurel Currie Oates, *Just Writing: Grammar, Punctuation, and Style for the Legal Writer* 166 (3d ed. 2009); *see also United States v. Sanders*, 966 F.3d 397, 406 (5th Cir. 2020) (discussing importance of the direct object and "defining 'direct object' as 'the word or words in a sentence designating the person or thing receiving the action of a transitive verb'") (quoting The American Heritage Dictionary 373 (New College Ed. 1981)).

It is not enough for the obstruction, resistance, or opposition to be directed at any officer engaged in any activity. Section 1501 requires that the officer be engaged in contemporaneous service or execution of the qualifying writ or process. The structure of Section 1501's first paragraph supports this reading. The direct object (the officer) is modified by another phrase: "in serving, or attempting to serve or execute, any legal or judicial writ or process." In this structure, where a sentence combines "in" with gerunds ("serving" or "attempting"), the term "in" means "while" or "in the course of." *In*, prep., def. II.21(b), Oxford English Dictionary (3d

14

ed. 2021, rev. online 2024) (Prepositional phrases that include gerunds are "equivalent in sense to a temporal clause introduced by when, while, if."). Essentially, the effect of this structure is to add a temporal element. It explains what the direct object—the officer—must be doing at the time the act occurs. For Section 1501, the officer must be "in the course of" "serving, or attempting to serve or execute" the qualifying writ or process. *See also United States v. Tinklepaugh*, 28 F. Cas. 193, 193 (C.C.S.D.N.Y. 1856) ("[A]fter such legal process, warrant, writ, rule or order was in the hands of such officer for service, some one knowingly and wilfully obstructed, resisted, or opposed him in serving or attempting to serve or execute the same"). What constitutes the execution of a qualifying writ or process depends on the type of process—here, a federal search warrant.

The rule of lenity counsels in favor of this interpretation. "The rule of lenity provides that 'ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor.'" *United States v. Metcalf*, 156 F.4th 871, 882 (9th Cir. 2025) (quoting *United States v. Davis*, 588 U.S. 445, 464 (2019)). As the reading above is, at the very least, a plausible interpretation, the Court should find in Mr. Huerta's favor. *See id.* at 882-83.

### 2. The SI Fails to Plead These Elements with Sufficient Specificity.

As a preliminary matter, the allegations against Mr. Huerta do not meet the Court's required specificity. In ordering the government to amend its Information, the Court specified that the SI should "more specifically identify (1) Defendant's conduct that allegedly obstructed, or aided and abetted the obstruction of, the execution of the search warrant and (2) the United States officer(s) or other authorized person(s) whom Defendant is charged with obstructing." ECF 102 at 4. The Court additionally directed the government to "specify which of § 1501's prohibitions—resisting, obstructing, or opposing—it charges Defendant with

15

violating." *Id.* at n.2.

The SI provides more detail than the original Information, but at such a high level of abstraction that it is impossible for Mr. Huerta to understand the actual charges against him. The SI charges Mr. Huerta under all three "prohibitions," and lumps them together in each allegation. It also fails to identify which acts are allegedly attributed to Mr. Huerta, and which are attributed to others. Instead of following the common sense structure of the statute, the SI splits its allegations into two parts: first providing a list of activities that Mr. Huerta and/or others engaged in that "obstructed, resisted, and opposed federal officers," SI 4:16-5:10, and then listing how those nebulous allegations "obstructed, resisted, and opposed federal officers . . . [in] attempting to serve and execute the warrant," *id.* 5:11-6:5. This structure appears to require a combination of one allegation from each list to meet the elements of the statute, *e.g.*, "Failing to comply with lawful commands to not block the entrance of the Search Warrant Location . . . [i]mpeded the pathway of a vehicle driven by federal agent S.T., which arrived and was delayed in entering the premises at approximately 11:28 a.m." Mr. Huerta has no way to know which action he did, let alone which action pairs with which alleged impact. Only two allegations actually mention specific officers, but because the SI requires a matching game to decipher its allegations, there is no way for Mr. Huerta to know which, if any, of his own actions impacted those officers. The SI's allegations are insufficiently specific.

### 3. The Allegations Still Do Not State a Violation of Section 1501.

Even with the high level of abstraction, the allegations in the SI do not meet the elements of Section 1501. As stated, Section 1501 requires obstruction, opposition, or resistance directly to an officer that is actively engaged in executing the search warrant.

First, the allegations state that Mr. Huerta (or others) blocked physical

16

locations, not the officers themselves.  Each specified activity notes blocking the front gate.  SI 4:20-5:10.  While two other allegations could plausibly be construed as "resisting" officers, those officers are not in the group specified to be engaging in executing the search warrant, and the allegations *still* revolve around blocking an entrance.  *See* SI 5:1-7.  If this is the sum total of Mr. Huerta's alleged criminal activity, all it pleads is that he blocked a gate, not an officer executing a search warrant.  A tangential effect on a search operation or an officer is not enough under the plain terms of the statute.  The SI must allege that Mr. Huerta obstructed, resisted, or opposed *an officer actively* executing a search warrant, but it does not do so.[8]

Second, even if the Court reads the allegations broadly to mean that Mr. Huerta's resistance to certain officers or the alleged impediments of law enforcement vehicles suffices to obstruct, resist, and oppose, an officer, it fails to plead that these officers were actively engaged in executing the search warrant.

