# Exhibit B

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

## REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



**CASE NUMBER**
[redacted]

**CASE OPENED**
6/9/2025

**CURRENT CASE TITLE**
Conspiring to Impede Federal Agents - Ambiance 15th Street

**REPORT TITLE**
June 6, 2025, Arrest of David HUERTA

**REPORTED BY**
Ryan Ribner
SPECIAL AGENT

**APPROVED BY**
Alfredo Rossi
SPECIAL AGENT

**DATE APPROVED**
6/19/2025

### SYNOPSIS

On June 6, 2025, Homeland Security Investigations (HSI) Los Angeles Special Agents (SAs), with assistance from Immigration and Customs Enforcement and Removal Operations (ICE ERO), the Drug Enforcement Administration (DEA) and the Federal Bureau of Investigation (FBI), executed multiple federal worksite search warrants at various commercial locations throughout the city of Los Angeles and within the Central District of California. While law enforcement agents were conducting one of the search warrants at 2415 East 15th Street in Los Angeles, a group of civilian protestors surrounded the entrance to the site, blocking the path of law enforcement agents from entering or exiting the location. HSI agents later arrested David HUERTA at the search warrant location for violating 18 USC 372 - Conspiracy to Impede an Officer.

This report of investigation will detail the arrest of David HUERTA.



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



## DETAILS OF INVESTIGATION

DETAILS OF INVESTIGATION:

On June 6, 2025, HSI, FBI, DEA, and ERO agents/officers served a federal search warrant on four locations related to harboring and employing illegal aliens. One of the warrants was served at the business Ambiance, 2415 East 15th Street, Los Angles, California.

Agent's Note: The Ambiance business and its owner Sang Bum NOH, was a target of an HSI narcotics money laundering and tax evasion investigation. In or about October 2020, Ambiance USA and Apparel Line USA, Inc. pleaded guilty to eight criminal counts of money laundering and customs frauds. A restitution order for $35,227,855 and a forfeiture money judgement of $81,564,856 with an additional forfeiture of $1,104,997 was previously seized by law enforcement.

The following law enforcement agents (hereinafter referred to as agents) were present at the search warrant:

Special Agent (SA) Jenae Combest-Smith, HSI - Team Leader
SA Arturo Becerra, HSI
SA Andrew Cox, HSI
SA Aaron Deguzman, HSI - Arrest/Search
SA Jeron Maklanron, HSI - Arrest/Search
SA Joe McKenzie, HSI - Arrest/Search
SA Jason Gertler - Arrest/Search
SA Ashley Holly, HSI
SA Joseph McKenzie, HSI
SA Ricardo Eldemire, HSI - Arrest/Search
SA Shabnam Aboubakri, HSI - Arrest/Search
SA Seth Tugg, HSI - Arrest/Search
SA Brian Joh
SA Christopher Wilkins
SA Brent Pickard
SA Steve Prestwood
SA Shawna Candelaria
SA Michael Flanigan
SA Vittoria Incandela - Foreign Language Interpreter
SA Kaitlyn Laflash
SA William Harrell
SA Matt Tran
SA Rochell Cup Choy



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



SA Megan Lynch
SA Calvin Weber - Foreign Language Interpreter
SA Jeremy Pearson
SA Albert Polito
SA Tiffany Hsieh
SA Hamlet Zadoorian, Federal Bureau of Investigation (FBI)
SA Eric Hill, FBI
SA Jessica Taylor, FBI
SA Molly Shannon, FBI
SA Kyle Dickerman, FBI
SA Mitch Bowman, FBI
SA Alexander Warrington
SA Maetha Jacobe, FBI
SA Brian Whitman, FBI
SA Daniel Latham, FBI
SA Emily McGuire, FBI
SA Matthew Sanderl, FBI
SA Bri Winter, FBI
SA Kyle Hicks
SA Cody Crutchley, FBI
SA Merrilee Goodwin, FBI
SA Karley Sirota, FBI
SA Eric Turner, FBI
Supervisory Special Agent (SSA) Jason Canty, HSI - Supervisor
SSA Michael Browning, HSI - Arrest/Search
SSA Scott Maekawa, HSI - Supervisor
SSA John Tran
SSA Dara Small
SSA Ryan Ribner, HSI - Arrest/Search
(A)Assistant Special Agent in Charge (ASAC) Alfredo Rossi, HSI - Supervisor
Supervisory Deportation Officer (SDDO) [redacted] [redacted] Entry and Removal Operations (ERO)
Deportation Officer (DO) Christian Gutierrez, ERO
HSI Task Force Officer (TFO) - Undercover Agent (UCA) - Documentation of criminal activities within potential crowd/protesting.