The SI describes the Search Warrant as authorizing "the seizure of evidence, including employment records, identification documents of employees, and digital devices, among other things[.]"  SI 2:2-5.  It does not describe with specificity how Mr. Huerta's protest impacted officers executing the Search Warrant.[9]  The SI identifies certain officers:  those standing at the front gate issuing commands or clearing the driveway, SI 5:1-7, "federal agent S.T." at 11:28 a.m., *id.* 5:15-17, and "federal contractor B.G." at 12:15 p.m., *id.* 5:18-20.  The identities of both Brian

---

[8] This is for a reason.  Neither officer that the SI names could even identify Mr. Huerta on June 6 when asked to do so after the fact.

[9] The SI does make a general statement that all federal "agents . . . present at the Search Warrant Location on June 6, 2025, were assisting with the execution of the Warrant . . . [and] were, in fact, so doing when present at the Search Warrant Location on June 6, 2025, when the operation began."  SI 3:22-28.  Taking this statement at face value, all officers present when the operation began, from 9:00 a.m. to 9:30 a.m., were actively engaging in the execution of the search warrant.  As Mr. Huerta was not at the protest during this time period, this is not relevant.

Gonzalez ("B.G.")and Special Agent Seth Tugg ("S.T.") are undisputed. The SI also describes certain activities of the officers at the warehouse. It describes how certain officers "effected the Warrant and [were] seizing evidence," SI 2:25-26, while others engaged in related activities, including "preventing the destruction of evidence, maintaining the efficacy of the search, and maintaining operational safety at the Search Warrant Location," *id.* 2:27-3:1, and "assisting with the safe entry and exit of any law enforcement vehicles connected to the Warrant," *id.* 3:7-8. It further states that the execution of the search was hindered because officers were required to respond to safety concerns at the front gate instead of executing the search. *See* SI 6:1-5. Assuming the truth of these allegations, as is required at this stage, agents "executing" the Search Warrant were not guarding the front gate. This distinction makes sense in the context of the government's previous, undisputed factual representations. The government has made clear that in the course of the dual operation, the perimeter team was separated from the team conducting the search. ECF 61 at 2:23-28.

For agents and contractors in vehicles, the SI alleges they were "transport[ing] seized evidence gathered during the execution of the Warrant," *id.* 3:10-11, as well as "remov[ing] any non-law-enforcement individuals who were detained during the execution of the Warrant, either for safety, for further investigation, or to promote the efficacy of the search," *id.* 3:12-13, and the "transportation of any individuals who were detained or arrested at the premises during the execution of the search," *id.* 3:19-21.

As a matter of law, transportation of detainees could not have occurred as part of the execution of the Search Warrant. A search warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981). But those detentions are narrowly circumscribed. Certain activities are not considered part of the

18

execution of a search warrant.  Detainees under *Michigan v. Summers* cannot be transported in vehicles to other locations—such a seizure would constitute an arrest without probable cause.  *See Perez Cruz v. Barr*, 926 F.3d 1128, 1142 (9th Cir. 2019) (citing *Bailey v. United States*, 568 U.S. 186 (2013))  Moreover, in the Ninth Circuit, *Michigan v. Summers*' authorization to detain incident to a search "does not extend to a preexisting plan whose central purpose is to *detain, interrogate, and arrest* a large number of individuals without individualized reasonable suspicion."  *Perez Cruz*, 926 F.3d at 1143 (emphasis added).  The SI describes how "law enforcement also suspected a large number of employees of the business at the Search Warrant Location were engaged in immigration fraud"—an allegation that is confirmed by the government's produced records showing that the government *pre-identified* individuals for administrative arrests, and told the agents to administratively arrest anyone they "believed" to be "illegal."  These pre-planned detentions, by the SI's own description, cannot be conducted incident to a search warrant.  If any vehicles were in fact used to transport "any non-law-enforcement individuals who were detained during the execution of the Warrant, either for safety, for further investigation, or to promote the efficacy of the search," SI 3:11-15, such actions would have been outside of the scope of the search warrant, and absent separate probable cause or a separate warrant, unconstitutional.  For this reason, those vehicles could not have been used for the execution of the Search Warrant.

This leaves the final interpretation, that the impeded officers were driving vehicles "to transport seized evidence gathered during the execution of the Warrant" and to "transport federal officers in and out of the Search Warrant Location[.]"  The first option does not describe any activity of an officer allegedly impeded, as the SI describes only officers attempting to *enter* the Ambiance gate, meaning that they could not be transporting seized evidence.  SI 5:15-20.  And for the second option, in light of the dual purpose of the operation, transportation of officers could be

19

entirely unrelated to the execution of the search—the failure of the SI to specify implies that, like for detainees, this transportation was unrelated to the Search Warrant. Regardless, the SI does not allege that these officers were actually obstructed, resisted, or opposed—just that they were delayed in entering the warehouse.[10]

Accordingly, the SI fails to state the elements of a Section 1501 offense and must be dismissed.