**AGENT'S NOTE AND BACKGROUND ON COUNTER-INVESTIGATIVE INCIDENTS**

In January 2025, HSI and ERO (DHS agents collectively) along with other federal law enforcement agents have been directed at a national level to conduct Title 8 immigration enforcement operations throughout the United States. This is a U.S. Government (USG) whole of government



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

HOMELAND SECURITY INVESTIGATIONS

REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



approach to combat widespread immigration enforcement. Due to U.S. Government policies several protests and criminal activities began to counter DHS/FBI/DEA/ATF investigative activities. SSA Ribner has knowledge of incidents and investigations involving organized criminal activity aimed at impeding and disrupting HSI and other federal law enforcement operations. The organized groups work in a concerted effort to provide training videos to the public on how to spot DHS law enforcement vehicles. Also, some of the groups utilize two-way radios and patrol neighborhoods to identify HSI/ICE operations. The groups also utilize social media to direct groups of people near federal law enforcement operations for the purpose of disrupting HSI/ICE operations by warning illegal aliens that ICE is in the area. The groups also yell and make threatening remarks aimed at intimidating agents. The group members also commit acts of intimidation, impede, and damage USG vehicles.

SSA Ribner requested and received permission from HSI management to place an undercover agent (UCA) inside of the crowd to document any criminal activities which would be aimed at targeting HSI operations, assets, and personnel. The activities that would be monitored include impeding, obstructing, assault/battery, intimidation, damage to property, vehicle chasing/vehicle blocking, and any other overall public safety concerns.

The following is a list of some of the historical events:

February 20, 2025, ATF INCIDENT

• Subject utilized megaphones to warn the neighborhood of ongoing law enforcement operation. Subjects actively blocked ATF law enforcement vehicle from responding to a barricaded event.

February 28, 2025, HSI/BP/ERO INCIDENTS

HSI served four federal residential search warrants for human smuggling and encountered an organized counter-operation in three locations to disrupt/impede HSI/ERO/BP agents.

466 E. 41 Street, Los Angeles, California (Blocking Roadway, Entering Crime Scene, Throwing Items at USG Vehicle)

• An organized group with megaphones began confronting Los Angeles Police Department (LAPD) officers regarding their involvement with providing traffic control. The LAPD officers then departed the search warrant scene, and a crowd began to form outside of the residence. The crowd began yelling and using megaphones and getting close to agents in an order to intimidate them. When agents departed, an unknown male threw a hard object at the USG vehicle striking it.

227 W. 61st Street, Los Angeles, California (USG Vehicle Chase, Blocking, Obstruction)



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

• Two subjects responded to the scene of the search warrant after they learned about the warrant via a social media post. The subjects then followed three U.S. Government (USG) vehicles from the crime scene and blocked the USG vehicles several times at various roadways, pulled in front of the USG vehicles and applied the brakes, and chased the USG vehicles. In May 2025, the two subjects were federally arrested.

1328 Connecticut Street, Los Angeles, California (USG Vehicle Blocking, Obstruction, Damage)

• An organized group arrived on scene of the search warrant and began forming in the street around the residence. At least three subjects purposely blocked an HSI USG vehicle from departing the residence with evidence. One male subject and a female subject stood behind the USG vehicle. Another female subject closed a metal fence on the USG vehicle causing approximately $3,150.85 worth of damage.

Worksite Enforcement Search Warrants

In or about May 2025, SSA Ribner was informed that there would be a worksite enforcement operation that would be occurring in the Los Angeles area with U.S. Government executives visiting our office during the operational phase.