### B.    The Superseding Information Charges First Amendment Protected Activities.

Even if the Court finds that the SI states the elements of Section 1501 with the required specificity for criminal charges, Mr. Huerta's activities cannot be the basis of the charge against him, as speech protected by the First Amendment cannot form the basis for a criminal charge.

The First Amendment provides substantial protection to protests and criticism directed at law enforcement officers. *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). This protection is not limited to just words: peaceful protest, picketing, and sit-ins are all protected speech. *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment."); *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 830 (9th Cir. 2020) ("Public demonstrations and protests are clearly protected by the First Amendment"); *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 861 (9th Cir. 2001) ("It is well established that peaceful picketing and parading are forms of expressive

---

[10] As the government's reports and videos confirm, for both vehicles, the front gate was closed during most of the alleged obstruction.

20

communication protected by the First Amendment."); *United Food & Com. Workers Loc. 99 v. Bennett*, 934 F. Supp. 2d 1167, 1192 (D. Ariz. 2013) ("Picketing 'plainly involves expressive conduct within the protection of the First Amendment.'" (quoting *Police Dept. of City of Chi. v. Mosley*, 408 U.S. 92, 99 (1972)). And sit-ins receive no less protection. *See Eisenstadt v. Baird*, 405 U.S. 438, 460 (1972) (Douglas, J., concurring) ("A sit-in can be a quiet, dignified protest that has First Amendment protection even though no speech is involved").

The protection of expressive activities is amplified when the activity speaks to an issue of public importance or occurs in a public forum. The Supreme Court "has recognized that expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). And it is "[a] basic rule . . . that a street or a park is a quintessential forum for the exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017); *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009) ("The protections afforded by the First Amendment are nowhere stronger than in streets and parks, both categorized for First Amendment purposes as traditional public fora."). "Restrictions on First Amendment activities in public fora are 'subject to a particularly high degree of scrutiny.'" *Collins*, 110 F.3d at 1371 (quoting *NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984)).

There is no reasonable dispute that the SI charges Mr. Huerta for protesting an issue of critical public importance—the immigration enforcement activities of the government—in a classic public forum—the sidewalk. The SI states that Mr. Huerta joined a protest in front of one of the warehouse's gates, which is a driveway that is part of a public sidewalk, SI 4:1-5, 26-27, and alleges that he conducted a sit-in, *id.*

21

4:21, and engaged in a picket line, *id.* 4:24. Each of these activities is expression protected by the First Amendment, and the SI contains no allegation that Mr. Huerta engaged in any activities that would rise to the level of unprotected speech, such as true threats or incitement.

The SI also appears to charge him with aiding and abetting others simply due to his presence at and participation in a protest where others may have obstructed, resisted, or opposed a search warrant. "If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, *they* may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge." *De Jonge v. State of Oregon*, 299 U.S. 353, 365 (1937). Absent incitement, the First Amendment even protects speech "tending to encourage or promote a riot." *United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969)). Mr. Huerta's participation in or encouragement of a protest cannot form the basis of the charges against him.

The SI can also be read to allege that he did not comply with officer commands or officer actions taken to stop him from protesting. SI 5:1-7. But "it is clearly established federal and state law that protests or assemblies cannot be dispersed on the ground that they are unlawful unless they are violent or . . . pose a clear and present danger of imminent violence . . . or they are violating some other law in the process." *Collins*, 110 F.3d at 1371. While certain circumstances may permit the government to disrupt, end, or require dispersal of individuals engaging in peaceful protest, the government has made no such allegations. For example, some "'time, place and manner' regulations of picketing may be necessary to further significant governmental interests." *Mosley*, 408 U.S. at 98 (quoting *Cox v. New*

22

*Hampshire*, 312 U.S. 569, 575-76 (1941)).  Moreover, while law enforcement may engage in certain tactics of crowd control, the "governmental interest in crowd control . . . must be closely watched and weighed against the constitutional allowances for protest and assembly." *Astorga v. Cnty. of Los Angeles*, No. 2:20-cv-09805-AB-AGR, 2024 WL 3313747, at *9 (C.D. Cal. May 28, 2024).  And "law enforcement orders prohibiting or restricting protected expression are subject to the First Amendment." *Laizure v. Washington Cnty.*, No. 3:17-cv-01254-SB, 2018 WL 3638124, at *4 (D. Or. July 13, 2018), *report & recommendation adopted Laizure v. Washington Cnty.*, No. 3:17-cv-1254-SB, 2018 WL 3636539 (D. Or. July 31, 2018).  Any intrusion into Mr. Huerta's First Amendment rights by charging him for failing to disperse must be supported and narrowly tailored to a significant government interest.