SSA Ribner reviewed various open-source videos from the HSI/ICE/FBI/DEA national worksite search warrants and discovered the following:

• On or about June 1, 2025, HSI/ICE conducted a search warrant on two San Diego, California restaurants. Agents were confronted by a large, organized crowd yelling, "shame" and expletives in a coordinated fashion.

• On or about June 3, 2025, FBI/ATF/DEA conducted a search warrant on a Minneapolis, Minnesota business. After the search warrant concluded a large crowd physically attacked agents /officers, blocked/impeded USG vehicles, and threw objects at agent's officers.

**END OF AGENT'S NOTE AND BACKGROUND**

The following is a non-verbatims synopsis of the operation and arrest of David HUERTA:

At approximately 9:20 a.m., HSI, ICE ERO, FBI, and DEA Special Agents (hereinafter referred to as Investigating Agents or Agents) served the search warrant and entered the front door to the Ambiance business. Agents were searching and clearing the office space and warehouse for any additional subjects that were hiding to avoid arrest.



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

HOMELAND SECURITY INVESTIGATIONS

REPORT OF INVESTIGATION



During this time, SSA Ribner was inside of the office and warehouse searching for additional subjects who were potentially hidden, obtaining pedigree information from subjects for processing purposes, and interviewing criminal subjects.

At approximately 11:10 a.m. - 11:36 a.m., the UCA agent advised via text message that approximately 4 people from either from either one or two activist groups were on scene. SSA Ribner asked the UCA to identify them (video or photograph them).

Agent's Note: SSA Ribner has knowledge from incidents and at least one investigation that there have been past criminal activities with a few activist groups. For example, as stated above at least one activist group has impeded ATF law enforcement vehicles and entered a law enforcement cordoned area that was not open to the public. That same activist group also has utilized social media and verbal yelling to obtain compliance from LAPD officers to leave traffic control positions during HSI search warrants. Once the officers leave the scene, the activist group act as "agent provocateurs" by using megaphones to amplify emotionality within the crowd. On at least two occasions the protestors and onlookers have consolidated in the street with cars and people. SSA Ribner has also observed protestors physically throw items and hit vehicles with their hands. SSA Ribner knows that the actions of blocking streets are agent/officer safety concerns as a quick departure in case of an emergency becomes difficult for fear of striking a pedestrian or a vehicle. These actions also pose legal risk to the USG through lawsuits and/or the potential for a protestor to place himself in the path of a USG vehicle to purposely get struck. Another activist group impeded and blocked an HSI law enforcement vehicle surrounding it and causing damage to it. Other incidents involve the use of megaphones to alert the neighborhood to the presence of agents. SSA Ribner knows from experience that law enforcement search and arrest warrant operations are usually conducted in early morning hours or using best tactical options. The purpose of those techniques is to obtain the element of surprise and reduce the risk to agents and public safety. When activists use megaphones to alert criminal subject(s) that law enforcement is in the neighborhood this increases the risk to agents and the public. Overall, the above actions cause increased officer and public safety concerns and are believed to be utilized in totality to thwart and impede U.S. Government policies toward immigration enforcement objectives.

At approximately 11:22 a.m., Special Agent (SA) Michael Fernandez contacted SSA Ribner and asked if SA Ribner could obtain photographs of the illegal aliens who were arrested for immigration offenses. SA Fernandez advised SSA Ribner that he needed the photographs as he was assigned to the operations command post.

At approximately 11:41 a.m., SA Fernandez sent SSA Ribner a text message asking again for the photographs.



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

At approximately 11:43 a.m., SSA Ribner asked an ERO officer if they were transporting subjects who were in custody. An ERO officer related that officers just transported some prisoners but that they would soon be transporting two more subjects.

At approximately 11:44 a.m., SSA Ribner followed two ERO officers outside as they escorted a subject out of the front door to a USG vehicle which was located at the southwest side of the parking lot. SSA Ribner took the photographs of the subjects and sent them to SA Fernandez. SSA Ribner overheard a few shouts from the crowd stationed by the entrance gate.