The government cannot show a significant interest to justify criminalizing and/or dispersing a lawful protest in this case.  First, the government's interest in accessing the property through its preferred gate is minimal.  On the face of the SI, the "Front Gate" is not the only gate for entry into the warehouse area, it was only the "primary entrance," SI 2:15-17, and "the only gate being used by law enforcement," *id.* 4:2-4.  This representation is consistent with the government's previous statements that other gates could be used by law enforcement to access the premises.  *See* ECF 61 at 9 (stating that the government agents "escaped out of the back gate of the Warrant Location").[11]  The government's interest in having officers access a search warrant location through their preferred entrance, when others are available, is not particularly significant.  Second, the government's interest in quashing a peaceful protest due to fears of officer safety is implausible on the face

---

[11] While the government states that the back gate had previously been locked, there is no indication for why it could not have been unlocked for officers requiring an alternative entrance when it was unlocked for officers to leave.

of the SI.  Officers effectuating the warrant were inside a "226,907 square foot warehouse and business center surrounded by high black metal perimeter fencing[.]" SI 2:13-14.  The threat to the safety of officers behind a closed, high, metal gate is minimal—particularly when they have another exit.  Third, the government cannot have any legitimate interest in effectuating unconstitutional searches or arrests, and the constitutionality of the government's activities during the dual operation is extremely suspect.  If the SI's allegations are taken as true, the government has admitted to engaging in arrests that violate the Fourth Amendment rights of the detained individuals and abusing its power under the search warrant.  *See supra*, pp. 18-19.  Such an interest cannot outweigh Mr. Huerta's legitimate First Amendment rights.

Mr. Huerta has an unimpeachable First Amendment right to peacefully protest.  His rights to do so are doubly protected as he protested on the public sidewalk regarding issues of critical public importance, with no countervailing significant government interest supporting an intrusion into those rights. "Demonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate." *Collins*, 110 F.3d at 1372.  Law enforcement is no more protected than the rest of the government from the criticism and protest of the citizenry.  *Resek v. City of Huntington Beach*, 41 F. App'x 57, 59 (9th Cir. 2002) ("[T]he job of police officers requires a thick skin.").  Mr. Huerta's protest cannot form the basis of a criminal charge, so the SI fails to state a crime, and the charge against Mr. Huerta must be dismissed with prejudice.

24

## II.    SECTION 1501 VIOLATES THE FIRST AMENDMENT, FACIALLY AND AS APPLIED TO MR. HUERTA

### A. Section 1501 Is Facially Overbroad in Violation of the First Amendment.

This Court should strike Section 1501's first clause as facially overbroad and dismiss the SI.  As "even minor punishments can chill protected speech," overbroad criminal statutes pose a particular threat to First Amendment rights.  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).   First Amendment overbreadth challenges are a "singular context" where "even a law with 'a plainly legitimate sweep' may be struck down in its entirety."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  A statute is facially overbroad where it "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep."  *United States v. Hansen*, 599 U.S. 762, 770 (2023).  "Criminal statutes must be scrutinized with particular care." *City of Houston*, 482 U.S. at 459.

Section 1501's three operative verbs sweep in a wide swath of protected speech, including criticisms and peaceful protest of law enforcement activity.  Mr. Huerta's own arrest, as well as the few applications of the statute throughout history, reveal its unconstitutional overbreadth.  Striking a portion of a criminal statute for facial overbreadth may be "strong medicine," *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), but the first clause requires this precise prescription.

### 1. "Obstruct, Resist, or Oppose" Reach Substantial Protected Speech.

Section 1501's three operative verbs—obstruct, resist, and oppose—are the root of its overbreadth.  As described above, *see supra*, pp. 20-22, protest and criticism of law enforcement officers are protected speech under the First Amendment.

Assessment of a statute's breadth begins with its text.  *See United States v.*

25

*Williams*, 553 U.S. 285, 293 (2008).  The most natural reading of the three verbs includes a broad array of speech and expressive conduct.  Viewed in contrast with the statute's second clause and Mr. Huerta's charged activity, the first clause prohibits a substantial amount of protected speech relative to its legitimate sweep.

In *City of Houston*, the Supreme Court invalidated a local ordinance that criminalized mere opposition to law enforcement.  482 U.S. at 467.  There, an individual was arrested after shouting at police officers to "pick on somebody your own size," under a provision that made it "unlawful for any person to . . . in any manner *oppose*, molest, abuse or interrupt any policeman in the execution of his duty."  *Id.* at 454-55 (emphasis added).  Construing the ordinance's plain language, the Supreme Court held that barring opposition to and interruption of police officers criminalized "verbal criticism and challenge directed at police officers," which is protected by the First Amendment.  *Id.* at 461.