As SSA Ribner was standing by the USG vehicle, SSA Ribner noticed that a crowd gathered outside of the front gate of the business. SSA Ribner asked the ERO officers if they were going to transport the prisoners in one vehicle. The officers mentioned that another vehicle was going to be arriving at the location to assist with the transport. Concerned for a vehicle incident, SSA Ribner then informed the officers that they should request more vehicles to assist with the transport so that they could potentially avoid a vehicular chase or vehicular blocking situation with any protestors/criminal activists.

SSA Ribner then walked back inside of Ambiance to obtain his body armor as SSA Ribner accessed the possibility of the need for agents to help escort the ERO vehicle through the gate. SSA Ribner obtained his body armor and then returned outside. SSA Ribner was watching the front gate area from the parking lot. Later, SSA Ribner walked over to the front gate to assess the crowd to determine if there any organized threats that could place agents/officers or the detainees in danger. SSA Ribner observed several people at the front gate. SSA Ribner heard some people yelling and making derogatory statements to agents.

Agent's Note: SSA Ribner was in communication via phone calls and texts with the UCA at various times throughout the day. The UCA continued to give various updates to the size and demeanor of the crowd.

SSA Ribner also observed a Hispanic male (later identified as David HUERTA, hereinafter HUERTA) with a red button shirt sitting in the driveway in front of the gate blocking the exit/entrance. A white female (later identified as Rose LENEHAN, hereinafter LENEHAN) sat next to HUERTA (on his right). There was another white female (later identified as Riley BANTON, hereinafter BANTON) near HUERTA as well. SSA Ribner identified that all three subjects were actively blocking the vehicle entrance/exit of Ambiance. SSA Ribner looked down at HUERTA and advised that it was a law enforcement operation and that he would be arrested if he blocked or stopped law enforcement vehicles from departing the location. LENEHAN stated, "Fuck you". HUERTA stated, "What are you going to do… You can't arrest all of us". SSA Ribner again told HUERTA, that he would be placed under arrest for impeding/obstructing federal agents if he and others decided to



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

HOMELAND SECURITY INVESTIGATIONS

REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



impede or block agents of the USG vehicles. SSA Ribner also told HUERTA that there would be federal charges placed on him. SSA Ribner wanted to warn HUERTA and others to open a dialogue with them for the purposes of de-escalating any potential situation.

Agent's Note: SSA Ribner knows from experience that activists often will physically lock themselves together to block the passage of vehicles. SSA Ribner knows that this poses a risk to the person(s) blocking the roadway/driveway as the driver may not see the person(s) and accidentally strike them with a vehicle.

SSA Ribner also observed a crowd of approximately 20 people gathering; within the crowd SSA Ribner also observed a male white (later identified as Robert STRONG, hereinafter STRONG) with a dark colored beret also wearing a reddish orange checkered shirt and a handkerchief covering his face. STRONG had an aggressive appearance and was walking back and forth and was yelling. SSA Ribner observed other people walking around.

SSA Ribner was near the fence again and HUERTA was aggressively asking SSA Ribner to identify himself. SSA Ribner asked HUERTA who he was, and at that time HUERTA stated his name. At some point SSA Ribner pointed to his body armor front placard which read "HSI POLICE"; by pointing to the patch SSA Ribner's intentions were to inform HUERTA that he was law enforcement. HUERTA made a comment about not knowing agents.

Agent's Note: Agents on the scene were wearing agency law enforcement attire noting that they were on duty federal law enforcement. Some body armor placards read "Police", "FBI", "HSI", "POLICE HOMELAND SECURITY INVESTIGATIONS". The word "Police" is a globally recognized word to identify government law enforcement officers.

A DEA agent then advised SSA Ribner to "be careful" that STRONG could try to grab SSA Ribner's firearm. The DEA agent went on to inform SSA Ribner that STRONG reached through the gate and removed a cell phone from an agent who was standing too close to the fence line. Hearing that STRONG removed equipment from an agent made SSA Ribner concerned for agent's safety.

Agent's Note: SSA Ribner knows from training and experience that when a subject(s) feels comfortable to grab/remove equipment from an identifiable law enforcement officer, that subject (s) could be gauging agent/officer response for a later attempt to commit a battery or try to remove the agent's firearm. Additionally, SSA Ribner became concerned that STRONG was placed in the crowd for agitation purposes and to provoke others to impede and physically batter agents /officers.