*City of Houston* correctly interpreted "oppose" to include protected speech, and the Court's reasoning equally applies to Section 1501's first clause.  Like here, the Court's analysis was limited to a series of verbs that could include both unprotected actions and verbal speech.[12]  The Court recognized, for example, that certain types of physical obstruction of a police officer in the course of their duties could be constitutionally criminalized.  *See id.* at 462, n.11.  But it identified the same fundamental problem that arises in Section 1501: a statute that contains such broad language that it can sweep in substantial protected speech is insufficiently tailored to the government's legitimate interests.  *Id.*  "Although that person might constitutionally be punished under a *tailored* statute that prohibited individuals from physically obstructing an officer's investigation, he or she may not be punished

---

[12] Although the statute at issue in *City of Houston* contained verbs describing physical and verbal assaults, the city conceded that those verbs were preempted, so the Court only analyzed the four listed here.  *City of Houston*, 482 U.S. at 460.

under a broad statute aimed at speech." *Id.* Ultimately, "if some constitutionally unprotected speech must go unpunished, that is a price worth paying to preserve the vitality of the First Amendment." *Id.*

The plain terms of Section 1501 cover anything that obstructs, resists, or opposes an officer's service or execution of a warrant—whether those activities include verbal speech or expressive conduct, in a public forum or in a house, so long as those activities hinder, stop, challenge, or contest the officer's actions. For example, according to the Fifth Circuit opinion affirmed in *City of Houston*, "oppose" can mean to have "an adverse opinion concerning" or "to offer arguments against." *Hill v. City of Houston*, 764 F.2d 1156, 1163 (5th Cir. 1985). As the Fifth Circuit noted, "[i]f a mother pleads with a policeman to 'spare my baby' while the policeman arrests her son in front of their home, she has 'opposed' the policeman in the execution of his duties." *Id.* Dictionaries confirm that "oppose" reaches protest activity. Today, "to oppose" can mean "to confront (a person) with hard questions or objections," "to interrogate, question," "to set (something) against or in opposition to," "to place or position as an obstacle," "to contend, fight," and "to be antagonistic or hostile to." Oppose, Oxford English Dictionary (revised ed. 2004). At the time of Section 1501's original passage, it meant "to set against, to put in composition, to withstand or thwart." Nathan Bailey & George Gordon, *Dictionarium Britannicum* (1730). Like "opposes," the other two verbs—"obstructs" and "resists"—also sweep in protected speech. The term "obstruct" is "broad." *Marinello v. United States*, 584 U.S. 1, 7 (2018). Earlier dictionaries defined "obstruct" as "to stop or shut up, to hinder" or "[t]o impede or hinder; to interpose obstacles or impediments, to the hindrance or frustration of some act or service," and the term "resist" to mean "to withstand, to oppose, to be against," Obstruct, Black's Law Dictionary (1st ed. 1891); Bailey & Gordon, *Dictionarium Britannicum* (1730). Today's dictionaries provide more breadth. *See* Obstruct, *Oxford English Dictionary* (rev. ed. 2004) (to

27

"obstruct" is "[t]o impede, stand in the way of, or retard the progress or course of (proceedings, a plan, an intention, etc.); (Law) to commit the offence of intentionally hindering."); Resist, *Oxford English Dictionary* (revised ed. 2010). (to "stop or hinder (a moving body); "to obstruct the passage of, to block," "to impede," "to strive against, fight or act in opposition to, oppose," "to contrive not to yield to; to withstand, be unaffected by the action or influence of.").[13]

Like in *City of Houston*, the first clause's substantial sweep is additionally shown by conduct it does *not* reach: the physical, violent actions listed in the second clause of the statute, "assault," "beat," and "wound."  The term "assault," specifically, includes true threats and fighting words, which are not protected by the First Amendment.  *See United States v. Sommerstedt*, 752 F.2d 1494, 1496 (9th Cir. 1985), *as amended*, 760 F.2d 999 (9th Cir. 1985) (defining assault in the context of Section 1501 as "either a willful attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.").  Congress's inclusion of this separate clause, with a lesser scienter requirement, shows that it did not intend to include the majority of violent, physical, or threatening conduct in the first clause.  *See, e.g.*, *Miller v. United States*, 230 F.2d 486, 488 (5th Cir. 1956) (Section 1501 "reflects a purpose to forbid, under the broader terms of the first [clause], those acts which constitute obstruction, resistance or opposition but which do not involve physical violence."); *United States v. McDonald*, 26 Fed. Cas. 1074, 1077 (C.C.E.D. Wis. 1879) (jury charge) (Section 1501 "includes also willful acts of obstruction or opposition; and to obstruct is to

---

[13] Where a word has multiple dictionary senses, courts apply "the contextually appropriate ordinary meaning," not merely the first listed.  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012); Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 423 (2013).

28

interpose obstacles or impediments, to hinder, impede or in any manner interrupt or prevent, and this term does not necessarily imply the employment of direct force").

Section 1501's placement of the three non-physical, more peaceful verbs in one clause, and the three violent and threatening verbs in the other, sets it apart from how courts have read other statutes. In *People v. Vasquez*, 465 Mich. 83, 89 (2001), the Michigan Supreme Court interpreted "oppose" out of a list of five words, including obstruct, resist, assault, beat, and wound. It found that the *combination* of "obstruct, resist, oppose" with three necessarily threatening or conduct-based words, "assault, beat, wound" evinced a common physical requirement. *Id.* at 90. In contrast, where obstruct, resist, and oppose were accompanied by different terms— impede and hinder—the "physical" limitation found in *Vasquez* did not apply. *See King v. Ambs*, 519 F.3d 607, 611 (6th Cir. 2008) ("In contrast to the state statute in *Vasquez,* the list of terms in the Columbia Township Ordinance, "obstruct[], resist[], impede[], hinder[] or oppose[]," presents a less apparently physical context in which to interpret the term "obstruct."). Like in *King*, the necessarily physical, threatening, or violent terms in Section 1501 are cabined to the second paragraph of Section 1501, not the first. Section 1501 is not the only statute that prohibits interference with law enforcement activity. But it is the only statute without any textual or court-imposed limitation to unprotected categories of speech or to physical force. [14]

Section 1501's context among the broader criminal code also sheds light on its comparably broad reach. Any hypothetical legitimate application is more specifically addressed in other criminal statutes. *See* 18 U.S.C. § 111; 18 U.S.C.