SSA Ribner walked away from the gate and met with SA Collin Murphy who responded to assist ERO officers with transporting the prisoners. SSA Ribner informed SA Murphy that there were some subjects in the crowd that were indicating that they would potentially impede agents by sitting



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

or laying their bodies in front of the USG vehicles. SSA Ribner requested SA Murphy's assistance to help verbally inform HUERTA and others not to impede/block USG law enforcement vehicles.

SA Murphy approached the front gate and began to speak to HUERTA. HUERTA yelled, "Why the fuck are you wearing a mask?... Where's your fucking badge number… What's your fucking name?". SA Murphy told HUERTA that law enforcement vehicle(s) needed to be able to enter and exit through the gate.

Agent's Note: SSA Ribner knows from other investigations that protestors and agitators want to identify HSI/ICE agents through photographs and computer doxxing for the purpose of "outing" the agents home address. By providing the information in an online format it may incite harassment and intimidation which could lead to a violent act on the agent(s) and his family. Further, SSA Ribner believes that this is a tactic used by militant agitators to attempt to instill fear and intimidation for the overall purpose of thwarting law enforcement activities.

SA Murphy informed HUERTA that he would be arrested if he obstructed federal agents during their duties. SA Murphy also provided the same instructions to an unknown male that was positioned near HUERTA. The male acknowledged SA Murphy's commands. SA Murphy departed the gate area shortly afterward.

Agent's Note: For more information about the encounter refer to ROI 002. SSA Ribner would walk away and then re-approach the gate approximately three times.

Later, HUERTA approached the gate and began yelling and about wanting to see agents' faces. At times HUERTA was putting his arms through the fence as he yelled, and on at least one occasion he pointed as well. HUERTA stated, "Your boss" [believed to be referring to President Trump] wants things "made in America". HUERTA went on and said that the things were manufactured inside of Ambiance. HUERTA appeared to be aggressive and angry by his voice, demeanor, and facial features. At some point HUERTA walked up to the gate and asked either about the purpose or legit impact of agents' duties. SSA Ribner asked HUERTA the purpose of what he was doing [regarding being belligerent with law enforcement]. HUERTA made a comment that he lived in the community and /or cared about the community. SSA Ribner advised HUERTA that "we" [agents] also live in the community. SSA Ribner made the comment to HUERTA in the hopes of obtaining HUERTA's compliance by advising HUERTA that law enforcement agents are just like him and care about the community and are also part of the demographic of the southern California area.

At approximately 11:53 a.m., based on HUERTA's actions, SSA Ribner texted the UCA and requested the UCA to watch HUERTA by indicating "red shirt".

SSA Ribner continued to watch the crowd and noticed people walking around and looking inside and making comments. SSA Ribner then spoke to a few DEA agents and informed them that HUERTA,



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

HOMELAND SECURITY INVESTIGATIONS

REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



STRONG, and LENEHAN would highly likely block or impede law enforcement vehicles, cause damage to USG property, or commit a battery against agents as they attempt to depart. SSA Ribner informed the DEA agents that if anyone in the crowd impedes, blocks, or physically batters an agent that arrests would be made.

Later, a pickup truck pulled into Ambiance partially blocking the driveway. When the truck pulled into the driveway area the vehicle's stereo system was playing music very loudly with lyrics that stated, "Fuck Donald Trump…" repeatedly. The crowd that congregated around the gate began to cheer. The truck was driven by an unknown Hispanic male with sunglasses and a Los Angeles Dodgers hat. Between the crowd's comments and the music, the environment was loud.

Agent's Note: SSA Ribner observed that some people in the crowd appeared to be operating in unison and in an organized manner and may even know each other.

Additionally, SSA Ribner believes that the controlled chaos was done purposely to create a tense environment to implement an atmosphere of intimidation which could cause agents to make mistakes that could ultimately disrupt and impede the law enforcement operation.

At approximately 12:02 p.m., SSA Ribner spoke to SA Fernandez and provided him an update on the crowd and the high potential for an arrest due to an incident.