---

[14] Where similar lists are not susceptible to either interpretation, state supreme courts have often chosen to limit the reach of the statute as a matter of law to avoid overbreadth—a remedy not available to federal courts. And where they have chosen not to, courts have found that protected speech is likely within the substantial sweep of the statute. *See Brooks v. N. Carolina Dep't of Correction*, 984 F. Supp. 940, 954 (E.D.N.C. 1997).

§ 231 ("commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder . . ."); 18 U.S.C. § 2231 ("forcibly assaults, resists, opposes, prevents, impedes, intimidates, or interferes with any person authorized to serve or execute search warrants or to make searches and seizures while engaged in the performance of his duties with regard thereto or on account of the performance of such duties[.]");18 U.S.C. § 2232 ("before, during, or after any search for or seizure of property by any person authorized to make such search or seizure, knowingly destroys, damages, wastes, disposes of, transfers, or otherwise takes any action, or knowingly attempts to destroy, damage, waste, dispose of, transfer, or otherwise take any action, for the purpose of preventing or impairing the Government's lawful authority to take such property into its custody or control or to continue holding such property under its lawful custody and control."); 18 U.S.C. § 1071 ("harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person."); 18 U.S.C. § 1073 (fleeing prosecution, process, or testimony); 18 U.S.C. § 2101 (making it a crime "to incite a riot . . . to participate in, or carry on a riot . . .to commit any act of violence in furtherance of a riot; or . . . to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot.") (as narrowed by *Rundo*, 990 F.3d at 721).

Section 1501's scienter requirement does not save it.  A specific-intent requirement provides little protection under this type of statute, *City of Houston*, 482 U.S. at 469 n.18, and "[a] defendant's view as to the unconstitutionality or invalidity of the law is irrelevant to . . . willfulness," *United States v. Atkinson*, 232 F.3d 897 (9th Cir. 2000) (citing *Cheek v. United States*, 498 U.S. 192 (1991)).  And the

30

scienter requirement makes the statute viewpoint-skewed: it criminalizes intentional opposition to officers while leaving identical support untouched. *See Nicodemus v. City of S. Bend*, 137 F.4th 654, 666 (7th Cir. 2025).

Statutes that prohibit speech "because of the topic discussed or the idea or message expressed" are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Here, Congress chose broad terms that turn on a viewpoint: antagonism and negativity towards the officer's actions. *See Nicodemus*, 137 F.4th at 666 (finding that, in City of *Houston*, "the Supreme Court found the words "oppose," "molest," "abuse," or "interrupt" were too generic, giving police too much discretion to 'arrest individuals for words or conduct that annoy or offend them.' In other words, the ordinance effectively allowed the police to discriminate against speech based on its content") (internal citations omitted). One cannot both "oppose" the execution of a warrant and "support" it. Section 1501's scienter element requires that these three actions be undertaken knowingly and willfully, which means that the criminalized activity must *intend* to obstruct, oppose, or resist a federal officer's specific activities, and exacerbates this issue. Opposition to law enforcement actions indicates a viewpoint—one that does not support the activities of the federal agents—and the scienter requirement ensures that that position is intentionally expressive. And the SI's allegations confirm this interpretation. The alleged obstruction, opposition, and resistance embodied in the protest was a violation of the statute because the officers executing the warrant were subjectively afraid of the protesters. In the government's interpretation, if Mr. Huerta instead joined a block party in front of the search warrant location, or if he had joined a crowd cheering on the officer's activities, the search would have continued without issue. This is a necessarily viewpoint-based decision. "Discrimination against speech because of its message" is an "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The

31

"government *must* abstain" from it.  *Id.* (emphasis added).

The definitions of these three verbs certainly include the legitimate criminalization of obstruction or resistance by the targets of the writs or process attempting to avoid or stop their execution.  The First Amendment does not protect, for example, shredding files, locking a process server in a coat closet, or running away from an arresting officer.  But a law may be facially overbroad under the First Amendment "even though it has lawful applications."  *Tucson v. City of Seattle*, 91 F.4th 1318, 1327 (9th Cir. 2024).

Ultimately, in choosing the terminology of the statute, "Congress said what it meant and meant what it said."  *Rundo*, 990 F.3d at 718.  Courts cannot "rewrite a law to conform it to constitutional requirements."  *Reno v. ACLU*, 521 U.S. 844, 884-85 (1997) (quoting *Va. v. Am. Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1988)) (cleaned up).  And *City of Houston* remains binding precedent that statutes broadly criminalizing opposition to law enforcement are overbroad.