ERO SDDO [redacted] [redacted] approached SSA Ribner to discuss a plan to safely escort an ERO USG vehicle into the facility. SSA Ribner provided the same information to SDDO [redacted] as he did to the DEA agents regarding subjects potentially impeding/blocking agents and USG vehicles. SDDO [redacted] asked if there was another entrance/exit to the facility; SSA Ribner related that he did not have knowledge of a secondary entrance/exit. SSA Ribner related that agents would need to go outside of the gate and encircle the sides of the van to make sure it isn't blocked and/or damaged. SDDO [redacted] asked how agents would move the pickup truck [playing loud music] from the driveway. SSA Ribner advised that he would verbally request the driver to move the truck.

Shortly thereafter, another DEA agent approached SSA Ribner with his concerns about the crowd as well. SSA Ribner advised that a USG vehicle (prisoner van) was arriving and that agents would have to escort the USG vehicle from the driveway area to inside of the fence line. SSA Ribner advised that we need to get enough agents to surround the vehicle to stop or thwart blocking attempts from the crowd. The DEA agent related that there were additional FBI agents inside the business. SSA Ribner utilized the radio to request additional agents to respond to the front.

SSA Ribner approached the gate again and due to the noise SSA Ribner waved for the unknown male (driver of truck) to come closer to SSA Ribner so he could speak with him. The unknown male came forward to the gate and SSA Ribner requested the male to move his truck due to the pending arrival of a USG law enforcement vehicle. Shortly after that, SSA Ribner informed HUERTA that a

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Conspiring to Impede Federal Agents - Ambiance 15th Street | [redacted]004 | 6/19/2025 |



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

HOMELAND SECURITY INVESTIGATIONS

REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



USG vehicle would be arriving shortly. SSA Ribner went on and informed HUERTA again not to block or impede the USG vehicle. HUERTA said that the truck isn't owned by him, referring to the pickup truck that was partially blocking the driveway. SSA Ribner told HUERTA that he was not referring to the truck, but rather HUERTA himself shouldn't block or impede the USG vehicle that would be arriving. HUERTA loudly repeated, "it's a public sidewalk". The unknown male complied and moved his truck from the driveway.

SSA Ribner and SDDO C[redacted] waited at the front gate until the USG vehicle was observed arriving on the scene. The USG law enforcement vehicle pulled into the driveway with its emergency lights activated and the driver used the sirens intermittently to alert the crowd to the presence of the vehicle. A large crowd gathered near the gate and vehicle. The USG vehicle pulled into the driveway while SDDO C[redacted] was to the right of SSA Ribner at the gate; a few agents were present in or around the gate as well. SSA Ribner observed HUERTA blocking and impeding the USG law enforcement vehicle by standing in the front of the vehicle by the driver's side near the driver's side headlight and driver's side bumper. The ERO officer operating the vehicle stopped and wouldn't drive forward.

SDDO C[redacted] exited the gate area and walked toward HUERTA, SSA Ribner followed behind SDDO C[redacted] acting as his cover agent for officer/agent safety purposes. SDDO C[redacted] confronted HUERTA and placed his hands on HUERTA's chest area and pushed HUERTA out of the pathway of the USG vehicle. HUERTA then placed his hands on SDDO Cr[redacted] and pushed him back. At that time SSA Ribner attempted to grab HUERTA as he was falling backwards. SSA Ribner attempted to place HUERTA under arrest for impeding the vehicle and battery to a federal officer. HUERTA fell on the ground as SSA Ribner again attempted to grab his arm to place him in custody. SSA Ribner verbally informed HUERTA he was "under arrest" a few times. HUERTA made comments to SSA Ribner that he was not under arrest. HUERTA's body shifted to the side as SSA Ribner started issuing verbal commands informing HUERTA to "stop resisting".