### 2. Section 1501's Unconstitutional Sweep Is Not Hypothetical.

Charges under Section 1501's first clause are vanishingly rare—only a few incidents can be identified over the last few centuries.  Given this light record, Mr. Huerta's own prosecution for his engagement in First Amendment protected activities is sufficient to show that the statute's substantial sweep is more than hypothetical.  Courts cannot "uphold an unconstitutional statute merely because the Government promised to use it responsibly," particularly where "[t]his prosecution is itself evidence of the danger in putting faith in government representations of prosecutorial restraint."  *United States v. Stevens*, 559 U.S. 460, 480 (2010).  Evidence of Mr. Huerta's own unconstitutional charge is sufficient to show the substantial overbreadth of Section 1501's first paragraph.

The few examples of prosecution under this statute that exist, however,

demonstrate its substantial unconstitutional application. Section 1501's first clause and its virtually identical predecessors have been quietly used for over two hundred years to criminalize dissent against law enforcement. As it is currently being used for this same purpose against Mr. Huerta, there is little doubt that its substantial unconstitutional application is more than hypothetical.

Its application largely begins in the public record in the mid-nineteenth century, where Section 1501's predecessor statute, Section 22 of the Act of April 30, 1790, was used to prosecute abolitionists advocating against the Fugitive Slave Act of 1850. For example, on April 3, 1855, Minister Theodore Parker was charged with a violation of Section 1501's predecessor for obstruction, resistance, and opposition, after he preached against federal law enforcement kidnapping formerly enslaved persons and returning them to their "masters."[15] Speaking in his own defense, Minister Parker decried that the charges against him "would make my daily talk a 'misdemeanor,' my public preaching and my private prayers a 'crime,' nay, my very existence is constructively an "obstruction" to the marshal." *Id.* He argued the charge "is a quo warranto against all Freedom of Speech," noting that everyone who expressed dissent—from clergymen to newspapers—would be guilty of a misdemeanor for "opposition" under this act. *Id.* Similar charges were brought against other vocal abolitionists. *See* Earl M. Maltz, *Slavery, Federalism, and the Constitution: Ableman v. Booth and the Struggle over Fugitive Slaves*, 56 Clev. St. L. Rev. 83, 97 (2008) (discussing underlying charges against Sherman Booth, an abolitionist activist, including one under Section 1501's first paragraph); *United States v. Buck*, 24 F. Cas. 1289 (E.D. Pa. 1860) (charges against abolitionist

---

[15] *See* Theodore Parker, *The trial of Theodore Parker: for the "misdemeanor" of a speech in Faneuil Hall against kidnapping, before the Circuit Court of the United States, at Boston, April 3, 1855*, Library of Congress (1870), transcript available at: https://tile.loc.gov/storage-services/service/ll/llst/001/001.pdf.

dismissed under Section 1501's predecessor statute).

Few examples exist in the last century, but the balance still favors overbroad application. In *United States v. Carpenter*, 2012 WL 292480, at *2 (W.D. La. Jan. 31, 2012), *aff'd*, 500 F. App'x 331 (5th Cir. 2012), an off-duty police chief was convicted of violating Section 1501's first paragraph after he, in a "very animated," "very confrontational, very excitable" way verbally challenged federal officers' arrest of one of his neighbors. In *Coleman v. United States*, 268 F. 468, 469 (6th Cir. 1920), the defendant was charged with two counts of violating Section 1501— one for the first paragraph and one for the second. He had used "abusive language" to the officer executing an arrest warrant and fired his revolver at him. It is no mystery which action was "assault" and which was "opposition." In *United States v. Brakke*, 934 F.2d 174, 177 (8th Cir. 1991), an individual was charged with "passive resistance to the marshalls' [sic] requests that he vacate his vehicle" under Section 1501's first clause. In *United States v. Peifer*, 474 F. Supp. 498, 500 (E.D. Pa. 1979), *aff'd*, 615 F.2d 1354 (3d Cir. 1980), the defendant was convicted of violating Section 1501, where he or his employee moved vehicles to block federal agents from accessing parts of his property during the execution of a search warrant. Other cases are also indicative. In *Avery v. King*, 110 F.3d 12, 13 (6th Cir. 1997), the Sixth Circuit found that an officer had probable cause to arrest a woman under Section 1501 because she was "agitated, insulting and verbally abusive" to federal officers executing a search warrant, including telling them that "they had no right to be on her property" and refusing to leave the scene. In *United States v. Schaffner*, 715 F.2d 1099, 1101 (6th Cir. 1983), the underlying district court opinion found that a defendant could be charged under Section 1501 when he "gave counsel, and advice to a witness in a criminal prosecution to avoid service of a subpoena." Adding Mr. Huerta's case to these past decisions, the balance tips in favor of unconstitutional overbreadth.