SSA Ribner informed HUERTA to "stop resisting" multiple times. HUERTA continued to resist arrest as SSA Ribner noticed that a crowd of people were surrounding him and yelling. SSA Ribner took a quick glance and noticed that he was the only law enforcement agent attempting to arrest HUERTA. SSA Ribner feared being physically attacked by the angry crowd from behind or that the crowd would interfere and attempt to release HUERTA from SSA Ribner's custody. SSA Ribner than placed his hands and at least one leg HUERTA's back to physically "pin" HUERTA from moving; SSA Ribner then removed his leg and used his arms to hold HUERTA. SSA Ribner then looked up and began yelling to other agents for assistance. SSA Ribner was concerned for his safety as the crowd was partially encircling him and yelling. Shortly thereafter SDDO C[redacted] placed his body on the back of HUERTA. SDDO C[redacted] used his body weight to physically pin HUERTA to the ground. HUERTA's arms

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Conspiring to Impede Federal Agents - Ambiance 15th Street | [redacted]004 | 6/19/2025 |



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

were placed in the front of his body as he laid faced down. HUERTA had tensed his arm muscles to attempt not to be arrested. SSA Ribner attempted to physically pull HUERTA's left arm from underneath him to place handcuffs on him and effect the arrest.

SSA Ribner continued to talk to HUERTA telling him not to resist. HUERTA displayed incredible strength and continued to physically resist by not allowing his arms to be brought to the rear of his back. SSA Ribner could not pry his arms from the front of his body. SSA Ribner then asked SDDO Cr[redacted] if he could physically remove HUERTA's arm (right side) so that agents could arrest HUERTA. SDDO C[redacted] informed SSA Ribner that HUERTA's arms were "locked" in the front of him and that he could not remove his arms either. SSA Ribner decided to deploy a chemical agent (pepper spray) on HUERTA due to HUERTA actively resisting arrest, the angered crowd, and HUERTA's safety as his head was near a cement curb and SSA Ribner didn't want him suffering an injury. Due to the concern of over spraying the chemical agent with others nearby (SDDO C[redacted] and the crowd) or spraying HUERTA directly in the eyes, SSA Ribner decided to spray a small amount of the chemical agent in his hand and place his hand near the upper nose area of HUERTA's face. HUERTA began to make noises and say that he couldn't breathe. SSA Ribner continued to talk to HUERTA and stated, "I want to help you" as SSA Ribner requested HUERTA to loosen his muscles and give SSA Ribner his arm. HUERTA continued to tighten his muscles; HUERTA then stated, "my shoulder… I have a bad shoulder". SSA Ribner again told HUERTA that he could "help" him and requested HUERTA to provide SSA Ribner his arm and allow agents to arrest him. HUERTA then provided his arms, still partially tensed, to agents. Both SDDO C[redacted] and SSA Ribner were able to handcuff HUERTA; other agents/officers assisted with lifting HUERTA onto his feet. A few other agents walked HUERTA into the gated parking lot toward a car. HUERTA was escorted into the Ambiance building and taken into the breakroom.

SSA Ribner told HUERTA he was going to place his handcuffs to the front of him so that it would be easier to render aid to HUERTA. SSA Ribner informed HUERA "don't do anything" telling him not to start fighting. HUERTA stated, "you got me" and that he wouldn't physically resist. HUERTA said that it was hard for him to breathe. SSA Ribner observed that HUERTA's eyes were watery, and his face was blush. SSA Ribner told HUERTA to relax and breathe and informed him that he would help him to decontaminate. HUERTA requested the help, and SSA Ribner provided several cups of water to help flush the chemical agent from HUERTA's face and eye area. SSA Ribner continued to speak to HUERTA so that he would continue breathe and relax. SSA Ribner asked HUERTA why he refused to listen to SSA Ribner's warnings (not to impede or obstruct). HUERTA stated, "I like to help people". Shortly thereafter a DEA agent stated to HUERTA, "was it worth it". HUERTA responded, "Yeah, and I would do it again".

Agent's Note: During the arrest encounter SSA Ribner never personally observed HUERTA strike his head on the ground. Additionally, when SSA Ribner was decontaminating HUERTA, he placed his hands on the back of HUERTA's head to help move his head back to place water in his eyes and



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

face area. SSA Ribner never felt any bumps or cuts on the back of HUERTA's head. Additionally, SSA Ribner didn't observe any physical bumps or cuts on HUERTA's head.