34

### B.      Section 1501 Is Void for Vagueness.

In the alternative to the arguments above, Section 1501 is impermissibly vague under the First and Fifth Amendments.  "'Vague statutes are invalidated for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms.'"  *United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014) (quoting *United States v. Kilbride*, 584 F.3d 1240, 1256-57 (9th Cir. 2009)) (cleaned up).  "When speech is involved, rigorous adherence to [the void for vagueness doctrine] is necessary to ensure that ambiguity does not chill protected speech."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).  "A statute is unconstitutionally vague as applied if it failed to put a defendant on notice that his conduct was criminal."  *Kilbride*, 584 F.3d at 1257.  Mr. Huerta stood on a public sidewalk and protested outside of a location where a search warrant happened to be being executed, engaging in prototypical protest activity.  The statute provides no method for distinguishing protected activity from unprotected conduct, so he could not have had notice of when his protest crossed from constitutional to criminal.

Three aspects of the government's interpretation of the law are impermissibly vague.  First, a Section 1501 offense turns on whether the affected officer is executing a legal writ or process, but under the government's interpretation, it provides no insight into how close in time or space a person must be to commit the offense.  If Mr. Huerta had, for example, delayed S.T. from returning to the warehouse by protesting at the Federal Building, would he have violated the statute?  The statute's highly general terms ensure that individuals do not know where, when, or how they *can* exercise their constitutional rights to protest police activities before someone alleges their conduct is criminal.

35

Second, the statute "poses heightened risks of arbitrary enforcement." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022). Protests of law enforcement activities are necessarily distracting, and likely disheartening to law enforcement. Facing a crowd of individuals condemning their acts is certainly intimidating. And "police, no less than anyone else, may resent having obscene words and gestures directed at them[.]" *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990). But Section 1501's broad terms give leeway for the government to use it as a tool to stop protests that are uncomfortable, inconvenient, or distracting.

Courts across the country have noted the "troubling trend" of federal agents "equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning, and criticizing their government, and those who are obstructing, assaulting, or doing violence." *Trump*, 2025 WL 2886645, at *5. The government's own reports in this case show that they treat protected acts as suspected "criminal activity," including "yell[ing]" at agents and using "megaphones to amplify emotionality within the crowd," Ex. B; *but see City of Houston*, 482 U.S. at 461 ("the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"); *Collins*, 110 F.3d at 1371 ("Speech that stirs passions, resentment or anger is fully protected by the First Amendment."). Although Mr. Huerta's protest was indisputably non-violent, Ribner characterized him and other protesters as "vicious, horrible people." Ex. F. Mr. Huerta's speech made him a target for Ribner, though he stood as one of a crowd protesting their actions. Mr. Huerta spoke directly to Ribner through the locked gate, and based solely on Mr. Huerta's words, Ribner repeatedly threatened him with arrest. Ribner even identified Mr. Huerta to other federal agents as a *potential* violent protester, with no other basis than his protected speech. *See* Ex. B at 9-10. The moment the gate opened for the ERO van, Ribner and Crook rushed

past several other protesters who were actually in front of the van in question to specifically confront Mr. Huerta and conducted a particularly (and unconstitutionally) brutal arrest. The subsequent charge against Mr. Huerta—with its ever-changing underlying basis and the sheer rarity of a charge under Section 1501 at all—demonstrates the statute's susceptibility to arbitrary enforcement.

Third, the vague terms included in Section 1501 chill constitutionally protected speech. It is unlikely that average citizens will be able to differentiate between when officers are executing a warrant and when they are engaging in other, tangential activities. Without clear directives on whether protest or speech is sufficient for a charge under this statute, it would be objectively reasonable for a would-be protester to refrain from protesting, or even criticizing, law enforcement activities out of fear of a charge.

The arrest and charge against Mr. Huerta showcase how the breadth and undefined terms in Section 1501 have enabled the government to read a long-standing (but seldom used) statute as a method for targeting and silencing anti-law enforcement speech. The government's pleadings here are so attenuated from impeding or interfering with an officer that only an unconstitutionally overbroad or vague statute could sustain them.

## CONCLUSION

For the foregoing reasons, Mr. Huerta respectfully requests that this Court find that the government has failed to state an offense in the First Superseding Information. Although constitutional avoidance counsels in favor of the first approach, the Court should additionally strike the first clause of Section 1501 as unconstitutionally overbroad in violation of the First Amendment, or in the alternative, find that Section 1501 is unconstitutionally vague, in violation of the First and Fifth Amendments, as applied to Mr. Huerta, and dismiss the SI with prejudice on either ground.

A Proposed Order is attached to this motion.

Dated: June 22, 2026              Respectfully Submitted,

                                  LOWELL & ASSOCIATES, PLLC

                                  By: /s/ Abbe David Lowell
                                          Abbe David Lowell

                                  MCLANE, BEDNARSKI & LITT, LLP

                                  By: /s/ Marilyn E. Bednarski
                                          Marilyn E. Bednarski

                                  *Attorneys for Defendant David Huerta*

38

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Mr. Huerta, certifies that this brief contains 12,255 words, which complies with the word limit set by this Court, *see* Order, ECF 112, dated June 17, 2026.

Dated: June 22, 2026                    */s/ Abbe David Lowell*
                                        Abbe David Lowell
                                        LOWELL & ASSOCIATES, PLLC

                                        *Attorney for Defendant David Huerta*