SSA Ribner brought HUERTA over to the faucet and allowed him to use continuous water to decontaminate himself. SSA Ribner then asked HUERTA what his occupation was; HUERTA responded that he was a "union organizer".

Agent's Note: Although earlier that day HUERTA told SSA Ribner that his name was "David Huerta", SSA Ribner did not have any knowledge as to the employment/occupation or background history of HUERTA. SSA Ribner only learned of HUERTA's background history later that day.

At approximately 12:15 p.m., SSA David Stone called 911 and requested the Los Angeles Fire Department (LAFD) to respond to attend to HUERTA regarding the decontamination.

At approximately 12:30 p.m., LAFD Vaca, Flores, Beaty, and Torres responded and rendered aid to HUERTA regarding the pepper spray aftereffects. HUERTA requested that the LAFD transport him to the hospital.

At approximately 12:20 p.m. - 12:40 p.m., HUERTA asked SSA Ribner if he could call his attorney. SSA Ribner advised that he could call later. HUERTA advised that without his phone he wouldn't have any telephone numbers. Later, SSA Ribner allowed him to use his phone to call his attorney. Later, SSA Ribner informed SA Joe McKenzie to take HUERTA's phone as he may need to get another number from his phone.

Agent's Note: During the arrest encounter SSA Ribner was being informed by SSA Stone that an exfiltration plan was in place due to an angry crowd outside. SSA Ribner was being asked to depart the premises in a caravan of agents for agent safety and to reduce any destruction to property. SSA Ribner related that he couldn't depart until HUERTA would be transported from Ambiance to the hospital. SSA Ribner and SA Joe McKenzie were being asked repeatedly to expedite so that agents could leave the scene.

At approximately 12:40 p.m., SSA Ribner contacted the United States Attorney's Office (USAO) duty telephone number to report the incident and probable cause arrest to an Assistant United States Attorney (AUSA). The duty AUSA advised that he would have to call SSA Ribner back later.

At approximately 12:47 p.m., SSA Ribner notified (A)ASAC Alfredo Rossi that he deployed pepper spray during a criminal arrest.

At approximately 1:05 p.m., SSA Ribner returned the call to the USAO. SSA Ribner provided additional information regarding the arrest.



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

## REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



At approximately 1:30 p.m., SSA Ribner departed Ambiance with the caravan of agents. SA Joe Mckenzie assisted with the medical transport of HUERTA to Los Angeles General Medical Center. SA McKenzie escorted HUERTA as he sat in rear of the ambulance. Upon departure from the secondary gate, SSA Ribner encountered subjects in the street that ran toward SSA Ribner's USG vehicle. One subject physically hit the side mirror on the USG vehicle.

Later, SSA Ribner was contacted by SA Murphy who was inside of HUERTA's hospital room. SA Murphy feigned concern because the City of Los Angeles's Mayor Karen Bass came to visit HUERTA. SSA Ribner instructed SA Murphy to request her to leave. SSA Ribner notified (A)ASAC Alfredo Rossi who also provided the instructions to request Mayor Bass to leave; SA Murphy asked Mayor Bass to exit the room, and she did so. SSA Ribner was later contacted by SA Murphy who advised that HUERTA's attorney took HUERTA's phone. SSA Ribner spoke to Attorney Monica Guizar and advised that HUERTA's phone was being seized pursuant to an investigation and search warrant. Guizar related that she wouldn't return the phone without a search warrant. SSA Ribner contacted the USAO and informed them of what Attorney Guizar said.

At approximately 9:36 p.m., SSA Ribner obtained a federal search warrant signed by Judge Jacqueline Chooljian for David HUERTA's (HUERTA) Apple iPhone 14, telephone number: (213) 590-4284, model number: MQ8W3LL/A, serial number: L2QL5Y605L, IMEI number: 358540305824040 (Target Phone).

At approximately 10:30 p.m., SA Collin Murphy and (A)ASAC) Alfredo Rossi served the federal search warrant on Monica Guizar. SA Murphy and (A)ASAC Rossi seized HUERTA's phone for forensic review.

THE INVESTIGATION CONTINUES.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Conspiring to Impede Federal Agents - Ambiance 15th Street | [redacted]004 | 6/19/2025 |



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.